**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ALEXANDER GALLO,** | |
| Plaintiff, | |
| v. | Case No. 1:21-cv-03298 (TNM) |
| **DISTRICT OF COLUMBIA**, | |
| Defendant. | |

<u>**MEMORANDUM OPINION**</u>

A century ago, Congress limited D.C. landlords' rights to evict tenants due to the exigencies of World War I.  *Block v. Hirsh*, 256 U.S. 135 (1921).  The Supreme Court upheld those restrictions, noting that temporary restrictions on property rights during times of emergency "may justify a law that could not be upheld as a permanent change."  *Id.* at 157.

Today, Alexander Gallo raises claims much like those advanced by the landlord in *Hirsh*. He sues the District of Columbia alleging that the District's emergency tenancy laws enacted during the COVID-19 pandemic violated several constitutional provisions.  The District temporarily banned landlords from filing eviction and debt collection actions.  Gallo claims a tenant has occupied one of his properties for two years without paying rent and that he has been unable to evict the tenant because of the District's laws.  The District moves to dismiss.  Because Gallo lacks standing for one claim and fails to state a claim as to others, the Court will grant the District's motion.

**I.**

Gallo owns several condominium units in the District.  Compl. ¶ 2, ECF No. 1-1.  He alleges a tenant has been living in one of these units for nearly two years without paying rent.

*See id.*  Gallo wants to evict the tenant but contends he cannot because of the District's COVID-19 tenancy laws that prohibited filing for evictions during the pandemic.  Before these measures, Gallo could have started an eviction action in D.C. Superior Court under D.C. Code § 16-1501, subject to the conditions set forth in D.C. Code § 42-3505.01.  *See Pernell v. Southall Realty*, 416 U.S. 363, 365 (1974); *Suggs v. Lakritz Alder Mgmt., LLC*, 933 A.2d 795, 797–98 (D.C. 2007).

The District's rules about evictions temporarily changed with the onset of the COVID-19 pandemic.  In March 2020, Mayor Muriel Bowser declared a public health emergency.  *See* Gov't of the Dist. of Columbia, *Declaration of Public Health Emergency: Coronavirus (COVID-19)* (Mar. 11, 2020), https://bit.ly/337cO2c.  Mayor Bowser extended her order until July 2021.[1] Gov't of the Dist. of Columbia, *End of Public Health Emergency and Extension of Public Emergency* (July 24, 2021), https://bit.ly/3zZM8fL.

Mayor Bowser's declaration of an emergency coincided with the D.C. Council enacting several restrictions on evictions.  Days after the Mayor's first declaration, the D.C. Council enacted a moratorium on evictions.  *See* COVID-19 Response Emergency Amendment Act of 2020, D.C. Act 23-247, § 308 (Mar. 17, 2020).  A few months later, the Council expanded the moratorium.  *See* Coronavirus Omnibus Emergency Amendment Act of 2020, D.C. Act 23-317, § 10 (May 13, 2020).  Section 10 of this new act amended D.C. Code § 16-1501 to prohibit the filing of "a complaint seeking relief" during a declared public health emergency "and for 60 days thereafter."  *See id.* (the Filing Moratorium).  Days later, the Council replaced these prior

---

[1]  In response to rising hospitalizations, in January 2022 the Mayor issued a limited public health emergency.  *See* Gov't of the Dist. of Columbia, *Declaration of Limited Public Health Emergency Related to Healthcare Capacity* (Jan. 11, 2022), https://bit.ly/3GxfMf0.  The Mayor extended the emergency until April 16, 2022.  *See* Gov't of the Dist. of Columbia, *Extension of Public Emergency for COVID-19* (Mar. 17, 2022), https://bit.ly/3wVxtkL.

measures with a consolidated version that reenacted, verbatim, the prior prohibitions on filing a complaint for an eviction.  *See* Coronavirus Support Emergency Amendment Act of 2020, D.C. Act 23-326, §§ 404, 1201 (May 27, 2020).

Around the same time, the Council passed emergency legislation that prohibited a creditor or debt collector from filing or threatening to file a lawsuit for the collection of a debt during the Public Health Emergency and for 60 days after.  *See* COVID-19 Response Supplemental Emergency Amendment Act of 2020, D.C. Act 23-286, § 207 (Apr. 10, 2020). The Council later passed temporary legislation enacting this prohibition into law beyond the period of emergency legislation (the Debt Collection Moratorium).  *See* Coronavirus Support Temporary Amendment Act of 2021, D.C. Act 24-62, § 303 (May 3, 2021); Protecting Consumers from Unjust Debt Collection Practices Temporary Amendment Act of 2021, D.C. Act 24-165, § 2 (Sept. 1, 2021) (codified as amended at D.C. Code § 28-3814(bb)(1)).

Together with these restrictions on evictions and debt collection, the District created programs to assist property owners facing financial strain from unpaid rent.  In April 2021, Mayor Bowser launched the Stronger Together by Assisting You (STAY DC) program.  *See* Press Release, Exec. Off. of the Mayor, *Mayor Bowser Announces $350 Million Rent and Utility Assistance Program for DC Residents*, Gov't of the Dist. of Columbia (April 12, 2021), https://bit.ly/3gLibqH.  This program allowed certain tenants and housing providers to apply for assistance to cover unpaid rental and utility payments that had accrued during the pandemic.  *See id.*

A month later, the Council enacted the Coronavirus Support Temporary Amendment Act of 2021 (the Payment Plan Program, or PPP).  D.C. Act 24-62, § 402 (May 3, 2021) (codified at D.C. Code § 42-3192.01).  Among other things, this Act requires that during the Public Health

Emergency and for one year afterwards, housing providers must offer rent payment plans to tenants who notify providers of their inability to pay all or part of their rent as a result of the Emergency.  If a tenant "does not default on the terms of the payment plan," a provider is "prohibited from filing any collection lawsuit or eviction for non-payment of rent."  D.C. Code § 42-3192.01(g).

