UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Alexander Gallo
*Plaintiff*

v.                                      Case 1:21-cv-03298-TNM
                                         Judge Trevor N. McFadden

District of Columbia
*Defendant*

**Plaintiff's Motion for Reconsideration**

      Plaintiff hereby moves for reconsideration of the Court's Order of Dismissal dated June 21, 2022. Plaintiff specifically objects to the Court's apparent conclusion that "relief" was available (to say nothing of adequate). In *Towers,* the District admitted this. The Court is requested to amend its order to one which reflects the reality that no relief was or is available. The Court is also requested to clarify its holdings.

      I.      The Court is Moved to Correct Errors

    a.  *There is no relief available. Not earlier- not now.*

      The Court's Order of Dismissal rests on an assumption that I could "apply" for relief and receive it. For example: "provided programs to assist landlords…" *Order* at 14. "He was not without recourse." *Order* at 20. "Gallo does not allege he sought assistance." *Order* at 21. "because the District provided avenues for Gallo to recoup some of his purported losses, the Court declines to find a frustration of his investment-backed expectations." *Order* at 22. "Gallo's entitlement to funds from the STAY DC program." *Order* at 23.

      All of this is incorrect. The Complaint stated: "No compensation was or is provided or promised by the District…No offsetting protection (such as Government directly covering expenses) was provided." Complaint at 3. The District moved for dismissal by alleging that "relief" existed and that I did not apply for it. This is *false*. I am not a tenant. I cannot apply for *tenant* relief. My motion to strike

1

referenced "nonexistent" remedies to "avoid wasting unnecessary time and money litigating the invalid defense" *SEC v. Gulf & Western Industries*, Inc., 502 F. Supp. 343 (D.D.C. 1980).[1]

*Media Has Repeatedly Covered the Lack of Remedy for Landlords*

This Court may take judicial notice of facts "appearing in the news media*" Gaither v. District of Columbia*, 333 A.2d 57 (D.C. 1975). The Complaint included several, including this one[2] of parties identically situated: "life savings *disappear…* maintain buildings at a *loss…* he has *absolutely no recourse*." A DC landlord identically situated to myself was interviewed a sidewalk by ABC News in June 2021. "They're not reimbursing me, they're not protecting me."[3] "Lawmakers in D.C. have passed a series of measures to help renters during the pandemic. But some mom-and-pop landlords wonder whether the city will do the same for *them…* landlords have zero ability to seek any cure"[4] (emphasis added). "How can you negotiate a rent payment plan when there's no money?"[5] ""There's been no safety net for them"[6] "never recover what they lost."[7] "Crushed by the Government."[8]

*How "StayDC" Works*

The Court's Order notes that Stay DC was created on April 12, 2021, and notes that it assists "certain tenants and housing providers." *Order* at 3. True: some tenants' arrearages are belatedly being covered: those tenants who are eligible and apply.

StayDC is a *tenant* assistance program. Its rules are mandated nationwide. It does not assist landlords for a landlord's losses. The District states that a landlord may "apply" for assistance. This is untrue: an "application" to the program is only generated for adjudication upon the *dual* application of a

---

[1] Statements of "available" relief are not only invalid defenses- they are *false*. Even if inadvertent, they are sanctionable. *In Re Schneider*, 553 A.2d 206 (1989). The false statements concerning "relief" now bear "directly upon the judicial process . . . with respect to an identifiable case" *In Re Hopkins*, 677 A.2d 55 (1996)
[2] https://reason.com/video/2021/02/23/the-victims-of-the-eviction-moratorium/
[3] https://weartv.com/news/nation-world/while-eviction-moratorium-protects-tenants-many-property-owners-are-forced-to-pay-double
[4] https://wamu.org/story/20/10/27/dc-landlords-eviction-moratorium-coronavirus-pandemic-relief-housing/
[5] https://wamu.org/story/20/05/07/when-d-c-s-ban-on-evictions-ends-what-will-happen-its-uncertain/
[6] https://www.washingtonpost.com/dc-md-va/2020/12/09/small-landlords-struggle-under-covid-eviction-moratoriums/
[7] https://www.youtube.com/watch?v=z5vf5_rnMtQ
[8] https://www.youtube.com/watch?v=nMDZBzjHNuc

