UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Alexander Gallo
*Plaintiff*

v.                                              **Case 1:21-cv-03298-TNM**
                                                **Judge Trevor N. McFadden**

District of Columbia
*Defendant*

### Plaintiff's Reply to District's Opposition to Motion for Reconsideration

*Note: Reconsideration is Pursued under Rule 59.*

The District now states: maybe the Complaint was accurate, and StayDC doesn't *actually* exist- but tee-hee: this Court fell for dismissal so now the burden to have 5th Amendment rights upheld is too steep and compensation should thus be denied forever. Such denial is obviously manifest injustice.

I.      This Court's Assumption of Available "Relief" or Compensation Was Clear Error

The District has it backwards as to who must submit "evidence" here. The Complaint stated that- *fact* - no compensation was/is provided and no offsetting relief was available. The District moved to dismiss based on: failure to "apply" to a program which allegedly exists to compensate me (zero *evidence* it does this). I opposed, restating the "lack of compensation." The District claims I never discussed "specific provisions" of StayDC: false. See *Towers* (*Response to Appellant's Rule 28(k) Submission Regarding "Stay DC"*) 9/20/2021"- presented as a sur-reply here to respond to renewed false statements.

The District now admits: StayDC is "no longer accepting applications," (Dist. Opp. At 4). But this was true as of October 27, 2021[1]- before the District even filed for dismissal, as noted in my sur-reply. The District's motion to dismiss for "failure to state a claim" (granted) based on some failure to pursue administrative remedies contravened settled precedent. Just one year ago the Supreme Court unanimously reaffirmed that: "To be sure, we have indicated that a plaintiff's failure to properly pursue administrative procedures may render a claim unripe *if* avenues still remain…" *Pakdel v San Francisco*, 594 U. S. ____ (2021). Do avenues remain? No- and the Complaint stated they never existed in the first place. StayDC was created 14 months after the taking *began* and eliminated before the taking *stopped*.

---

[1] https://dcist.com/story/21/10/15/dc-will-close-applications-for-rent-assistance-october-27/

All 3 judges in *Towers* noted the lack of remedy for me- this Court may take judicial notice of the hearing. Judge Glickman asked: "Take someone like Mr. Gallo…What avenues would you suggest Mr. Gallo" have taken? The District's only response: "negotiation" with the squatting prior owner. They did not allege compensation was available because it wasn't; they then argued StayDC might *belatedly* exist for me- "or not." *Dist 28(k) letter*. Judge Easterly mused regarding remedy: "he's supposed to pay this person a million dollars to move out? That just seems unrealistic" (at 1h 10m).[2]

Judge Deahl, at 2h 02m, stated: "They could probably do that under eminent domain, if they paid you" and that I have "a takings claim for a certain amount of money." Judge Glickman observed at 2h 12m that my only remedy seemed to be an "inverse condemnation action against the Government."

No remedy- no compensation- no "entitlement" to funds- not even a *promise* of funds- nothing. Legislators now even give speeches from the dais calling this a taking.[3]

*"PPP" was Not a Remedy and is Irrelevant to Count (vi)'s Claim for Just Compensation*

Lastly, and again, the "PPP" did not allow filings for eviction *during the two-year moratorium*- it simply delays the due date of rent another year. How does this "remedy" the unpaid occupancy *imposed from March 2020*? It cannot. It also never applied to the squatter in question in count (vi)- he had no lease[4]-and is thus inapplicable to count (vi).

II.     Under *Yee*, the Landlord Invites Tenancies- not Individuals Squatting Without Paying

The District describes my motion as a "disagreement" with the court's analysis. Not quite. My motion was a claim of error as to this Court's finding of a tenancy for either the foreclosed owner in question or any non-paying "tenant" (thus bringing *Yee* into the picture). Despite the District's claim that I have "not raised this 'invitation' argument before" (Dist. Opp. At 6), my Complaint did so clearly: "a squatter has been residing at the District's invitation for nearly two years not paying one cent" Complaint, Introduction at 2. "Mr. Hopkins has resided there at the District's invitation from February 2020 through (likely) April or May 2022- the earliest time at which the District is likely to *remove* him." Complaint Count (vi). Yet this Court stated that "Gallo claims a tenant has occupied" (Order at 1), describes a moratorium for non-payment as a "tenancy law," (Order at 1), finds "Gallo's contractual relationship with his tenant" to be presumably still existing after non-payment, and finds that "Gallo invited the nonpaying tenant onto his property" (Order at 15).