When it became clear the Public Health Emergency would expire in July 2021, the Council passed the Public Emergency Extension and Eviction and Utility Moratorium Phasing Emergency Amendment Act of 2021 (the Phasing Act).  D.C. Act 24-125 (Jul. 24, 2021) (codified at D.C. Code § 42-3505.01 *et seq.*).  This Act permitted property owners to resume filing eviction cases for nonpayment of rent in October 2021, provided these owners meet certain conditions.  This included a requirement that the property owner had applied for relief through the STAY DC program.  D.C. Code §§ 16-1501(c)(1), 42-3505.01(b-1)(2).

Gallo challenges these laws and programs on several grounds.  First, he argues the PPP violates the Constitution's Contracts Clause.  *See* Compl. ¶ 12(iii).  Next, Gallo argues the Filing Moratorium and Debt Collection Moratorium violate his constitutional right of access to courts and his rights under the Constitution's Contract Clause, Takings Clause, and Petition Clause.  *See id.* at 2, ¶¶ 5, 12.[2]  Finally, Gallo contends that judicial estoppel precludes dismissal of his claims.  *See* Pl.'s Opp'n at 4–5, ECF No. 8.  The District moved to dismiss, and Gallo opposes that motion.  The motions are now ripe.

## II.

To survive a motion to dismiss under Rule 12(b)(1), Gallo bears the burden of proving that the Court has subject matter jurisdiction to hear his claims.  *See Arpaio v. Obama*, 797 F.3d

---

[2]  All page numbers refer to the pagination generated by the Court's CM/ECF filing system.

11, 19 (D.C. Cir. 2015).  In evaluating a motion to dismiss under Rule 12(b)(1), the Court must "treat the complaint's factual allegations as true . . . and must grant plaintiff[s] the benefit of all inferences that can be derived from the facts alleged." *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (cleaned up).

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Hurd v. Dist. of Colum.*, 864 F.3d 671, 678 (D.C. Cir. 2017) (cleaned up).  A plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Courts accept  complaints' factual allegations as true and grant plaintiffs "all inferences that can be derived from the facts alleged." *L. Xia v. Tillerson*, 865 F.3d 643, 649 (D.C. Cir. 2017) (cleaned up).

The Court need not, however, credit "a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (cleaned up).  The Court considers "only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint[,] and matters of which [it] may take judicial notice." *Hurd*, 864 F.3d at 678 (cleaned up).

Gallo proceeds without counsel.  This triggers special solicitude for him.  "A document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (cleaned up).  More, courts assess a *pro se* complaint "in light of all filings, including filings responsive to a motion to dismiss." *Brown v. Whole Foods Mkt. Grp., Inc.*, 789 F.3d 146, 152 (D.C. Cir. 2015) (cleaned up).  But *pro se* plaintiffs must still adequately plead their complaint consistent with the edicts of *Iqbal* and *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007).  *See Atherton v. D.C. Off. of Mayor*, 567 F.3d 672, 681–82 (D.C. Cir. 2009).

5

### III.

### A.

*First*, consider Gallo's claim that the PPP violates the Constitution's Contracts Clause. *See* Compl. ¶ 12(iii).  The District responds that Gallo fails to properly allege standing for this claim.  *See* Def.'s Mot. to Dismiss at 20–21 (Def.'s Mem.), ECF No. 6-1.  To show standing, Gallo must allege:  (1) that he has suffered an injury in fact that is both concrete and particularized and actual or imminent; (2) that the injury is fairly traceable to the District's actions; and (3) that a favorable decision is likely to redress the identified harm.  *See Sabre, Inc. v. DOT*, 429 F.3d 1113, 1117 (D.C. Cir. 2005).

Gallo shows no injury tied to the PPP.  In the sole section of his Complaint where he discusses the PPP, *see* Compl. ¶ 12(iii), he does not ask for nominal damages, unlike many other sections of his Complaint, *see, e.g.*, *Id.* ¶¶ 12(i)–(ii), 12(iv).  Elsewhere, he asks for compensation in the amount of $36,400 for property taken by the District, *see id.* ¶ 12(vi); $10,000 in legal fees stemming from a related case, *see id.* ¶ 12(vii); $50,000 in compensatory damages for mental anguish, *see id.* ¶ 12(viii); and $37,500 in lost time and diversion of resources, *see id.* ¶ 12(ix).

But he ties none of these damages to his PPP claim.  Nor is it clear how he could.  The PPP is a remedy for the District's laws restricting evictions.  The Court can conceive of no way to tie his monetary losses to a *remedy*.  Gallo thus not only fails to allege injury, he also fails to show traceability and redressability.  This is fatal to his PPP claim.

### B.

*Second*, consider Gallo's claims about the Filing Moratorium and the Debt Collection Moratorium.  *See* Compl. at 2.  Gallo contends these two laws violate his right of access to courts

and one or more of the Contract Clause, the Takings Clause, and the Petition Clause.[3]  *Id.* ¶ 12. The Court takes each of these rights in turn.