2

tenant and a landlord, with the landlord's participation purely as a fraud prevention mechanism.[9] If a tenant does not act there is no application.[10]

*Other Jurisdictions Belatedly Offered the Landlord "Relief" Missing Here*

Some jurisdictions recognized that- precisely as I make clear here- *tenant* assistance programs do not assist *landlords*. For example, New York's Emergency Rental Assistance Program (ERAP) website acknowledges the separate *Landlord* Rental Assistance Program (LRAP), which assists "landlords whose tenants have left their property or who are *unwilling to apply for ERAP*."[11] (emphasis added). San Diego created its own program called "Rental Assistance for Small Landlords."[12] On June 28, 2022, even a legislator in Los Angeles admitted: "I believe we are well past the time to bring financial relief to property owners. They've had to continue making mortgage payments and have been fulfilling their financial obligations *without any respite*."[13] Virginia's program- operating under the same federally imposed rules- states clearly: "a landlord cannot proceed" if the tenant "refuses to cooperate."[14]

*Estoppel Should Apply to False Statements that "Relief" or "Remedy" Was/Is Available*

The Court did not properly construe the estoppel argument. My opposition stated the District's 28(k) letter was an admission "regarding the lack of compensation"- not an admission that I must win whatever I file. *Opposition* at 5. The argument was that the District cannot come into this Court and state the opposite of what they admitted there, which was: I *cannot* individually apply for relief; thus to "vindicate my rights" to compensation I can file "a claim under the Takings Clause."

The precise issue of whether I could "apply" for relief was discussed in oral argument at 2h27m. The District suggested I do so despite my brief saying this was impossible. Judge Glickman interjected:

> Glickman: "I don't understand how that helps Mr. Gallo. He doesn't have a tenant who owes rent."
> District: "He can apply…"
> Glickman: "Anybody could apply. But why would StayDC give him money?"
> District: "He's a housing provider. He would have to come to some agreement with the foreclosed homeowner about what the rent amount…"
> Glickman: "yea that does not sound entirely practical to me in his circumstances"

---

[9] Eliminating the risk of a tenant receiving a check for a year's rent and disappearing without paying the landlord
[10] https://www.pewtrusts.org/en/research-and-analysis/blogs/stateline/2021/09/17/congress-might-allow-frustrated-landlords-to-seek-rent-relief
[11] https://otda.ny.gov/programs/emergency-rental-assistance/faq.asp
[12] https://www.sandiegocounty.gov/content/sdc/sdhcd/community-development/RASL.html
[13] https://scvnews.com/eviction-moratorium-relief-coming-to-l-a-county-tenants/
[14] https://www.dhcd.virginia.gov/rrp-landlord-faqs

3

The District then submitted a 28(k) letter docketed on September 27, 2021. *See Appendix*. It *admitted* that I cannot "apply" for relief without the *participation* of a tenant. Mine simply disappeared.

The doctrine of judicial admission is part of judicial estoppel. Factual concessions are "conclusively binding on the party who made them." *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224,226 (9th Cir. 1988). Such an admission is "conclusive in the case." *Legal Soc'y Chapter of the Univ. of Cal. V. Martinez*, 561 U.S. 661, 676-77 (2010), referencing *Oscanyan v. Arms Co.*, 103 U.S. 261 (1880) ("any fact, bearing upon the issues involved, admitted by counsel, may be the ground of the court's procedure equally as if established by the clearest proof.")

*Numerous Superior Court Cases Demonstrate the Lack of "Relief"*

The Superior is full of cases demonstrating that no "relief" is available to similarly situated owners. See 2020 LTB 004312 ($96,000 unpaid on one apartment in Navy Yard), 2022 LTB 000090 ($75,000 unpaid on one apartment), 2022 LTB 000287 ($64,000 unpaid on one apartment), 2016 LTB 027496 ($60,000 unpaid by foreclosed coop members squatting), 2022 LTB 000072 ($400,000 unpaid by a squatting pizza shop), 2021 LTB 000459 ($350,000 unpaid), 2021 LTB 000361 ($1.3 Million unpaid). This Court's opinion- if left uncorrected- wipes away the 5th Amendment rights of all of them.

b. *The Individual who is the Subject of the claim for $30,000 was not "Invited" By Me*

The Court's Order states that "Gallo invited the nonpaying tenant onto his property." *Order* at 16. This is incorrect as to the individual in question for damages count (vi), who was a squatting foreclosed homeowner. The Complaint stated that "In one, a squatter has been residing at the District's invitation" Complaint at 3. (See 2020 LTB 008032 "other grounds- foreclosed homeowner").