---

[2] Quite *real* it has become: https://www.youtube.com/watch?v=d4BIN3yTT9Q
[3] https://www.youtube.com/watch?v=whSHLL5urDE
[4] "To be eligible, a tenant must have a current residential lease agreement" (https://dhcd.dc.gov/page/faq-tenant-repayment-plan-residents-impacted-covid-19)

2

As this is not a new argument, I properly highlighted the fallacy of recent cases this Court cited to. This is not confusing but rather astonishingly simple, as I further show below.

*Invited Leaseholds vs. Compelled Invasions*

My motion highlighted what was missed by most trial courts: a non-paying "tenant" is not a *tenant*. I encouraged the Court to reassess its "invitation" analysis under *Yee* as one potentially applicable to some leaseholds- not individuals.

Whether a tenancy (alternately, an "estate") *exists* is foundational. For example, DC's Rental Housing Act of 1985 permanently prohibits evictions for expired leases just as *Block v Hirsh* temporarily upheld in 1921. Doing so simply extends an "estate by sufferance" -a feature of law for over a century: an estate "year to year at common law, as where a tenant goes into possession and <u>pays rent</u> without an agreement for a term, or where a tenant for years, after the expiration of his term, continues in possession and <u>pays rent and the like</u>." *DC Code § 42–520 Estates by Sufferance* (emphasis added). Simply: payment creates the estate. No payment, no estate. See for example *Merriweather v. DC Bldg. Corp.*, 494 A.2d 1276 (1985) ("they are tenants by sufferance").

Is a "tenant"[5] who stops paying and for whom the government is *not paying* still a "tenant?" No- they have no *estate*. They have no *tenancy*: "such a tenancy requires *payment of rent*" - when someone is "permitted to remain in the premises rent free, there can be neither a lessor-lessee relationship nor an 'express contract' in the absence of consideration." *Smith v. Town Center Management Corporation*, 329 A.2d 779 (D.C. 1974). "To constitute the relation of landlord and tenant these elements must be present: Permission or consent on the part of the landlord, subordination to the landlord's title and rights on the part of the tenant, a reversion in the landlord, an estate in the tenant, and the transfer of possession and control of the premises to the tenant under a contract either express or implied between the parties." *Beall v. Everson*, 34 A.2d 41 (D.C. 1943) (emphasis added). "Absent… privity of estate and privity of contract, the occupier is in adverse possession as a "squatter*." 3 G. Thompson, Thompson on Real Property § 1029*, at 87-90 (Replacement ed. 1980)" *Nicholas v. Howard*, 459 A.2d 1039 (D.C. 1983).

Once this foundational principle is acknowledged, it becomes clear that government commits a physical taking when it *grants possession* to a person who has no estate. Such a person is no different than a member of the public. The 9th Circuit agreed in distinguishing a formerly-paying tenant: "the

---

[5] This term includes the foreclosed homeowner who was in my unit, who is a "tenant at will" by law with a corresponding obligation to pay fair use value. His "tenancy" was also legally terminated by a Notice to Quit served in March 2020, though the power of eminent domain could in theory nullify that notice.

3

appellant ceased to be a tenant of the appellee and became a *trespasser*, 'guilty of unlawful detainer'." *Western Un. Tel. Co. v. Hansen Rowland Corp.*, 166 F.2d 258 (9th Cir. 1948) (emphasis added).

Let's now return to trial court cases cited by this court: "the eviction moratorium regulates the landlord-tenant relationship once it is already established." *Jevons v. Inslee*, 2021 WL 4443084; "the Ordinance simply regulates landlords' relationship with tenants" *Southern California Rental Housing Association v. County of San Diego*, 550 F. Supp. 3d 853 (S.D. Cal. 2021). This was copy and paste from 2020: "modifying existing relationships between landlords and their tenants" *Elmsford Apartment Assocs. v. Cuomo*, 469 F. Supp. 3d 148 (S.D.N.Y. 2020); "new regulations regarding his or her relationship with tenants" *Baptiste v. Kennealy*, 490 F. Supp. 3d 353 (D. Mass. 2020).