**1.**

Consider first Gallo's right of access to the courts.  *See* Compl. ¶ 12(i).  The Supreme Court has recognized a right of access to courts arising from various constitutional provisions. *See Christopher v. Harbury*, 536 U.S. 403, 415 n.12 (2002) (invoking the Article IV Privileges and Immunities Clause, the First Amendment Petition Clause, the Fifth Amendment Due Process Clause, and the Fourteenth Amendment's Equal Protection and Due Process Clauses).  Although Gallo does not specify which District law allegedly violates his right of access to the courts, *see* Compl. at 2, ¶ 12(i), the Court broadly construes his Complaint as challenging both the Filing and the Debt Collection Moratoria.

Start with the Filing Moratorium.  While Gallo's claim is far from trivial, it is too late. He already argued and lost this claim in the D.C. Court of Appeals.  Thus, the doctrine of claim preclusion bars him from bringing that same claim here.

"The general principle of claim preclusion is that a final, valid judgment on the merits precludes any further litigation between the same parties on the same cause of action."  *Stanton v. D.C. Ct. of Appeals*, 127 F.3d 72, 78 (D.C. Cir. 1997).  "The District of Columbia, like the majority of jurisdictions, has adopted the Second Restatement's 'transactional' approach under

---

[3]  Gallo also references the Fifth Amendment's Due Process Clause.  *See* Compl. at 2.  But he makes no argument about the Due Process Clause and references it only in one instance when discussing his takings claim.  *See id.* ¶ 12(v).  Gallo thus presents no separate argument under the Due Process Clause that the Court does not consider in its Takings Clause analysis.  *See infra* III.B.3.  And if Gallo is arguing that "suspension of [a] cause of action" constitutes a taking *separate from* the taking of his property, *see* Compl. ¶ 12(v), the Court addresses this when evaluating Gallo's claim that the District abridged his right of access to the courts.  *See infra* Section III.B.1.

which a 'cause of action,' for purposes of claim preclusion, comprises all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose." *Id.* at 78 (cleaned up).  A "cause of action is determined by the factual nucleus." *Sheptock v. Fenty*, 707 F.3d 326, 330 (D.C. Cir. 2013) (cleaned up).  Thus, "[a] court looks at 'whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations.'" *Casares v. Wells Fargo Bank, N.A.*, 268 F. Supp. 3d 248, 254 (D.D.C. 2017) (quoting Restatement (Second) of Judgments § 24(2) (1982)).

Gallo's litigation in D.C. courts began when he filed an eviction action in D.C. Superior Court in May 2020.  *See Gallo Holdings LLC – Series 2 vs. Hopkins*, 2020 LTB 008032 (D.C. Super. Ct. May 5, 2020).  Soon after, the presiding judge of the Superior Court's Civil Division issued an order directing all plaintiffs who filed an eviction action after March 11, 2020, to show cause why their cases should not be dismissed because of the Filing Moratorium.  *See* Judge Laura A. Cordero, *General Order Concerning Landlord and Tenant Cases Filed on or After March 11, 2020* (July 28, 2020), https://bit.ly/38MBuQy.   The Order appointed the Honorable Anthony Epstein "to adjudicate all questions of law common to any eviction cases filed on or after March 11, 2020 in the Landlord and Tenant Branch." *Id.*

Judge Epstein issued a thoughtful opinion declaring the Filing Moratorium unconstitutional because it denied landlords access to the courts.[4]  *See Gallo Holdings*, 2020 LTB 008032, Order (D.C. Super. Ct. Dec. 16, 2020).  The District, having previously intervened, appealed the ruling to the District of Columbia Court of Appeals (DCCA).  *See id.*, Notice of

---

[4]  Judge Epstein declined to consider any other constitutional issues, including potential violations of the Contracts Clause and whether the Filing Moratorium constitutes a taking.  *See Gallo Holdings*, 2020 LTB 008032, Order at 39.

Appeal (D.C. Super. Ct. Jan. 14, 2021).  The DCCA consolidated four similar appeals into *District of Columbia v. Towers*, 260 A.3d 690 (D.C. 2021).  *See id.*; *see also* D.C. Ct. App., *Case Information: 21-cv-0037* (listing both Alexander Gallo and Gallo Holdings, LLC Series 2, as appellants in a case consolidated with 21-cv-0034).  Gallo filed motions in *Towers*, *see, e.g.*, *id., Brief (Appellee Gallo)* (July 2, 2021), and presented oral argument before the DCCA, *see* Def.'s Mot. at 17 n.10; Pl.'s Opp'n at 2.

*Towers* overruled *Gallo Holdings*.  *See* 260 A.3d at 696.  The *Towers* court determined that "the right of access to the courts [is] not implicated when the underlying claim [does] not involve a fundamental interest."  *Id.* at 694.  Because the Filing Moratorium was only temporary, the court found that it "involves no abrogation of contracts or deprivation of the ability to file for eviction."  *Id.* at 695.  The court thus concluded that "we do not find a fundamental constitutional right to evictions on a particular timetable to support appellees' claim their right of access to the courts is violated by the District's filing moratorium."  *Id.* at 696 (cleaned up).

Gallo's claim in *Towers* arose from the same "factual nucleus" as his present claim.  *Sheptock*, 707 F.3d at 330.  The very same eviction is at issue in both cases, *see* Compl. ¶¶ 7–11, so the facts are related in time, space, origin, and motivation, *see Sheptock*, 707 F.3d at 330.  Thus, the Court treats the eviction before the Superior Court and the DCCA and the eviction before this Court as the same "unit."  *Id.*  And because the Court must "give the same preclusive effect to a state-court judgment as another court of that State would give," *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 293 (2005), to the extent Gallo challenges the Filing Moratorium, the Court finds his access to courts claim precluded.