The lens through which to view "invitation" of either this individual or the tenants in other units who were given a right to breach contracts and did ("lease contracts with other tenants were similarly declared unenforceable" Complaint at 3) is discussed more fully in section III-a.

4

    *c.   PPP is not a "remedy"*

The Court's order twice describes the PPP as a "remedy" in addition to Stay DC. It is not a remedy; it is not a program. There are no "accounts." It is merely an extension of the filing ban. "Gallo did not use it. If he had set up a PPP account and if his tenant had still been unable to pay, Gallo would have been free to file an eviction action…" *Order* at 21. The PPP statute blocks- not permits- filings. It is simply a statute which *further* grants a breaching tenant the right to breach the lease an *additional year* into 2023. The District's Motion to Dismiss calls it a "regulation." *Motion* at 25.

    *d.   Stay DC was not created "together with" the moratorium*

The Court's order states "together with these restrictions on evictions…, the District created programs to assist property owners facing strain from unpaid rent." *Order* at 3. This is incorrect. For argument's sake, let's say I could "apply" to StayDC in April 2021 and make $30,000 appear. Better yet, let's say the District simply handed me a check in April 2021 for the accrued damages.

The moratorium was imposed in March 2020. No remedy- and thus the mental anguish- existed for anyone for 11 months. No remedy was even promised- it was denied when landlords claimed a taking in *Towers* in summer 2020. This should alone be dispositive. The Contracts Clause prohibits "forced loans to the State" even when the government promises to reimburse and the impairment is only 7%. *Reporters Assn. v. N Y State*, 79 N.Y.2d 39 (N.Y. 1992). The Takings Clause is violated by delinquent compensation. See *Knick v. Township of Scott*, 588 U.S. ___ (2019).

    *e.   The Moratorium had no "End Date"*

The Court is advised that the filing ban had no end date (See Order at 12). It was extended repeatedly.[15] The District stated at oral argument that "had we known" how long it would last, people could have at least known their damages prospectively.[16]

---

[15] See for example Mayor's Order 2020-079 ("Extending" the emergency from July 2020 to October 2020); Mayor's Order 2021-069 (multiple continued extensions through 2021).

[16] The "end date" argument appears in other cases. "Contrary to the Plaintiffs' insinuation that the Governor will extend duration of the Order as long as he can, into 2021 (Dkt. No 24, Pl.'s Reply at 6), there is nothing permanent about EO 202.28; it expires on August 19" *Elmsford*. Funny: It was then extended *two more years*.

5

II.  The Court should clarify its holding regarding the Contracts Clause

a. *Hirsch did not raise nonpayment claims*

The Court's Order of Dismissal states my Complaint "raises claims much like those advanced by the landlord in Hirsch." Order at 1. This is inaccurate: while Hirsch did raise a taking challenge to a filing ban, Hirsh claimed the right to possess for expiration of a lease- nothing more. There was no non-payment. Nonpayment is a distinct cause of action for possession.

The Supreme Court in *Hirsch* did "permit a lessee to continue in possession of leased premises after the expiration of his term, against the demand of his landlord…*so long as he pays the rent*." *Block v. Hirsch*, 256 U.S. 135 (1921). There was no taking found because the tenant was paying. Here, the Court assumed the District was guaranteeing the rents. The Court should amend its opinion.

b. *Does this Court hold that "seeking" rent equates to receiving it?*

This issue has been the most disingenuously briefed aspect of all these "eviction ban" cases. This Court's Order suggests no violation because "The Filing Moratorium is not permanent and does not bar landlords from seeking past-due rent after its expiration" (Order at 15) and "rent continues to accrue" (Order at 12), distinguishing *Melendez* on the grounds it "permanently" impaired a landlord's rights. Yet the damages alleged here are *permanent*- not temporary. "the Complaint does not limit the alleged injury to delay." Plaintiff Opposition at 3. The "temporary" statute causes a permanent loss. The occupant did not pay, did not "apply" for assistance, disappeared, and the Government denies liability for its invited guest.