Nonsense. There is no *tenancy*. There is no *estate*. There is no *relationship*. It is odd that inadequately briefed injunction decisions are supplanting appellate doctrine. *Baptiste* at least recognized something was off- that by launching a ridiculous decision that would be copied and pasted to suppress civil rights, confession would be in order: "Hopefully, the decisions made during this pandemic by … the courts will not in the future, like Korematsu, be deemed 'gravely wrong.'" *Baptiste*[6], at 375.

*The Right to Re-Possess is the "Reversionary Interest"*

*Beall* used a key word: reversion. The right to possess one's *own estate*. The "reversionary interest" protected by the Takings Clause. "The relation of landlord and tenant is created alone by the existence of a reversionary interest in the landlord." The reversionary interest is "to be resumed summarily upon the failure…to pay rent." *Davis v. Vidal*, 105 Tex. 444 (1912) (reaffirmed in *El Dorado Land Co. v. City of McKinney*, 56 Tex. Sup. Ct. J. 415 (Tex. 2013), finding a taking). No reversion- no ownership. "Without the statutes, the holders of the reversionary interests would absolutely and automatically obtain possession" upon "abandonment. Under the statutes, they would not." *Lawson v. State*, 107 Wn. 2d 444 (Wash. 1986) (en banc), finding a taking. "the interests alleged here were created…not by legislative grant. Most importantly, as we discuss below, we conclude these are valuable property interests entitled to protection under our constitution's prohibition against takings." *Id*.

Local precedent comports: "The District's actions were directed against the possessory rights of the tenant, not against the reversionary rights of the landlord…there was no entry affecting a reversionary interest, warranting compensation to the landlord" and "without taking an estate in land (even as sublessee) or assuming any obligation to take over the tenant's obligation to pay rent to the landlord."

---

[6] Who was Baptiste anyway? A nurse from Haiti whose tenant was squatting $21,000 in arrears while "She has been struggling to pay her own mortgage and living expenses. Baptiste has paid a penalty and taken at least one loan from her retirement accounts to pay her bills." No "relief" was available to her.

4

*District of Columbia v. Carr*, 607 A.2d 513 (D.C. 1992). Maryland's highest court found a taking of "the right to re-enter in the event of default." State of *Maryland v. Stanley Goldberg*, et al., 437 Md. 191 (2014) ("the vested right of re-entry upon default").

Upon nonpayment, m*y estate* reverts[7]- I then evict someone who is unlawfully present *on it*. The government does not "regulate" a tenancy when no tenancy exists. The government *takes my estate*. *Yee* concerned regulation of pricing of valid estates- not a taking of the owner's estate. *Cedar Point* discussed only an owner's right to "exclude" where the owner's estate was undisturbed.

III.    It is Thus an Appropriation to "Extend" the "Redemption" Period Without Payment

The retort next becomes: "extending" the redemption period is thus simply "adjusting" the "relationship." Relationship? No- as already shown. Relevantly- my foreclosed homeowner squatter had no redemption right.

"a landlord sues… for recovery of his estate as forfeited" ("forfeiture of the estate for non-payment of rent reserved") and the right of redemption is merely a "relief from a forfeiture." *Sheets v. Selden*, 74 U.S. 416 (1868) ("redemption of the lands from the forfeiture *incurred for nonpayment* of rent" (emphasis added)). See also *Davis v. Taylor*, 276 F. 619 (D.C. 1921) ("removing the forfeiture which resulted from the default in the payment of the rent"). The doctrine is ancient.[8] *Blaisdell* affirmed that its requirement of *payment* extended the estate in that case: "While the mortgagor remains in possession he must pay the rental value" – this being "cognate to the historic exercise of the equitable jurisdiction." *Home Bldg. L. Assn. v. Blaisdell*, 290 U.S. 398 (1934).[9]

---

[7] *Coinmach Corp. v. Aspenwood Apartment Corp*., 56 Tex. Sup. Ct. J. 77 (Tex. 2014) (observing that eviction laws "provide procedural protections that apply once the tenant has lost, or allegedly lost, all legal interests" and are thus no longer tenants)