Consider next the Debt Collection Moratorium.  The District argued that:  (1) Gallo's claim does not implicate the right of access to courts because the D.C. Council can lawfully

abridge causes of action and merely imposed delays; (2) Gallo's claim does not implicate the right of access because filing a debt collection action was not and is not Gallo's sole means of redress; and (3) even if the Debt Collection Moratorium implicated the right of access to the courts, it would survive rational basis review.  *See* Def.'s Mem. at 24–29.  Because Gallo fails to respond to these arguments in his opposition, the Court treats them as conceded.  *See Wannall v. Honeywell, Inc.*, 775 F.3d 425, 428 (D.C. Cir. 2014).  Gallo's claim that the Debt Collection Moratorium violates his right of access to the courts thus fails.[5]

**2.**

Consider next Gallo's Contract Clause claim.  Gallo alleges that both the Filing Moratorium and the PPP violated his rights under the Contract Clause.  *See* Compl. ¶¶ 12(ii)–(iii).  The Court considers Gallo's argument only about the Filing Moratorium because he lacks standing for his PPP claim.  *See supra* Section III.A.

The Contracts Clause provides that "[n]o state shall . . . pass any . . . Law impairing the Obligation of Contracts."  U.S. Const., Art. I, § 10, cl. 1.  The Clause "applies to any kind of contract" but "not all laws affecting pre-existing contracts violate the Clause."  *Sveen v. Melin*, 138 S. Ct. 1815, 1821 (2018).  Courts use a two-step test to determine whether a law implicates the Contracts Clause.  First, courts look to "whether the state law has operated as a substantial impairment of a contractual relationship."  *Id.* at 1821–22 (2018) (cleaned up).  If a substantial impairment exists, then courts examine "whether the state law is drawn in an appropriate and reasonable way to advance a significant and legitimate public purpose."  *Id.* at 1822 (cleaned up).

---

[5]  The District made these same three arguments with respect to the Filing Moratorium.  *See* Def.'s Mem. at 24–29.  Because Gallo did not respond to those arguments with respect to the Filing Moratorium either, *see* Pl.'s Opp'n at 2 (discussing the access to the courts claim but failing to respond to the District's arguments), these are alternate bases for ruling against Gallo's claim about the Filing Moratorium.

The Filing Moratorium does not substantially impair Gallo's contractual relationship with his tenant.  To determine whether a substantial impairment exists, the Court must look at the "extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights."  *Id.*  When engaging in this analysis, the Court bears in mind *Home Building & Loan Association v. Blaisdell*, 290 U.S. 398 (1934), and the Supreme Court's subsequent Contracts Clause jurisprudence.  In *Blaisdell*, the Court "upheld Minnesota's statutory moratorium against home foreclosures, in part, because the legislation was addressed to the legitimate end of protecting a basic interest of society."  *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 503 (1987) (cleaned up).

Since *Blaisdell*, "courts have often upheld statutes which cut off or modified private contracts where it appeared that the legislation sought to attain social purposes of greater importance than predictability and reliance."  *Leedom v. Int'l Bhd. of Elec. Workers*, 278 F.2d 237, 240 (D.C. Cir. 1960); *see also Matsuda v. Honolulu*, 512 F.3d 1148, 1152 (9th Cir. 2008) (noting that, after *Blaisdell*, "the Supreme Court has construed [the Contracts Clause] prohibition narrowly in order to ensure that local governments retain the flexibility to exercise their police powers effectively"); *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 240 (1978) ("[T]he [state's] police power[] is an exercise of the sovereign right of the Government to protect the lives, health, morals, comfort and general welfare of the people, and is paramount to any rights under contracts between individuals.") (cleaned up).

With this binding teaching in mind, the Court finds that the Filing Moratorium imposes an acceptable burden on Gallo's "contractual bargain."  *Sveen*, 138 S. Ct. at 1822.  The Supreme Court has recognized the national importance of controlling the pandemic.  *See Roman Cath.*

11

*Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) ("Stemming the spread of COVID–19 is unquestionably a compelling interest[.]"); *see also Roman Cath. Archbishop of Wash. v. Bowser*, 531 F. Supp. 3d 22, 37–38 (D.D.C. 2021) (same for D.C. government).  The Moratorium thus aims to achieve an important social interest.  Its effects are temporary, and rent continues to accrue while the Moratorium is in effect.  Gallo's remedies for contractual breaches are not eliminated but merely delayed because of a national emergency.  *See Blaisdell*, 290 U.S. at 431 ("The obligations of a contract are impaired by a law which renders them invalid, or releases or extinguishes them.").

Indeed, other district courts considering various state and local eviction moratoria have come to the same conclusion.  *See, e.g.*, *Elmsford Apt. Assocs., LLC v. Cuomo*, 469 F. Supp. 3d 148, 172 (S.D.N.Y. 2020) (finding that the New York eviction moratorium did not substantially impair contractual rights because it did not "eliminate" remedies but "merely postpone[d] the date on which landlords may commence summary proceedings against their tenants"); *Auracle Homes, LLC v. Lamont*, 478 F. Supp. 3d 199, 244 (D. Conn. 2020) (same, for Connecticut's state moratorium); *HAPCO v. City of Philadelphia*, 482 F. Supp. 3d 337, 352 (E.D. Pa. 2020) (same, for Philadelphia's city moratorium).