The Court's opinion suggests that an owner may "seek" rent from a tenant after being forced to expend cash providing free goods but makes no finding that upon such belated seeking the creditor *receives* it. Several circuit courts have rejected the notion that pursuing a non-collectible money judgment is a "remedy."

The Supreme Court noted a "risk of irreparable harm by depriving them of rent payments with no guarantee of eventual recovery." *Alabama Association of Realtors v. HHS*, 594 U. S. ____ (2021). Circuit courts have long held the same: See *Lakeview Tech., Inc. v. Robinson*, 446 F.3d 655, 657-58 (7th Cir. 2006) ("A judgment-proof defendant is not deterred by the threat of money damages " and "Nothing in the record of the case indicated that the departing employee "would be good for 'very large' damages."'");

6

*Hoxworth v. Blinder, Robinson Co., Inc.*, 903 F.2d 186, 206 (3d Cir. 1990) ("the unsatisfiability of a money judgment can constitute irreparable injury").

Seeking does not equate to receiving. The government did not guarantee the rents here. It simply dispensed private property to insolvent people. If the Court's holding is that "seeking" rent is the equivalent of receiving it, this should be clarified. To test this very theory, I obtained a money judgment against Andre Hopkins 7 months ago. It remains unsatisfied.

    c.   "Controlling Cases"

The Court is requested to clarify its interpretation of why certain cases may not "control." Order at 14. This issue is already presenting a circuit split. *Blaisdell* explicitly affirmed and distinguished the 19th century cases: "in the Bronson case… there was no provision, as in the instant case, to secure to the mortgagee the rental value of the property during the extended period." *Blaisdell* at 432. It equally affirmed *Barnitz* and *Oshkosh*.

"these cases continue to control." *Melendez*, footnote 50 (referencing such 19th century cases). The 9th Circuit, however, simply waived away cases from a supposedly "earlier era."[17]

III.    The Court should clarify its holding regarding the Takings Clause

The Court properly reads the Complaint as challenging the Filing Ban's grant of possession of the condo- where "no compensation is provided"- as an uncompensated taking both physical and regulatory.

I will briefly note that a bifurcation of the takings clause into two "types" of takings seems to only apply when the form of property in question is *real* property (land). It does not apply to other forms of property which the government must pay to "take," for example personal property, intellectual property, franchises, income from land, and contract rights- none of which have been subjected to "regulatory" balancing theory. The Court may appropriately apply older controlling cases and find a taking without boxing its holding into a modern theory. I of course contend that a taking exists under both lenses.

---

[17] The 9th Circuit's purportedly "modern" doctrine conflicts with many modern state supreme court cases. See *Federal Land Bank of Wichita v. Story*, 1988 OK 52 (1988) ("fails to provide for the protection of the mortgagee"); *Federal Land Bank of Wichita v. Bott*, 240 Kan. 624 (1987) ("the Act does not provide sufficient protection for the mortgagee, and lacks the 'reasonable conditions' contained in the debtor relief legislation upheld in Blaisdell"); *Federal Land Bank of Omaha v. Arnold*, 426 N.W.2d 153 (1988) ("cannot withstand scrutiny"); *Flushing Nat. Bank v. MAC*, 40 N.Y.2d 731 (1976) ("ideal to be worshiped when not needed and debased when crucial")

a. Physical Taking

The Court notes that "Gallo argues that Cedar Point… controls this analysis." *Order* at 16. Yes- but equally controlling are the World War II era cases concerning "temporary" takings of possession.

The Court's analysis focuses only on *Cedar Point* and *Yee*- found to be in conflict. The conflict can be resolved. The Court notes *Yee* was a case about the "confluence" of rent control and prohibiting evictions based on expired leases,[18] whereas *Cedar Point* is about excluding[19] the State's guests who walk onto a farm. The Court reads *Yee* to essentially stand for a categorical proposition that no physical taking can occur once a landlord "invites" occupancy via a lease and occupancy is then compelled via uncompensated decree.