[8] "at least since Sheets v. Selden…" *Trans-Lux Radio City Corp. v. Service Parking*, 54 A.2d 144 (D.C. 1947). The "Trans-Lux" moniker is used to this day and the doctrine indeed predates 1868: John Adams documented it in his *Treatise on the Principles and Practice of the Action of Ejectment, and the Resulting Action for Mesne Profits* ("The Courts… would set aside the forfeiture, upon the payment of the debt and costs") (1830 reprint, at p150). See *Galvin v. Southern Hotel Corp*., 154 F.2d 970 (4th Cir. 1946) "equity may relieve against them if complete justice can be done by the payment or tender of the arrears"; *Atkins v. Chilson*, 52 Mass. 112, 11 Met. 112 (1846) ("Courts of law in England… before the American revolution, stayed proceedings, in cases like the present, on payment of the rent and costs"); *Walker v. Wheeler*, 2 Conn. 299 (1817) ("relieve against forfeitures arising from the breach of conditions subsequent, where compensation can be made for the failure of precise performance"); *Powers v. Powers*, 11 Vt. 262 (1839) ("to recover the forfeiture of real estate, conveyed by mortgage, is considered as an action to recover money, in which a tender of the amount due, three days before the sitting of the court, according to the statute, may be made'); *Jackson ex dem. Norton v. Sheldon*, 5 Cow. 448 (1826) (N.Y. Supreme Court of Judicature) ("If the plaintiff here is entitled to recover, it must be on the ground of forfeiture, that the rent has not been paid according to the condition. If the tenancy still exist, there can be no foundation for the action.")

[9] *Blaisdell*, in footnote 18, channels John Adams' look to pre-Revolutionary War England and cites all the way back to *Roscarrick v Barton*, 22 Eng. Rep 769 (1672).

IV.   The 8th Circuit Correctly Distinguished *Yee*

This Court's Order questioned the 8th Circuit's conclusion: "Walz I, then, chose to follow Cedar Point rather than Yee because it misinterpreted…" Order at 18. The 8th Circuit simply recognized that the government forced occupancy "regardless of whether tenants provided compensation" and where leases were "materially violated." *Walz I*, at 17. It was almost a verbatim restatement of *Block v Hirsch* and a later DC Circuit case which repeated *Block's* language: "No action or proceeding to recover possession of housing accommodations shall be maintainable by any landlord against any tenant, notwithstanding that the tenant has no lease or that his lease has expired, *so long as the tenant continues to pay the rent*." *Myers v. H.L. Rust Co.*, 134 F.2d 417 (D.C. Cir. 1943) (emphasis added).

The 8th Circuit did not provide the "disquisition" I do regarding the lack of tenancy, but *Yee* itself highlighted the "unambiguous distinction between a . . . lessee and an interloper with a government license." *Yee v. City of Escondido*, 503 U.S. 519 (1992).

V.   Many "Temporary Takings" Cases Concern Possession and Control Aptly

The District's opposition suggests I am floating a "new" theory concerning the applicability of precedents regarding temporary takings. But *Kimball Laundry* was in the Complaint.

Similarly, while my motion (and Complaint) highlighted the World War II cases, cases exist from World War I. All utilize a "per se" framework. The government requisitioned the possession of a pier from December 1917 through May 1919 (~18 months). Despite the government's initial tender of partial compensation, the Supreme Court unanimously held the deprived owner "entitled to have the full equivalent of the value of such use." *Phelps v. United States*, 274 U.S. 341 (1927). Similarly, for one year, the government "without obtaining plaintiff's consent or instituting condemnation proceedings or making any compensation therefor, took possession of a part of plaintiff's land" - and thereupon the owner "became entitled to have the just compensation safeguarded." *Campbell v. United States*, 266 U.S. 368 (1924). Similarly, "for property requisitioned for public use, the owner is entitled to judgment for the value of the property." *Seaboard Air Line Ry. Co. v. United States*, 261 U.S. 299 (1923). Similarly, an 8-month temporary diversion of goods was held a per se taking in *International Paper Co. v. United States*, 282 U.S. 399 (1931). The government "requisitioned" the electric capacity of a power plant, and in doing so consumed the water that someone else was entitled to receive. The compensation due was the value of the "property rights in water" taken- the inquiry entailed no balancing or investment-backed expectations- no trip into *Penn Central* land.