This temporal limitation on D.C.'s moratorium distinguishes Gallo's case from *Heights Apartments, LLC v. Walz*, 30 F.4th 720 (8th Cir. 2022) (*Walz I*)—a supplemental authority he submitted.  *See* Pl.'s Notice of Supp. Authority, ECF No. 13.  *Walz I* found the Minnesota governor's executive order mandating a statewide eviction moratorium violated the Contracts Clause, but it relied heavily on the fact that the executive order had no end date.  *See Walz I*, 30 F.4th at 724, 729–32.  For example, the *Walz I* court noted that although landlords in Minnesota operated in a heavily regulated businesses, none of the preexisting regulations "provided

reasonable notice that landlords' right to exclude would be severely curtailed *for an indefinite duration.*"  *Id.* at 729 (emphasis added).  The court also distinguished the executive order from *Blaisdell* because the "the legislation in *Blaisdell* had an explicit end date."  *Id.* at 730.  The court acknowledged that "the Supreme Court has upheld emergency legislative acts that suspend 'all possessory remedies' for removing tenants or occupants in possession against Contract Clause challenges," but it highlighted that "those laws were unlike the [executive order] because they had . . . specified end dates."  *Id.*

More, Gallo cannot claim that the Filing Moratorium interferes with his "reasonable expectations."  *Sveen*, 138 S. Ct. at 1822.  For over a century, landlords in the District have had fair warning that legislation enacted because of emergencies can impact landlord rights.  In *Hirsh*, the Supreme Court considered federal legislation that required a landlord in the District to give a tenant 30 days' notice of intent to repossess the property.  *Hirsh*, 256 U.S. at 154.  The landlord, Hirsh, argued the law was an unconstitutional taking.  The Court disagreed.  It noted the legislation came about because of "emergencies growing out of the war" and would expire in two years.  *Id.*  The Court reasoned that in times of emergencies, the government could pass ordinarily impermissible laws.  Because "[h]ousing is a necessary of life" and "[a]ll the elements of a public interest justifying some degree of public control are present," the Court found for the tenant.  *Id.* at 156.

And even when no emergency exists, the District has regulated landlord-tenant relationships through other means.  For example, rent control laws have existed in the District since 1974.  *See Suggs v. Lakritz Adler Mgmt., LLC*, 933 A.2d 795, 797 (D.C. 2007).  Even though Gallo could not have foreseen the pandemic, he cannot reasonably claim surprise at the District's response.

Gallo cites several cases in his opposition that he says counsel otherwise.  But for each, he cites selectively, and a complete examination of the cases does not support his position:

- Gallo cites *Oshkosh Waterworks Co. v Oshkosk*, 187 U.S. 437, 440 (1903), for the proposition that a legislature may not "materially delay or embarrass the enforcement of rights" under a contract.  Pl.'s Opp'n at 3.  But immediately following the text Gallo cites, the Court said:  "[I]t is equally well settled that the legislature may modify or change existing remedies, or prescribe new modes of procedure, without impairing the obligation of contracts, provided a substantial or efficacious remedy remains or is given, by means of which a party can enforce his rights under the contract."  *Oshkosh Waterworks*, 187 U.S. at 439.  Because the District provided programs to assist landlords, this case supports the District, not Gallo.

- Gallo cites *Louisiana v. New Orleans*, 102 U.S. 203, 207 (1880), for the proposition that "[a]ny authorization of the postponement of payment . . . is in conflict with the constitutional inhibition."  Pl.'s Opp'n at 3.  But despite that pronouncement, the Supreme Court upheld a law requiring registration of judgments before the city of New Orleans would pay them.  *See Louisiana*, 102 U.S. at 207.  And in any event, this case does not control given more recent, relevant precedent about a legislature's ability to modify private contracts to "protect[] a basic interest of society."  *Keystone Bituminous Coal Ass'n*, 480 U.S. at 503 (cleaned up) (describing the effect of *Blaisdell* jurisprudence).  For the same reason, Gallo's reference to a nineteenth century case involving mortgage contracts, *Barnitz v. Beverly*, 163 U.S. 118 (1896), is unavailing.  *See* Pl.'s Opp'n at 3.

- Gallo cites *Melendez v. New York City*, 16 F.4th 992 (2d Cir. 2021), claiming it "found that a challenge to a COVID moratorium under the Contracts clause sufficiently states a claim."  Pl's Opp'n at 3.  True.  But the Second Circuit relied heavily on the fact that the law under review *permanently* impaired a landlord's contractual rights.  *See Melendez*, 16 F.4th at 1033.  The Filing Moratorium is not permanent and does not bar landlords from seeking past-due rent after its expiration.

- Finally, Gallo cites *Apartment Association of L.A. Cty., Inc. v. City of Los Angeles*, 10 F.4th 905 (9th Cir. 2021), which he says "reached the merits" of a Contracts Clause issue and "assum[ed] a 'substantial' impairment."  Pl.'s Opp'n at 3.  But contrary to Gallo's claim, the court held that "there is no apparent basis under modern cases to find the challenged provisions unconstitutional under the Contracts Clause. . . .  [C]ontemporary Supreme Court case law has severely limited the Contracts Clause's potency."  *Apartments Ass'n*, 10 F.4th at 909.  This case supports the District, not Gallo.

Because the Filing Moratorium does not substantially impair Gallo's rights under the Contracts Clause, the Court need not consider whether it is narrowly drawn.  Gallo's Contracts Clause claim fails.

### 3.

Now consider Gallo's claim that the District's actions violate the Takings Clause.  *See* Compl. ¶¶ 12(iv)–(vi).  Gallo does not specifically identify which piece of the District's legislation he is challenging.  Because he references the "eviction ban," *see id.* ¶ 12(iv), and because he elsewhere equates the "eviction ban" with the Filing Moratorium, *see* Pl.'s Mot. to

Strike at 2, ECF No. 10, the Court interprets Gallo to argue that the Filing Moratorium violates the Takings Clause.