Just like in *Hirsch*, non-payment was rejected in *Yee*: "The Mobilehome Residency Law limits the bases upon which a park owner may terminate a mobile home owner's tenancy. *These include the nonpayment of rent*." (emphasis added) *Yee v. City of Escondido*, 503 U.S. 519 (1992). *Yee* stands only for the proposition that rent control itself is not a "physical" taking. My theory is that I "invite" a *leasehold*- not an individual who can be extracted from his leasehold (eg, his *payment*) and still be considered "invited." The tenancy is breached by non-payment and thus no longer exists. *Yee* confirms the government may regulate *prices* and proscribe the *expiration* of a tenancy. It does not stand for the proposition that the government may impose via "regulation"[20] the occupancy of someone without a leasehold[21]- the same way it does not stand for the idea that a ban on vehicle repossession for unpaid leases is not a "physical" taking of the car because the dealership "invited" the lessee to originally drive off the lot, or that a ban on utility shutoffs is not a "physical" taking of water, electricity, gas or bandwidth because the provider originally "invited" that person to connect and consume from the system.

My Complaint cited several relevant World War II era cases which fall into the "physical" column. The compensation due is the "rental which could have been obtained." *Kimball Laundry Co. v. United States*, 338 U.S. 1 (1949) (case concerning "immediate possession of the facilities" and "compensation for the temporary taking of petitioner's land" and "the proper measure of compensation is the … and so this Court has held in the two recent cases dealing with temporary takings. United States v. General Motors Corp., 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311, 156 A.L.R. 390; United States v. Petty Motor Co., 327 U.S. 372"). "compensation for a temporary possession of a business enterprise is the reasonable

---

[18] This "confluence" is already the permanent law in the District and is not challenged.
[19] The right to "exclude" and the right to "possess" are different rights. For example, a condo building can see its right to "exclude" guests from the property curtailed while owners fully retain *possession* of their units
[20] It can of course impose it via eminent domain
[21] Why not simply command that homeless people can occupy with the owner left to sue them for money?

8

value of the property's use." *United States v. Pewee Coal Co., Inc*., 341 U.S. 114 (1951). These are "per se" cases. None would be subject to the "regulatory" *Penn Central* test, which is "generally applicable to *nonpossessory* governmental activity. See Penn Central…" *Loretto v. Teleprompter Manhattan CATV Corp*., 458 U.S. 419 (1982) (emphasis added). As such, the Court could simply find a temporary physical taking under *Kimball Laundry, General Motors*, *Petty Motors, Peewee* and ignore *Yee*. Similarly, in *United States v. Russell*, 80 U.S. 623 (1871), a ship was "taken into the service" of the government for "twenty-six days" and a categorical duty to compensate for the value of the services was found. *Yee* does not shunt all this lineage into reinterpretation under Penn Central factors.[22] The taking is "per se" and it is the occupancy value. It is not a "regulation" to seize possession of a ship, a laundromat, a coal mine, a warehouse, gas, electricity, or water. Or a condo.

Similarly, *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555 (1935) was a unanimous decision regarding a taking of the "substantive right" of possession, in which the mortgagee was compelled to "surrender" it to a "bankrupt." It equally controls.

*Existence of Rent Control does not Preclude "Physical" Taking*

Rent control regulates only prices: the owner may be forced to accept a slower rise in prices. It is based on the doctrine that a landlord does not have a right to a windfall profit but also cannot be compelled to operate at a loss. It is a "rational attempt to accommodate the conflicting interests of protecting tenants from burdensome rent increases while at the same time ensuring that landlords are guaranteed a fair return on their investment." *Pennell v. City of San Jose*, 485 U.S. 1 (1988) (no citation to Penn Central). "a statute which does not provide for a fair rental to each landlord is unconstitutional." *Bowles v. Willingham*, 321 U.S. 503 (1944) (predating Penn Central). Earlier cases permitted price limits where they effect no "confiscation of income"- See for example *Kennedy Bros. v. Sinclair*, 287 F. 972 (D.D.C. 1923) (holding that government compelling a rate of return below the prevailing interest rate

---

[22] This is precisely the problem with *Elmsford* and similar cases. After it's now-abrogated physical takings analysis, Elmsford's analysis conflicts with the World War II precedents in two ways. First, it takes an apartment building in which a plaintiff stated multiple tenants were not paying and subjects it to a "parcel as a whole" test applicable to development restrictions. In essence, if only some units were "taken" in a building, it is not a taking. This flies in the face of *United States v. General Motors Corp*., 323 U.S. 373 (1945), which found a categorical duty to compensate for the value of the "temporary occupancy of a *portion of a leased building*." *Elmsford* was then cited as basis for finding no taking of single-family houses elsewhere, without any appreciation for the *facts* of the case. Elmsford goes further astray in subjecting the occupancy value itself to the Penn Central test. It disregards the clear command from the World War II cases that the "proper measure of compensation" is *categorically* the occupancy value of that "floor space…taken" and instead declares that the occupancy value of some units can be stolen by the government if it doesn't upset "investment backed expectations" for the building as a whole. *Elmsford*'s takings analysis was the product of rapid-fire briefing and is full of errors and should not be persuasive.