That makes eight "temporary taking" of possession cases using a per se framework: *International Paper, Phelps, Campbell, Seaboard Air, Kimball Laundry, Petty Motor, General Motors, Peewee Coal*. Modern cases align: See for example *Caquelin v. United States*, No. 19-1385 (Fed. Cir. 2020) (finding the uncompensated imposition of a 6-month easement a "categorical taking, for the period"- even if valued at only $900 and distinguishing regulatory takings). This matter is far broader than *Yee* and *Cedar Point*, and *Cedar Point* itself pointed to such cases as relevant. "See United States v. Peewee Coal" *Cedar Point*, at 5, distinguishing types of takings. Even the dissent in *Cedar Point* conceded that had the regulation in question gone beyond the right to "exclude" into the right to possess and impose an estate, a physical taking would clearly lie. "It does not, for example, take from the employers, or provide to the organizers, any freehold estate… or any leasehold estate" *Cedar Point*, Breyer, J, dissenting, at 4.

VI.   The 8th Circuit Correctly Stated Regulatory Takings Doctrine: Public Benefit is <u>*Not a Defense*</u>

This doctrine flows back to *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393 (1922), which held that a regulation which caused coal deposits to be stuck underground had "the same effect for constitutional purposes as appropriating or destroying it." *Lingle* reaffirmed: a regulatory taking is an enactment which has an effect "tantamount" to an appropriation or an ouster. Yet this Court cited to a dissent by an 8th Circuit judge which accused the panel of deviating "from the view of other federal courts" because it failed to weigh whether, under *Penn Central*, the moratoria "benefit the public enough to justify temporary regulation. See Baptiste…". Colloton, at 3, citing to *Baptiste* ("The final Penn Central factor -- the character of the governmental action" *Baptiste* at 390) and *Elmsford* and *Auracle*.

Colloton is the one running "counter to governing precedent" here. My Opposition to dismissal noted (Pl. Opp. At 4) that the Supreme Court in *Lingle* unanimously held that while public-benefit language had somehow become "ensconced in our Fifth Amendment takings jurisprudence," such an off-ramp "has no proper place in our takings jurisprudence" because it is a *perverted tautology*. See *Lingle v. Chevron U. S. A. Inc., 544 U.S. 528 (2005)*, holding that the "final factor" of the Penn Central test must not include balancing of public benefit: "(for example, a test such as 'substantial relation to the public health, safety…' *Id)*. All takings must be for public benefit, so an articulation of a public benefit by the Government is a prerequisite for the taking to be valid- not ammunition to deny compensation.

Colloton's error aside[10], various circuit and state courts recognize the importance of *Lingle*: *Spoklie v. Montana*, 411 F.3d 1051, 1058 (9th Cir. 2005) ("[T]he Supreme Court has just disavowed the

---

[10] He simply regurgitates the solicitor general: "the Orders were expressly intended to protect public health" (Petition for Rehearing, at 11); panel ignored "the larger community benefit of reducing the spread" same at 12. A solicitor general violating *Lingle* in requesting a court of appeals reverse itself and violate civil rights should be grounds for disbarment. This Court should politely notify Judge Colloton that his dissent is seemingly the product of

7

use of the 'substantially advances' test in takings claims. . . ."); *Mansoldo v. State*, 187 N.J. 50, 898 A.2d 1018, 1024 (2006) (in view of Lingle, "considerations of 'legitimate state interest[s]' have no bearing on whether the [state] regulation effected a taking"); *Byrd v. City of Hartsville*, 365 S.C. 650, 620 S.E.2d 76, 80 (2005) ("To the extent that some of our previous cases have applied Agins alone or both Agins and Penn Central, we overrule them."); *Bottini v. City of San Diego*, 27 Cal.App.5th 281 (Cal. Ct. App. 2018) ("the rationale underpinning the Lingle decision applies with equal force to the California takings clause as to the federal takings clause."); *Rose Acre Farms v. U.S.*, 559 F.3d 1260 (Fed. Cir. 2009) ("That inquiry is now obsolete…Turning to what Lingle requires us to do rather than what we cannot do").