A taking may be either a physical or regulatory taking. *See Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 321 (2002). Gallo does not specify in his Complaint what type of taking the District purportedly wrought. The District construes his Complaint as alleging a regulatory taking, *see* Def.'s Mem. at 36, but in his opposition, Gallo suggests he is alleging a physical taking—although he does not disclaim a regulatory taking. *See* Pl.'s Opp'n at 3–4. The Court thus analyzes Gallo's claim under both theories.

Start with a physical taking. A physical taking occurs when there is "a direct government appropriation or physical invasion of private property." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005).

Gallo argues that *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063 (2021), controls this analysis. Compl. ¶ 12(iv). In *Cedar Point*, "[a] California regulation grant[ed] labor organizations a 'right to take access' to an agricultural employer's property in order to solicit support for unionization." *Cedar Point*, 141 S. Ct. at 2069. Two growers challenged the regulation, arguing it constituted a per se physical taking under the Fifth and Fourteenth Amendments. *Id.* at 2070. The Court agreed. Noting that "[t]he right to exclude is one of the most treasured rights of property ownership," the Court held that "[w]henever a regulation results in a physical appropriation of property, a *per se* [physical] taking has occurred." *Id.* at 2072 (cleaned up).

But *Cedar Point* is distinguishable. Unlike the growers, Gallo invited the nonpaying tenant onto his property. This changes the analysis, and an older case—*Yee v. City of Escondido*, 503 U.S. 519 (1992)—controls. In *Yee*, owners of mobile home parks challenged a local rent

control ordinance.  *Id.* at 522.   The park owners contended that the interplay of a California

mobile home law and the rent control ordinance "amount[ed] to a physical occupation of their

property."  *Id.*  The park owners argued that the rent control ordinance "transferred a discrete

interest in land—the right to *occupy the land indefinitely* at a submarket rent—from the park

owner to the mobile homeowner.  [The park owners] contend[ed] that what ha[d] been

transferred from park owner to mobile homeowner [was] no less than a right of physical

occupation of the park owner's land."  *Id.* at 527 (emphasis added).

The Court disagreed.  It noted that the park owners "voluntarily rented their land to the

mobile home owners. . . .  Put bluntly no government has required any physical invasion of [the

park owner's] property.  [The park owners] tenants were invited by [the park owners], not forced

upon them by the government."  *Id.* at 528–29.  The park owners countered that the ordinance

"transferr[ed] wealth from park owners to incumbent mobile home owners," so they were

entitled to compensation.  *Id.* at 529.  But the Court noted that land use regulations regularly lead

to such wealth transfers.  "[T]he existence of the transfer in itself does not convert regulation into

physical invasion. . . .  Because [the park owners] voluntarily open[ed] their property to

occupation by others, [the park owners] cannot assert a *per se* right to compensation based on

their inability to exclude particular individuals."  *Id.* at 529–31.

So too here.  The District's laws do not force Gallo to give anyone access to his property

that he did not invite.  So he does not suffer the same infringement on his right to exclude as the

growers in *Cedar Point*.  *See FCC v. Fla. Power Corp.*, 480 U.S. 245, 252 (1987) ("[I]t is the

invitation . . . that makes the difference.").  In coming to this conclusion, the Court joins multiple

courts around the country that have recently considered similar state and local eviction

moratoria.  *See, e.g.*, *Jevons v. Inslee*, 561 F. Supp. 3d 1082, 1105–1108 (E.D. Wash. 2021)

17

(rejecting plaintiffs' argument that *Cedar Point* controlled the analysis and applying *Yee* to find a state eviction moratorium did not constitute a per se physical taking); *S. Cal. Rental Hous. Ass'n v. Cnty. of San Diego*, 550 F. Supp. 3d 853, 864–867 (S.D. Cal. 2021) (same).

Gallo urges the Court to follow the lead of the Eighth Circuit in *Walz I* and apply *Cedar Point* rather than *Yee*. *See* Pl.'s Notice of Supp. Authority. Respectfully, the Court is unconvinced by *Walz I* on this point. *Walz I* characterized the landlords in *Yee* as seeking "to exclude future or incoming tenants *rather than existing tenants*." *Walz I*, 30 F.4th at 733 (emphasis added). The Eighth Circuit said this distinguished the claims of plaintiffs in *Yee* from those in *Walz I* because the *Walz I* plaintiff could not evict *current* tenants. *Id.* ("According to [the *Walz I* plaintiff's complaint], the [executive orders establishing the eviction moratorium] 'turned every lease in Minnesota into an indefinite lease, terminable only at the option of the tenant.'"). But the plaintiffs in *Yee* also alleged they were unable to evict current tenants: "According to the complaint, 'the rent control law has had the effect of . . . granting to the tenants of mobilehomes *presently in The Park,* as well as the successors in interest of such tenants*, the right to physically permanently occupy and use the real property of Plaintiff." *Yee*, 503 U.S. at 525 (cleaned up) (emphasis added). *Walz I*, then, chose to follow *Cedar Point* rather than *Yee* because it misinterpreted the *Yee* plaintiffs' claims. *See also Heights Apartments, LLC v. Walz*, 2022 WL 2167494, at *1 (8th Cir. June 16, 2022) (Colloton, J., dissenting from denial of rehearing en banc) (*Walz II*) (contending that *Yee*, not *Cedar Point*, should have guided the panel's decision and arguing the decision to disregard *Yee* turned on a misunderstanding of the *Yee* plaintiff's claims).[6]

---

[6] To be sure, there is some tension between *Cedar Point* and *Yee*, as portions of *Cedar Point* appear to conflict with *Yee*. *See, e.g.*, *Cedar Point*, 141 S. Ct. at 2071 (stating a physical taking occurs when the government "appropriate[es] private property for itself *or a third party*")