would be confiscatory); *Karrick v. Cantrill*, 51 App.D.C. 176, 277 F. 578 (1922) (same); *Apartment & Office Bldg, Etc. v. Washington*, 381 A.2d 588 (1977) (finding no taking because hardship petitions avoid subjecting owners to operating when "their cash flow is negative.").

This is all to say: regulation of *prices* is not a "physical" taking of the object whose price is regulated. But "eviction bans" for nonpayment do not concern regulation of prices- they concern *possession* of the thing whose price is validly regulated. Just like in *Hirsch* and *Yee*, the Supreme Court affirmed in *Levy Leasing Co. v. Siegel, 258 U.S. 242 (1922)* a law which suspended the "right of action to recover possession" in order to snag a *higher rental* but required "the payment, or securing the payment, of a reasonable rental." In *Marcus Brown Holding Co., Inc. v. Feldman*, 256 U.S. 170 (1921) the Court similarly upheld a law which "declares a public emergency to exist, and provides that summary proceedings shall not be maintainable to recover the possession" in order to seek a *higher* rental but that a tenant must "pay a reasonable rent" and the landlord "be put in possession if payment be not *promptly made*." (emphasis added). These cases were all reaffirmed in *Blaisdell*.

Now back to *Yee*. One further case supports the theory that the landlord "invites" the *leasehold* and not the individual: *Rent Assn. v. Higgins*, 83 N.Y.2d 156 (N.Y. 1993). It held that landlords are not forced to "accept strangers as tenants" even when the State injects a new *individual* as "tenant" - because they are injected into the existing *leasehold*. The landlord's "invitation" is simply: the "voluntary acquiescence in the use of its property for rental housing." Under *Higgins*, the individual is irrelevant.[23] Sufficient attention must be given to this "invitation"[24] trope.

The Government, however, is not "adjusting" the "terms" of a leasehold when it grants physical possession to someone with no tenancy. I thus find *Yee* in harmony: the government may "regulate" the *terms* of a leasehold- in New York that includes its members. Here, the District regulated no terms. It physically invaded land by *compelling the occupancy* of someone who has no leasehold under the rent control statute because there is no payment. Admittedly, I arrived at this harmonious viewpoint only after lengthy contemplation of what I actually "invite" when I sign a lease in this city.

b. Regulatory Taking

The regulatory takings analysis centers on an assumption that I was "not without recourse." Order at 20. The Court is requested to reset the analysis with corrected facts. The facts alleged clearly state a

---

[23] "The District's actions here legitimized a temporary physical occupation of the property but only by individuals whom landlords had invited…" Order at 22
[24] See R v R [1991] UKHL 12 (1991), rejecting the "consented to invasion" off-ramp in another context

10

taking under regulatory doctrine also. The court should find a taking under both physical and regulatory theories.

*Conclusion*

The Court's opinion suggests that "relief" is dispositive. The Court is requested to expeditiously amend its opinion, which is centered on the assumption it was available. I have been steadily and permanently drained of $30,000, and continuously and imminently threatened with the permanent loss of approximately $150,000 more without "relief." An amended opinion should reflect the fact that remedy was- and remains- unavailable. Had contemporaneous relief existed, "An appropriation under eminent domain with compensation of a contract neither challenges its validity nor impairs the obligation. It is a taking, not an impairment, of its obligation." *Cincinnati v. Louisville & Nashville R. Co.*, 223 U.S. 390 (1912). That is precisely what did *not* happen- either here in the District or any other jurisdiction.

This court need not plow any new ground. "They do not even offer adequate compensation for the right taken, or any compensation at all." *State ex Rel. Cleveringa v. Klein*, 249 N.W. 118 (N.D. 1933).