Now back to *Baptiste*: a moratorium "benefitted those tenants… and members of the public…" and therefore isn't a taking. *Wrong*. Similarly, *Auracle*: "promote the common good" therefore no taking. Wrong. *Elmsford*: same.[11]

It is unclear whether this Court's analysis of the "character" of the action veered where *Lingle* prohibits. This Court stated "the legislation had a legitimate public purpose." Order at 22, citing to *District Intown*. But *District Intown* predates *Lingle* and thus does not state the test. A taking is *allowed*- not rendered nonexistent because it is allowed. A "reset" regulatory takings analysis (motion for reconsideration at 9)- must comport with *Lingle*.

VII.     "Older" Types of Takings

My motion suggested that all cases do not fit neatly into "physical" vs "regulatory" tracks, and that "older" cases equally control. By this, I mean the "physical" track is a misnomer. As this Court noted, the proper description of the "per se" track is a "direct government appropriation or physical invasion of private property" *Lingle v. Chevron U. S. A.*, 544 U.S. 528 (2005). The regulatory track considers whether a non-possessory regulation which is otherwise valid "is tantamount to a direct appropriation or ouster" in its effect, as applied. *Id*. The government need not "physically" invade to commit a *per se* taking- it may simply *appropriate* an *interest*. See for example *Cienega Gardens v. U.S.*, 331 F.3d 1319 (Fed. Cir. 2003) ("taking of a property interest, albeit temporarily, and not an example of government regulation under common law nuisance or other similar doctrines, which we would treat differently").[12]

---

a fraud- the same one attempted in *Towers* which the Superior Court was kind enough to proactively snuff out ("the fact that the taking is for a compelling public purpose does not diminish the property owner's right to just compensation from the District under the Takings Clause" Epstein, 12/16/2020, footnote 2).

[11] And on it goes: "purpose of advancing the common good. See Penn Central" *Southern California Rental Housing*

[12] *Jevons* finds *Cienega Gardens* inapplicable because it finds a moratorium to not "diminish" the lessor's interest "by even a penny." Well that's odd- I've been diminished to the tune of *three million pennies*.

VIII.  "Seeking Rent"

The Superior Court held that "a landlord's ability to seek damages from a judgment-proof debtor is not a substitute for an action for possession." Epstein, 12/16/2020, footnote 16. The Contracts Clause was not addressed there or on appeal, but this Court seemingly held the opposite regarding such seeking. The Clause is not violated "if an adequate and efficacious remedy is left." *Antoni v. Greenhow*, 107 U.S. 769 (1883). See also *Oshkosh Waterworks*. (Both affirmed in *Blaisdell*).

*Conclusion*

*Where* is the compensation? "StayDC" belatedly doled out some money to some people- good for them. *Where* are *my rights*? Even socialist dictators go on TV to offer to pay[13] for their shakedowns.

On the Takings Clause, I have shown how cases cited to (thus adopted by) by this Court are worse than "unrefrigerated dead fish." (Dist. Opp. footnote 2). They are not even *dead*. They are live and metastasizing- born by disingenuous government briefs thrown out in 2020 bastardizing centuries of precedent to dodge injunction and dodge payment.[14] It seems nothing has changed since Solzhenitsyn observed that in this country's courts, pursuing rights becomes "an ulceration," a "degrading encounter," "affording crooks and swindlers an advantage" with cases dragging on for "months, even years" and lawyers spinning "nothing but chicanery."[15]

What exactly did this Court's June 21 dismissal *hold*? It seems to erroneously hold the complaint unripe. The District says: whatever, punt up to the DC Circuit the duty to discern that no "relief" existed then or now and then apply facts in the first instance. Yet I already did that dance before the DC Court of Appeals and it concluded with those judges telling me to bring this claim.

Respectfully submitted,

*Alexander Gallo*
Alexander Gallo
950 25th St NW #329N
Washington, DC 20037
516-770-1624
aogallo@gwmail.gwu.edu

---

[13] https://www.youtube.com/watch?v=fFOJzqEwFwg
[14] *JL Properties Grp. B LLC v. Pritzker*. Governor's Memorandum in Opposition. July 5, 2020. "their rights have not been diminished or abolished but rather have been suspended only temporarily" & the "Constitution… is merely an expression of a philosophy and not a mandate"
[15] Aleksander Solzhenitsyn, Between Two Millstones, Book 1.

## **Certificate of Service**

I certify that on August 9, 2022, a copy of this Reply is served by electronic mail on:

micah.bluming@dc.gov

andy.saindon@dc.gov