More, neither Gallo nor the *Walz I* court contended with *Hirsh*. *Hirsh* upheld emergency legislation prohibiting evictions for two years in most circumstances. *See Hirsh*, 256 U.S. at 154. *Hirsh* is like *Yee*, which denied the plaintiff-landlords' takings claim even though they could evict tenants only after giving six to twelve months' notice. *See Yee*, 503 U.S. at 527–28. Compare the laws at issue in those cases to the Filing Moratorium, which was always temporary, lasted about 18 months (from May 2020 to October 2021), and has now expired.[7] *See* Def.'s Mem. at 14–15; *see also Walz II*, 2022 WL 2167494 at *1 (Colloton, J., dissenting from denial of rehearing en banc) ("[T]he [*Walz I*] panel decision never addressed why the scheme in *Yee* that allowed a landlord to evict existing tenants only for limited reasons after up to 12 months' notice did not constitute a per se taking, while a temporary eviction moratorium during a pandemic

_____

(emphasis added), *id.* at 2074 ("The regulation appropriates a right to physically invade the growers' property—to literally 'take access,' as the regulation provides. It is therefore a *per se* physical taking under our precedents.") (cleaned up), *id.* at 2077 ("[T]he right to exclude . . . is a fundamental element of the property right that cannot be balanced away.") (cleaned up).

But *Cedar Point* did not explicitly overrule *Yee*—indeed, it cited *Yee* for principles of takings law. *See id.* at 2072; *see also Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of [the Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the [lower court] should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."). More, circuit courts continue to cite *Yee* as good law even after *Cedar Point*. *See, e.g.*, *Ballinger v. City of Oakland*, 24 F.4th 1287, 1292 (9th Cir. 2022); *CDK Glob. LLC v. Brnovich*, 16 F.4th 1266, 1282 (9th Cir. 2021). Thus, because *Yee* is still precedential and is a closer fit to this case than *Cedar Point*, the Court declines Gallo's invitation to jettison *Yee*.

[7] Before the Filing Moratorium, the D.C. Council enacted an Eviction Moratorium. *See* Def.'s Mem. at 12; COVID-19 Response Emergency Amendment Act of 2020, D.C. Act 23-247, § 308 (Mar. 17, 2020). This Act amended D.C. Code §§ 42-3505.01(k)(3), (k-1). But Gallo does not challenge the Eviction Moratorium. *See* Compl. at 2 (listing the code provisions for the Filing Moratorium, the Debt Collection Moratorium, and the PPP, but not the Eviction Moratorium). And even if he did challenge it, at most it would add three months to the period during which he could not evict a tenant, bringing the total to 21 months. This is still less than the two-year eviction moratorium the Supreme Court upheld in *Hirsh*.

ostensibly does.").  The nature and duration of the Filing Moratorium thus make it permissible under governing Supreme Court precedent.

Finally, the Filing Moratorium does not constitute a physical taking because physical takings occur when the owner "can make no nonpossessory use of the property."  *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435–36 (1982)*.*  But that is not the case here because the Filing Moratorium did not stop rent from accruing.  *See also Tahoe-Sierra*, 535 U.S. at 322–23 ("[A] government regulation that merely prohibits landlords from evicting tenants unwilling to pay a higher rent . . . does not constitute a categorical taking."); *Fla. Power Corp.*, 480 U.S. at 252 ("[S]tatutes regulating the economic relations of landlords and tenants are not *per se* takings.").  Thus, the Filing Moratorium does not constitute a physical taking.

Now consider regulatory takings.  In evaluating these takings, the Court relies on the framework from *Penn Central Transportation Company v. New York City*, 438 U.S. 104 (1978).  *See Tahoe-Sierra*, 535 U.S. at 326–27.  *Penn Central*'s inquiry has three parts:  the regulation's economic effect on the claimant, the effect on investment-backed expectations, and the character of the government action.  *Dist. Intown Properties Ltd. P'ship v. Dist. of Colum.*, 198 F.3d 874, 883 (D.C. Cir. 1999).

Start with the Filing Moratorium's economic effect on Gallo.  Under Gallo's estimate of the property's fair use value, the Moratorium has cost him $36,400 through the end of April 2022.  Compl. ¶ 12(vi).  Added to that are $10,000 he claims he spent on legal counsel for his action in Superior Court, $50,000 in compensatory damages for mental anguish, and $37,500 for lost time and diversion of resources.  *Id.* ¶¶ 12(vii)–(ix).

This factor cuts in Gallo's favor.  The District's efforts to aid tenants have no doubt come at the expense of landlords like Gallo.  But he was not without recourse.  The District enacted the

PPP to help landlords like him recover some of their losses.  Yet Gallo did not use it.  If he had

set up a PPP account and if his tenant had still been unable to pay, Gallo would have been free to

file an eviction action despite the Filing Moratorium.  *See* D.C. Code § 42-3192.01(g).  More, the

Filing Moratorium lasted only during the Public Health Emergency and 60 days after.  *See*

Coronavirus Support Emergency Amendment Act of 2020, D.C. Act 23-326, § 404 (May 27,

2020). The Public Health Emergency expired on July 25, 2021.  *See* Gov't of the Dist. of

Columbia, *End of Public Health Emergency and Extension of Public Emergency* (July 24, 2021),

https://bit.ly/3zZM8fL.  In anticipation of the emergency expiring, the Council passed Phasing

Act, which allowed property owners to resume filing eviction cases for nonpayment of rent after

October 2021 if they first applied for emergency assistance.  *See* D.C. Code §§ 16-1501(c)(1);

42-3505.01(b).  But Gallo does not allege he sought assistance or has refiled for eviction.