Respectfully submitted,

*Alexander Gallo*
_____
Alexander Gallo
950 25th St NW #329N
Washington, DC 20037
516-770-1624
aogallo@gwmail.gwu.edu

**Certificate of Service**

I certify that on July 1, 2022, a copy of this Notice is served by electronic mail on:

micah.bluming@dc.gov

# GOVERNMENT OF THE DISTRICT OF COLUMBIA
## Office of the Attorney General





**ATTORNEY GENERAL**
**KARL A. RACINE**

Clerk of the Court
Received 09/27/2021 08:31 AM
Filed 09/27/2021 08:31 AM



**Office of the Solicitor General**

September 27, 2021

Julio A. Castillo, Clerk of Court
District of Columbia Court of Appeals
430 E Street, NW
Washington, D.C. 20001

Re:    28(k) submission in *District of Columbia v. Towers*, Nos. 21-CV-34, 21-CV-35, 21-CV-36 & 21-CV-37

Dear Mr. Castillo:

On September 17, 2021, the District filed a 28(k) letter in the above-captioned case.  In response to the Court's questions at oral argument, the District stated that a foreclosed homeowner and a new owner could "negotiate a rental agreement to account for the time that the property has been occupied."  9/17 28(k) Letter.  Upon further consultation with the relevant District agencies, the District has concluded that a backdated rental agreement would not be accepted in the absence of a pre-existing rental obligation.  The proper avenue for an applicant in Mr. Gallo's position to seek STAY DC assistance is by billing the occupant for the fair use and occupancy of the property, and for the occupant and Mr. Gallo to attest to that amount when applying to STAY DC.

Federal law does not limit STAY DC to providing housing assistance for only rent and utilities.  It also permits payment for "other expenses related to housing incurred due, directly or indirectly, to the novel coronavirus disease (COVID-19) outbreak."  Consolidated Appropriations Act of 2021, Pub, L. No. 116-260, § 501(c)(2)(A)(v).  This broad catch-all provision can encompass housing expenses beyond rent, such as internet service and relocation assistance, and it even covers the expense of hotel stays by temporarily displaced households.  *See* U.S. Dep't of Treas., *Emergency Rental Assistance: FAQs* 7, 12-13, 15, *available at* https://tinyurl.com/25ekvzew.  Applicants must support any expense "by documentary evidence such as a bill [or] invoice."  *Id.* at 7.  In the same way, provided the applicant meets other financial and COVID-19 hardship requirements, a property owner can invoice an occupant for the fair use and occupancy amount and use that evidence to initiate an application for STAY DC funding.  After the occupant completes the application, STAY DC would then determine whether it will cover such an expense in the first instance.

Finally, the District notes that the question whether Mr. Gallo is entitled to STAY DC funding is wholly separate from the constitutional issue of access to the courts.  Mr. Gallo seeks to file a

complaint for possession, and he will be able to do so in approximately three months. And he has always been able to file other claims to vindicate his asserted property rights, including a claim under the Takings Clause. The existence, or not, of STAY DC funding does not affect his access to the courts.

              Sincerely,

              KARL A. RACINE
              Attorney General

         By:  /s/ Megan D. Browder
              MEGAN D. BROWDER
              Assistant Attorney General

cc, by service through the Court's electronic filing system:

  Morris R. Battino
  Battino & Sokolow PLLC
  *Counsel for Appellee McArthur*

  Gary D. Wright
  Law Offices of Gary D. Wright, PLLC
  *Counsel for Appellee Borger Management, Inc.*

  Jennifer Friend-Kelly
  Stephen O. Hessler
  Offit Kurman
  *Counsel for Appellee Towers*

  Alexander Gallo
  aogallo@gwmail.gwu.edu
  *Appellee*

and by first-class postage-paid mail to:

  Gallo Holdings, LLC-Series 2
  950 25th Street, NW, #329N
  Washington, D.C. 20037

  James Shelton
  256 15th Street, SE
  Washington, D.C. 20003

  Abel Hernandez-Cruz and Fulgencio Cruz
  1515 Ogden Street, NW, Apartment 608
  Washington, D.C. 20010

Unknown Occupants
2832 27th Street, NE
Washington, D.C. 20018

Kendra Bryant
1607 D Street, NE
Washington, D.C. 20002

Andre Hopkins
912 Barnaby Street, SE, Apartment 103
Washington, D.C. 20032

*Appellees*