Gallo must put forth "striking evidence of economic effects to prevail."  *Dist. Intown*,

198 F.3d at 883.  Despite providing evidence that the Filing Moratorium harmed him financially,

his evidence does not meet that high standard.

Now consider the effect on Gallo's investment-backed expectations.  Gallo "cannot

establish a takings claim simply by showing that [he has] been denied the ability to exploit a

property interest" in the particular way he desires.  *Dist. Intown*, 198 F.3d at 879.  Indeed, the

Supreme Court "has consistently affirmed that States have broad power to regulate housing

conditions in general and the landlord-tenant relationship in particular without paying

compensation for all economic injuries that such regulation entails."  *Loretto*, 458 U.S. at 440;

*see also Yee*, 503 U.S. at 529 ("When a landowner decides to rent his land to tenants, the

government may place ceilings on the rents the landowner can charge, or require the landowner

to accept tenants he does not like, without automatically having to pay compensation.") (cleaned up).

More, "[b]usinesses that operate in an industry with a history of regulation have no reasonable expectation that regulation will not be strengthened to achieve established legislative ends." *Dist. Intown*, 198 F.3d at 884.  This is especially true during times of emergency.  *See Hirsh*, 256 U.S. 153–54.  Thus, Gallo could not reasonably believe that the District would never try to regulate his leases.  And because the District provided avenues for Gallo to recoup some of his purported losses, the Court declines to find a frustration of his investment-backed expectations.

Consider also the character of the District's actions.  "[T]he character of the governmental action depends both on whether the government has legitimized a physical occupation of the property, and whether the regulation has a legitimate public purpose." *Id.* at 879 (cleaned up).  The District's actions here legitimized a temporary physical occupation of the property but only by individuals whom landlords had invited onto their property.  And its legislation had a legitimate public purpose.  The Supreme Court has upheld similar legislation, *see Hirsh*, 256 U.S. 153, and the Circuit has upheld legislation restricting the use of private property even in less dire circumstances where no emergency existed, *see Dist. Intown*, 198 F.3d at 877.

The Court finds there was no regulatory taking.

## IV.

Finally, Gallo argues that judicial estoppel precludes dismissal.  *See* Pl.'s Opp'n at 4–5. The doctrine of judicial estoppel "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase."

*New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (cleaned up).  Although the doctrine is not

"reducible to any general formulation of principle," several factors guide a court's analysis of

whether to invoke the doctrine.  *See id.* at 750 (cleaned up).  One such principle is that, for the

doctrine to apply, "a party's later position must be clearly inconsistent with its earlier position."

*Id.* (cleaned up).

Gallo argues the District violated this principal.  In the DCCA proceedings, one of the

issues was Gallo's claim that the District had infringed on his right of access to the courts.

Intertwined with this claim was Gallo's entitlement to funds from the STAY DC program.  In

commenting on Gallo's entitlement to these funds, the District argued that the issue of STAY DC

compensation is "wholly separate from the constitutional issue of access to the courts . . . Mr.

Gallo has always been able to file other claims to vindicate his asserted property rights, including

a claim under the Takings Clause."  Pl.'s Opp'n at 5.  But in the current proceeding, says Gallo,

the District argues he has no Takings Clause claim.  Gallo maintains that this conflicts with the

argument the District made before the DCCA and that the Court should stop the District from

trying to "permanently bar the very claim it stated would vindicate his rights."  *Id.*

Gallo's claim fails because the District did not make contradictory statements.  In arguing

that the existence of STAY DC funding did not impact Gallo's access to the courts, the District

argued that he was free to file a claim under the Takings Clause.  *See Gallo Holdings*, No. 21-

CV-0037, Rule 28(k) Cit. of Supp. Authority by Dist. of Colum. at 2 (D.C. Ct. App. Sept. 27,

2021).  The District did *not* argue that such a claim would succeed.  Nor did it suggest it would

allow any such claim to go unopposed.  It merely argued that Gallo's ability to bring such a

claim undercut his argument that his access to the courts was denied.  Because the District did

not make contradictory arguments, the doctrine of judicial estoppel does not apply.

**V.**

For the all these reasons, the Court will grant the District's motion to dismiss.[8]  A

separate order will issue.

Dated: June 21, 2022                                   _____

                                                      TREVOR N. McFADDEN, U.S.D.J.

---

[8]  During this litigation, Gallo filed two motions:  a motion to strike, *see* Mot. to Strike, and a motion to expedite, *see* Mot. to Expedite, ECF No. 15.

The District opposed the motion to strike by arguing that Gallo "cannot move to strike the District's memoranda in support of its motion."  Opp'n to Mot. to Strike at 4, ECF No. 11.  Gallo responded by asking the Court to construe his motion to strike as a motion for leave to file a sur-reply.  *See* Reply in Supp. of Mot. to Strike at 1, ECF No. 12.  Sur-replies are generally disfavored, *see Kiewit Power Constructors Co. v. U.S. Dep't of Labor*, 959 F.3d 381, 393 (D.C. Cir. 2020), and "and the determination of whether to grant or deny leave is entrusted to the sound discretion of the district court."  *Crummey v. Soc. Sec. Admin.*, 794 F. Supp. 2d 46, 62 (D.D.C. 2011).  The primary argument in Gallo's motion to strike is that the filing ban and the eviction ban are the same.  *See* Mot. to Strike at 2.  Because the Court equated these two bans and still found for the District, *see supra* Section III.B.3, the Court declines to exercise its discretion to allow a sur-reply and will deny Gallo's motion.

Because the issuance of this opinion makes Gallo's motion to expedite unnecessary, the Court will deny it as moot.