## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Alexander Gallo
950 25th St NW #329N
Washington, DC 20037
aogallo@gwmail.gwu.edu
516-770-1624
*Plaintiff*

v.

**Case 1:21-cv-03298-TNM**
**Judge Trevor N. McFadden**

District of Columbia
400 6th St NW
Washington, DC 20001
202-727-3400
oag@dc.gov
*Defendant*

### Amended Complaint for Damages and Declaratory Relief (42 USC 1983)

This Amended Complaint, submitted pursuant to the March 1st Order, provides background principles, fleshed out timeline/facts, and distinct pleading of the "types" of takings Plaintiff argues occurred.

The Court finds one notion to be "novel" (*Order* at 6): that a lessee who defaults becomes a trespasser while in default. This truth is fundamental both here and globally (see Footnote 14) and the distinction[1] was recognized by the Supreme Court: "preventing them from evicting tenants who breach their leases intrudes on one of the most fundamental elements of property ownership- the right to exclude." *Alabama Ass'n v. HHS*, 594 U. S. _ (2021). Trespassers get removed- lessees don't. The dissent in *Alabama Ass'n* did not dispute the resultant existence of a giant appropriation- it merely found the "balance of the equities" favored a stay because "Congress has appropriated…" *Id*, Breyer, J, dissenting. That the notion seems novel is evidence of the magnitude of the fraud running rampant.



RECEIVED
3/16/2023
Clerk, U.S. District & Bankruptcy
Court for the District of Columbia

---

[1] "*Yee* never makes the distinction…this Court will not either" *Order* at 6. But ignoring the distinction would itself be a holding that reversionary interest (expectant estate) does not become present upon breach or termination, contrary to *DC v. Design Center Owner (D.C.) LLC* and *District of Columbia v. Carr*, 607 A.2d 513 (D.C. 1992). Such a holding would be a judicial taking: "If a legislature *or a court* declares that what was once an established right of private property no longer exists, it has taken that property" *Stop the Beach Renourishment, Inc. v. Florida Dept. of Environmental Protection*, 560 U.S. 702 (2010) (emphasis original).

*Parties*

Alexander Gallo is a natural person. The District of Columbia is a municipality subject to suit under 42 USC 1983.

*Related Proceedings*

- Superior Court. *Gallo Holdings LLC – Series 2, et al*, v. Andre Hopkins. 2020-LTB-008032. Declaratory Judgment entered 12/16/2020. Possessory action stayed per statute. Case subsequently dismissed pursuant to Filing Ban.
- DC Court of Appeals. *District of Columbia v. Karen Towers, et al*. 21-CV-0037. Judgment entered 10/7/2021, reversing Superior Court's Access to the Court holding of 12/16/2020.

The constitutional challenges raised herein were raised in both related cases. The Contracts Clause and the Takings Clause were left unresolved by both the Superior Court and the Court of Appeals.

## <u>STATEMENT OF THE CASE</u>

*Statutes*

<u>*DC Code § 16–1501: Forcible Entry and Detainer (the "Filing Ban")*</u>

"During a period of time for which the Mayor has declared a public health emergency pursuant to [§ 7-2304.01], and for 60 days thereafter, the person aggrieved shall not file a complaint seeking relief"

<u>*DC Code § 28–3814. Debt collection*</u>

"During a public health emergency and for 60 days after its conclusion, no creditor … shall, with respect to any debt:

(A) Initiate, file, or threaten to file any new collection lawsuit;

(B) Initiate, threaten to initiate, or act upon any statutory remedy for the garnishment, seizure, attachment, or withholding of wages, earnings, property, or funds for the payment of a debt to a creditor"

<u>*DC Code § 42–3192.01. Tenant payment plans*</u>

"During a period of time for which the Mayor has declared a public health emergency pursuant § 7-2304.01, and for one year thereafter ("program period"), a provider shall offer a rent-payment-plan program"

"A provider shall approve each application for a payment plan"

"unless the provider has offered a rent payment plan pursuant to this section and approved a rent payment plan pursuant to subsection (d) of this section, that provider shall be prohibited from filing any collection lawsuit or eviction for non-payment of rent"

*Note: the Payment Plan Statute was an extension of- not a carve out to- the Filing Ban. No filings for possession were allowed for nonpayment or squatters under the Filing Ban- in effect through October 2021.*

## *Introduction: Background Principles of the Law of Land Possession*

*What a Landlord Owns and What a Tenant Owns*

1) At Time = 0, someone holds title to land.[2] This entails the right of possession- for simplicity assume the owner is in possession, like a condo owner sitting in his kitchen. *DC Code §42–507. Estate in possession*. An owner's possession right comes from someone else, who got it from someone else, who obtained it from others since the dawn of time- not from the Mayor, the President, or the DC Council. Here, it traces to Cecil Calvert[3] who negotiated it from those here before.[4] Possession is not a dispensation from on high; there is no authority to snap a finger and "regulate" who gets to occupy whose house.[5] The government can do so under eminent domain.

2) The possession interest is distinct from other rights of ownership. There is no property interest in building a tall building, operating a distillery, or replacing a pretty brick rowhouse with an ugly glass cube- those are *uses* of land. There is no distinct property interest in the *value* of land itself.[6] Interests are not uses; interests are not value.

3) Since one person can't personally use more than a small piece of land, a landowner invites others to *enter,* to *use*, or possibly to *possess*. An owner of agricultural land invites farm workers, who may reside as licensees. See *Cedar Point*. An owner of a commercial building may choose to owner-operate a business, such as a bar, inviting entries until last call. An owner in possession may invite various non-exclusive entries or occupations, such as guests (a friend visiting for dinner), roomers,

---

[2] *Chevy Chase Land Co. v. United States*, 37 Fed. Cl. 545, 564 (Fed. Cl. 1997) ("A fee simple absolute (often inaccurately described as 'fee simple') is of infinite duration, and comprises the greatest estate that one can possess.")
[3] *The Charter of Maryland* (1632) ("to have, hold, possess, and enjoy the aforesaid Region…forever")
[4] Elsewhere, title traces differently: *State v. Romero*, 140 N.M. 299, 142 P.3d 887 (2006) ("Taos Pueblo was settled in approximately 1000 A.D." … "Governor Jironza Cruzate made land grants on behalf of Spain…which started the chain of title that is recognized by this state…"); *United States v. Repentigny*, 72 U.S. 211 (1866) ("The grant of the land was made…by the Governor and Intendant-General of Canada (then called New France)"); *United States v. Percheman*, 32 U.S. 51 (1832) ("a grant from the Spanish governor…their relation to their ancient sovereign is dissolved, but their relations to each other and their rights of property remain undisturbed…"); *Steam-Engine Co. v. Steamship Co*., 12 R.I. 348 (R.I. 1879) ("our ancestors claimed to hold their lands by purchase from the native proprietors and not by grant from the Crown"); *Fairfax's Devisee v. Hunter's Lessee*, 11 U.S. 603 (1812) ("Lord Fairfax…had the absolute property of the soil…complete seizin and possession thereof").
[5] *Terrett v. Taylor*, 13 U.S. 43 (1815) ( "the minister for the time being was seized of the freehold…title thereto was indefeasibly vested in the churches, or rather in their legal agents. It was not in the power of the Crown to seize or assume it… The dissolution of the regal government no more destroyed the right to possess or enjoy this property than it did the right of any other corporation or individual to his or its own property. The dissolution of the form of government did not involve in it a dissolution of civil rights or an abolition of the common law under which the inheritances of every man in the state were held. The state itself succeeded only to the rights of the Crown, and, we may add, with many a flower of prerogative struck from its hands")
[6] *Reichelderfer et al., Commissioners of District of Columbia, v. Quinn et al*., 287 U.S. 315 (1932) ("the existence of value alone does not generate interests protected by the Constitution")

servants, licensees, etc. Such invitation can be *rescinded* at any time. *Tamamian v. Gabbard*, 55 A.2d 513 (D.C. 1947) ("a roomer has merely a right to the use of the premises" and is not a tenant); *Harkins v. Win Corporation*, 777 A.2d 800 (D.C. 2001) (a lodger in a hotel is an invitee only and may be evicted any time using self-help). Any person who enters the land of another does so via invitation or via breaking and entering.

4) An owner may alternately decide to give away his possession for some period and for agreed conditions, thereby becoming the "landlord." The grantee of possession- the "tenant"- then assumes the right to exclude or invite the world. When the tenant is seized in possession, the tenant's possession cannot be disturbed by the landlord. This is called the covenant of quiet enjoyment.

5) A tenant is a *purchaser* of exclusive possession- an *estate*- from the owner by permissive grant. See *Odunn v. United States*, 227 A.3d 1099 (D.C. 2020): ""[I]t is well settled that a tenant, while not a property owner, [is] a purchaser of an estate and entitled to exclusive legal possession of the leased property." …Thus, "[p]roperty law regards a lease as equivalent to a sale of the premises for the term of the lease, making the tenant both owner and occupier during the lease." 49 Am. Jur. 2d Landlord and Tenant § 390 (2020) ; see also Young v. District of Columbia , 752 A.2d 138, 144 (D.C. 2000) ("[A] tenant is a purchaser of an estate, entitled to exclusive legal possession ...." (quoting Beall v. Everson , 34 A.2d 41, 41 (D.C. 1943)))." The owner *offers* land for *purchase*; a tenant *purchases*. The term may be fixed or indefinite. Conditions are stipulated. That is a landlord's "***invitation***."

6) A tenant must perform two covenants to retain tenancy: the covenant to pay rent and the covenant to perform other conditions. When a tenant breaches the covenant to pay rent, they forfeit the tenancy. *Davis v. Taylor*, 276 F. 619 (D.C. 1921) ("forfeiture which resulted from the default in the payment of the rent"), citing *Sheets v. Selden*, 74 U.S. 416 (1868). When the tenant breaches a covenant to perform other conditions (rules on noise, maintaining insurance, etc), they forfeit their estate if the breach is non-trivial. *Entrepreneur, Ltd. V. Yasuna*, 498 A.2d 1151 (D.C. 1985).

7) The owner, having parted with his possessory estate by becoming "landlord"- retains two non-possessory *property interests*. The owner's estate is now "expectant." *D.C. Code §§ 42-508 Estates in Expectancy*. The first interest retained is the "reversionary interest." Upon the landlord's initial voluntary grant of possession, "the lessee has the possessory interest; and the lessor has the reversionary interest." *Velicky v. The Copycat Bldg. LLC*, 476 Md. 435 (Md. 2021).[7] The reversionary

---

[7] This is essentially universal. *City Council of Greenville v. White*, 194 Miss. 145 (Miss. 1943) (""the 'landlord's rights, after the tenant's entry, are confined to the protection of his reversionary interest'"); *Smiley v. Van Winkle*, 6

interest is vested. *DC v. Design Center Owner (D.C.) LLC*, Nos. 21-TX-0473 & 21-TX-0627 ("the lessors' already-vested future ownership interests…" at 17 & upon breach or termination "vested future interest to a present one" at 23).[8] Someone's estate must legally exist at any given moment on land- what the Magna Carta described as being "seised." The tenant is initially seised with an estate; the landlord is seised upon reversion.

8) The second property interest held by the landlord, when a lease is in force, is the "leased fee interest." This is the property interest in the rents to be received under the lease, which may escalate yearly as rent control permits. See *Adkins Ltd. Partnership v. O St. Mgmt, LLC*, 53 A.3d 1159 (2012) ("if real estate is encumbered by a lease, the ownership interest in that property is considered a leased fee interest rather than a fee simple interest."). When the lease terminates or is breached, the land is no longer encumbered. The leased fee interest ceases and the reversionary interest resumes.

9) For the Landlord-Tenant relationship to continue, "these elements must be present: Permission or consent on the part of the landlord, subordination to the landlord's title and rights on the part of the tenant, a reversion in the landlord, an estate in the tenant, and the transfer of possession and control of the premises to the tenant under a contract either express or implied between the parties." *Beall v. Everson*, 34 A.2d 41 (D.C. 1943)

10) The legal status of an occupant exists temporally. Status may change. An occupant of the owner's house is not necessarily the owner's tenant, as tenancy "does not arise by mere occupancy" *Nicholas v. Howard*, 459 A.2d 1039, 1040 (D.C. 1983). A tenant who gave away the keys to the owner's house may still be the owner's tenant. *Hall v. Henry J. Robb*, 34 A.2d 863 (1943). A person evicted from the owner's house may still be the owner's tenant. *Wylie v. Glenncrest*, 143 A.3d 73 (D.C. 2016), *Quick v. Paregol*, 68 A.2d 211 (D.C. 1949). A person who holds *adversely* (eg, without a present estate or without present permission) is a squatter. "Absent… privity of estate and privity of contract, the occupier is in adverse possession as a "squatter." 3 G. Thompson, Thompson on Real Property § 1029, at 87-90 (Replacement ed. 1980)" *Nicholas v. Howard*, 459 A.2d 1039 (D.C. 1983).

---

Cal. 605 (Cal. 1856) (""it is one of the essentials of a lease, that it should contain a reversion in favor of the party from whom the grant or assurance proceeds")

[8] "No matter how the termination comes about, the result is the same: the landowners' reversionary interests become present interests" Id, at 24 ("whenever their lessee breaches the lease agreement and thereby causes an early termination of the lease." footnote 9).

*Background Principles: Recovering Possession Under DC Law*

11) To begin: a landlord does not- and cannot- legally "evict" a *tenant*. The notion itself is a logical absurdity and constitutes the tort of wrongful eviction. A tenant has a covenant of quiet enjoyment. The landlord cannot breach it. A tenancy must *cease to exist* before an owner can claim the right to possession and- when possession is subsequently "detained"- file a complaint for it.

12) When someone entered the owner's house via invitation but without tenancy, and where such invitation has expired or been withdrawn (guests, roomers, lodgers, servants, invitees), the owner may use "self-help" to remove the person on the basis such person never had exclusive possession which the owner's self-help could disturb. *Harkins v. Win Corporation*, 771 A.2d 1025 (D.C. 2001) (self-help permissible to evict a non-paying lodger).

13) Since time immemorial, when a tenancy was breached or terminated, the landlord had a common law right to immediately use self-help to "re-enter" and restore his possession. He could also always summon the assistance of the law. In the 19th Century this entailed a summoning a justice of the peace, which in 1864 switched to the "detainer" process. Modern law abrogated self-help as an option, on the grounds that summary process afforded an equal "remedy" post-breach.

14) The simplest possessory action is where a tenancy was "at will" and was *terminated*. *DC Code § 42– 3203. Tenancy at will*. These tenancies include all commercial properties as well as non-lessee holdovers such as a foreclosed owner residing in a condo after they lose ownership. Such tenancies are terminated by a 30-Day Notice to Quit. Take a restaurant. If, after the lease term expired, the landlord gives 30-Day notice and such tenant hasn't vacated, the landlord must now sue for possession which is being "detained" by the business which is no longer a tenant. If a defendant appears in landlord-tenant court in this situation, their only defense is to offer a lease showing a current entitlement to the land.

15) Turning now to residential. Evictions for expiration of term are prohibited, so all tenants are "tenants by sufferance." § 42–520. *Estates by sufferance*. The landlord's initial invitation is thus indefinite and lasts until one of two things happens: (1) the tenant *breaches* the lease, thus *ceasing to be a lessee* and *forfeiting* their estate or (2) the owner, exercising some prerogative of ownership, *unilaterally terminates* a tenancy which has not been breached.[9] Category 2 is what various municipalities have

---

[9] A residential landlord ***invites*** a "periodic tenancy, terminable only on the occurrence of an event specified by statutes such as the violation of an obligation of the tenancy" *Habib v. Thurston*, 517 A.2d 1 (1985)

"regulated" in the modern era: so-called "just cause" eviction laws which restrict the grounds and timelines upon which a *non-defaulting tenant* may be kicked out. For each ground, rules differ on how far in advance a Notice to Vacate must be served and whether a tenant may reoccupy.

16) Take for example one Category 2 ground: owner occupancy.[10] The owner terminates a non-breached tenancy by serving a Notice to Vacate for personal occupancy. This requires 90-Day notice and a good-faith assertion of intent. If such a notice is served, and the "tenant" is still present on Day 91 when the owner desires to move in, the owner's only recourse is to sue for possession on the ground the tenancy no longer exists as of Day 91 and someone has "detained" in his house. Even then, the "tenant" may appear as defendant in the Landlord-Tenant case for possession and may assert defenses, such as "I was never served a notice" or "he's not really going to move in- he just hates me." If the "tenant" defendant successfully defeats the Notice, what the Landlord-Tenant court judge holds, essentially, is the following: the tenancy was not, in fact, ever terminated: that the defendant is still and was throughout a *tenant* with the possessory right originally granted by the Plaintiff. On the other hand, if a "tenant" appears as a defendant and spouts a bogus defense such as "I never got a notice"[11] but the plaintiff refutes that, the Landlord-Tenant court judge rules: the tenancy was *in fact terminated*, the defendant was no longer a tenant as of Day 91, the Complaint was validly filed, non-redeemable judgment for possession issues, and the U.S. Marshalls will remove the person if he doesn't disappear. In this latter example, on Day 91, the *former tenant* became a *squatter*, "detaining" on the owner's estate. If the Complaint were filed on Day 89, it would be dismissed.

17) Take another Category 2 example: Demolition.[12] Let's say the owner of a residential building wants to demolish it and replace it with a sports stadium. Such *changes of use* are allowed. But rarely are they urgent- so the law requires a 180-Day notice along with a copy of the plans to be reviewed by the Rent Administrator to confirm the demolition is not a pretext. So the owner serves such notices and hires his demolition crew. On Day 181, the owner discovers: a "tenant" is still on site. The owner now must sue for possession. At trial, it will be determined: the tenancy ceased to exist on Day 180 and the "tenant" should have departed. They didn't. On Day 181 they became a *squatter*.

---

[10] DC Code 42-3505.01 (d): "A natural person with a freehold interest in the rental unit may recover possession of a rental unit where the person seeks in good faith to recover possession of the rental unit for the person's immediate and personal use and occupancy as a dwelling"

[11] *Moody v. Winchester Management Corp*., 321 A.2d 562 (D.C. 1974) ("As the landlord's service of the notice to quit was defective, the tenancy was not terminated")

[12] DC Code 42-3505.01 (g)(1) "A housing provider may recover possession of a rental unit for the purpose of immediately demolishing the housing accommodation in which the rental unit is located and replacing it with new construction"

18) Now turn to Category 1: *breaches* of lease by a tenant. Assume the breach is non-payment.[13] At Time=0, all is going well. The owner wakes up loving the tenant he originally "invited," expecting to receive rent when it is due so that he can cover expenses. The relationship of landlord and tenant exists. The privity of estate (the leasehold estate given by the landlord to the tenant) and privity of contract (the lease terms signed by both parties) exists. The first of the month passes and… no money arrives. He calls the "tenant:" no answer. He sends a text: no answer. He knocks on the door: no answer. The owner's sole remedy is now: immediately file for possession to avoid his own endless robbery. The landlord-tenant judge will ask one question: was the rent paid? If not: judgment for possession. Because again: the only reason a landlord can claim possession is if the *tenancy ceases to exist*.[14] If an innocent reason for the default in payment exists, a tenant receives what is known as a "redemption" right. Judgment enters regardless, but if the defaulted tenant pays before the Marshalls arrive, the eviction will be canceled, they will be "relieved" of their forfeiture, and their *prior tenancy* restored. The clock resets to zero or the Marshalls execute an eviction without delay.

19) Where a redemption right exists for default in payment, the trial court has no authority to stay the eviction date. *National Capital Housing Authority v. Douglas*, 333 A.2d 55 (1975) In a landlord's suit for possession based on non-payment, if a defendant shows up and demands a trial (thus delaying the

---

[13] Breaches of other lease terms (blasting music all night) do not necessarily deprive the landlord of money.

[14] *In Re Windmill Farms, Inc*, 841 F.2d 1467 (9th Cir. 1988) (for nonpayment, "In an ensuing unlawful detainer proceeding, the court does not decide whether the lessor terminated the lease. That has already occurred"), *Western Un. Tel. Co. v. Hansen Rowland Corp*., 166 F.2d 258 (9th Cir. 1948) (upon nonpayment, "the appellant ceased to be a tenant of the appellee and became a trespasser, 'guilty of unlawful detainer'"), *Lowry v. Woolsey*, 31 N.Y.S. 1101 (1894) (for nonpayment, "from that time Henderson, if in possession of the land, would be but a trespasser"), *Parmelee v. Oswego & Syracuse Railroad*, 6 N.Y. 74 (1851) ("the estate ipso facto ceases, as soon as the condition is broken, without an entry"), *Jackson ex dem. Norton v. Sheldon*, 5 Cow. 448 (1826) (N.Y. Supreme Court of Judicature) (to repossess, "If the tenancy still exist, there can be no foundation for the action."), *Cavanaugh v Cook*, 38 R.I. 25 (R.I. 1915) (formerly paying tenant is a "trespasser"), *Owens v. Layton*, 233 P. 645 (Wash. 1925) (tenant becomes a "trespasser" when he "continues in possession after default in the payment of rent…"), *Shanfelter v. Horner*, 81 Md. 621 (1895) ("a re-entry was not requisite to have entitled the lessor to determine the tenancy" & "the estate will ipso facto cease as soon as the condition is broken"), *Smith v. Shaw*, 16 Cal. 88 (Cal. 1860) ("Ejectment cannot be maintained until the relationship of landlord and tenant has ceased to exist"). See also, globally: *Moses v. Lovegrove* (1952) 2 QB 533 ("the defendant was admittedly a tenant of the plaintiff up to the time he ceased to pay rent" but "from the date of the last payment of rent, the defendant is deemed to have had no contractual right to possession, and theretofore to have been a trespasser or a squatter"), *Joy Tumushabe & Another vs M/s Anglo Africa Ltd  & Another* SCCA No. 7 of 1999 (Supreme Court of Uganda) (citing to Halsbury's Laws of England) ("when the appellants refuse to pay rent… they became trespassers"), *Abioye v Yakubu* (1991) 5 NWLR (Supreme Court of Nigeria) (a tenant is one who "keeps to the conditions of the grant and payment" but who will "incur forfeiture and lose his tenancy on breach of the terms"), *Namdeo Lokman Lohdi v. Narmadabai and Others*, 1953 AIR 228 1953 SCR 1009 (1953) (Supreme Court of India) ("the forfeiture is complete when the breach… occurs"), *Ching Pue, Et Al., Petitioners-Appellants, v. Benito Gonzales, Respondent-Appellee*., G.R. Nos. L-2554-2564. July 21, 1950 (Supreme Court of The Philippines) ("lessee has forfeited his right as such because of his failure to pay the rents as agreed upon"), *Burghardt v. Taylor*, [2012] JMSC Civ. 126. (Jamaica) ("when that license was revoked…defendant's continued occupation of the land was that of a squatter").

potential date of judgment), the court imposes a "protective order" requiring the defendant to *timely* pay the rent amount they are alleged to not be pay into the court registry. This is to prevent the defendant from claiming a bogus defense as a ploy to squat for free, kick the can and disappear when judgment finally issues. *Mahdi v. Poretsky Management, Inc*., 433 A.2d 1085 (D.C. 1981) ("the Constitution, expressly protects against confiscation of private property or the income therefrom").

### *Facts of This Case (Plaintiff's Ownership and Timeline)*

20) Alexander Gallo owns and manages several residential condominium units in the District.

21) In most of Plaintiff's units- the usual setup-tenants occupy under leases. Their right to possession continues contingent on lease compliance (Footnote 10). These occupants include persons invited by him (the unit is advertised and a tenant selected) or persons invited by Plaintiff's predecessor in interest. The persons occupying these condos, as of February 2020, were not in breach of lease. These persons were, and some continue to be, Plaintiff's tenants.

22) Separately, Plaintiff purchased a condo at a foreclosure auction in February 2020 (hereafter, the "Foreclosure Unit"). At such sales, the purchaser bids sight-unseen on a property being auctioned because the owner (possibly but not necessarily the occupant) is heavily delinquent.[15] Upon winning the auction and closing the sale, the purchaser takes title (thus assuming liability for taxes and HOA dues) but not possession. If the unit turns out to be vacant, the purchaser takes possession and changes the locks. If a foreclosed owner is still in the property after the sale, they assume the status of "tenant at will" (see paragraph 14).[16] Such tenancy can be *terminated* by the new owner by service of a 30-Day notice to quit. Plaintiff served such a notice in March 2020, *terminating the right of possession* of the prior owner as of April 2020. After the notice expired, a complaint was filed.

### *The District Imposes its Uncompensated Filing Ban*

23) In March 2020, the Mayor declared without warning: all evictions are banned. No mention was made of compensation. Canceled evictions were those scheduled after the court system had issued

---

[15] This is unlike a "normal" sale, in which someone browses Zillow, finds a house they like, and gets a key to a vacant property after touring it, with possession delivered at the closing.
[16] *Crockett v. Deutsche Bank Nat. Trust*, 16 A.3d 949 (D.C. 2011) ("Our law defines a "squatter" who is a mortgagor remaining in possession after a foreclosure sale as a "tenant at will." D.C. Code § 42-522. While the term "tenant" is used to define such status, that term itself does not create a contractual landlord-tenant relationship; it is used to allow property owners to avail themselves of the summary procedures of the Landlord and Tenant Branch.")

judgment. At this point, the Mayor dispensed possession to some people somewhere but had not directly caused Plaintiff any pecuniary losses.

24) Plaintiff's initial reaction was: what's a one-month delay on a process which already takes 4 months? "Two weeks" to slow the spread, right? Nobody would waste time suing the government for a one-month taking. Precedent supports such a suit though. See *United States v. Russell*, 80 U.S. 623 (1871) (a ship was "taken into the service" of the government for "twenty-six days").

25) Two weeks then morphed via new decree into two more months. Compensation was still not mentioned. Plaintiff thought: this sucks for people who already got judgment for possession and who now can't evict until summer. But surely two months will be it- otherwise this is a total crock. And at least the court system is open for filings, so if tenants breach now (Category 1 ground) he could still file a suit for possession to at least *begin enforcing* payment obligations for all leases. And Plaintiff's possession of the Foreclosure Unit would deliver as scheduled in summer 2020.

26) In May 2020, the District revealed: the two-month ban was just a teaser. It passed the Filing Ban, which "suspended" the cause of action of possession entirely- including for non-payment- for the duration of the "emergency" and retroactively dismissed all complaints currently sitting in court filed in March 2020 or later. How long would this go on for? Nobody said. Everyone citywide was now *immune from suit* in the event they decided to stop paying. The guy in the Foreclosure Unit- Andre Hopkins- who Plaintiff had never met and whose right to possession Plaintiff had *terminated* as of April 2020- now received a statutory right to squat for free in a condo that was no longer his, while Plaintiff was required to sit there paying for it. Other statutes were simultaneously imposed which prohibited any suit for money, or any execution of judgment for money. Open season had begun.

27) In the same bill as the Filing Ban (B23-0758), a "payment plan" provision was also imposed, which required any lessor to accept a breach of lease by a lessee for the duration of the Filing Ban and for one year beyond (essentially, upon a tenant's insistence, they would have no legal obligation to immediately get "current" whenever the Filing Ban expired). This statute had no *operative effect* as long as the Filing Ban was alive because no cases for nonpayment were allowed.

28) As of May 2020, all of Plaintiff's leases were thus declared legally unenforceable, leaving him in a precarious state of being personally liable for $7,000 per month in expenses while having his ability to enforce leases and take possession of the Foreclosure Unit withdrawn. No compensation, guarantee or "relief" was made available by the District for any occupancy imposed by any non-paying person.

29) The Filing Ban came with no provision of compensation by the government or any alternate form of "relief" by the government for Plaintiff. Or, to Plaintiff's knowledge, for any other landlord. No offsetting protection (such as Government directly covering expenses) was provided. Adding insult to injury, the District continually subjected homeowners with outlay obligations such as HOA dues, utilities, property tax, cost of capital and maintenance, with foreclosure and civil fines to be imposed for any failure to continue serving non-paying persons.

30) The District thus- by fiat- suspended the right to possess, to exclude, and receive income from land. It appropriated contracts and converted private property to public housing without compensation.

31) Given the District's imposition of total robbery (instead of what could have been a permissible exercise of eminent domain), and lack of any "relief programs" available to landlords, various landlords challenged the Filing Ban in summer 2020. Grounds included access to the courts, the contracts clause, and the takings clause. Cases were consolidated into one hearing in Fall 2020.

32) Whereas in normal times (see Paragraph 18) there would typically be no response from an occupant who started robbing you, responses around the country shifted to versions of "you can't evict me so I am not paying shit"[17] or "Next time if you come here, I'm gonna let my dogs loose on you."[18] Inside Edition covered how in the Hamptons in 2020, a "wave of squatters moved in, refusing to pay rent" while "there is little the owner can do about it." An owner states to the news: "complete nightmare… emotionally and financially. Completely devastating." One squatter exits his $90,000 SUV while his lawyer pulls up behind demanding the news crew "get off of the grounds."[19]

33) The situation here was no different. One home became "beset with numerous problems, including…not maintaining the house, loud noise, constant groups of people hanging out smoking marijuana, fireworks being shot off during the night, as well as frequent visits from police" after a group of squatters took over, relaxing $23,000 in arrears with water bills spiking 1,388% (affidavit, 2020-LTB-006315). The owner- a U.S. Embassy employee in the Dominican Republic- could not return because she had nowhere else to live. "We believe in institutions and the American judiciary system" she stated naively in August 2020.

34) Other affidavits contained similar abuses. "I am stuck still paying thousands in property taxes and the costs of keeping the Property in good shape while Vivian and her friends occupy the Property rent-

---

[17] *Baptiste v. Kennealy*, 490 F. Supp. 3d 353, 369 (D. Mass. 2020)
[18] https://caanet.org/landlords-speak-out-against-alameda-eviction-moratorium-on-eve-of-vote/
[19] https://www.youtube.com/watch?v=slRaMVkTDUI

free. A neighbor has let me know they are damaging the Property too, probably out of spite... The D.C. government has not waived any property taxes, assisted in maintenance of the Property, or otherwise helped my father's estate or myself at all…They might as well be the same as random strangers walking and occupying the Property." "I am outraged at having no recourse to remove a squatter …for nearly a year and the government has given me no recourse…The District government has not provided me any assistance or compensation whatsoever." In one exchange between a homeowner and a Councilmember's office in October 2020, the owner asks: "Why am I left to hold the bag for a policy that punishes me for conducting commerce in good faith? Where is my protection as a consumer and a constituent?" The DC Council responds with "…costs are tax deductible- maybe this is his only recourse. I am sorry I don't have better news for you." *Reply Brief of Amici Curaie Shirley Proctor*, 2020-LTB-006315.

35) The District responded to landlords' challenges in fall 2020 by stating: no violation of anything. See *Brief of District of Columbia*, 11/06/2020, Case No. 2020 LTB 006315. In addressing the Takings Clause, the District argued: "there may be no economic impact in any given case" because the money being stolen may magically reappear in the future because a tenant may be eligible for some relief program which may or may not be created. *Brief* at 30. It also suggested no landlord had pled they were not "capable of earning a reasonable return." Physical taking doctrine was sidestepped.

36) In December 2020, the Superior Court held the Filing Ban unconstitutional on one ground while leaving "unaddressed" the Contracts Clause and the Takings Clause. It went out of its way to snuff out frauds which were getting traction. For example, if the Filing Ban "effects a taking of property (an issue that the Court does not decide), the fact that the taking is for a compelling public purpose does not diminish the property owner's right to just compensation from the District under the Takings Clause" (footnote 2), for the subset of cases which concerned non-payment, the Filing Ban would be a "confiscation of their property and associated income" (at 20), and "The record does not provide a basis for the Court to assess the probability that landlords will ultimately be made whole" at 23, and noting the infirmities of *Elmsford v Cuomo* (footnote 16).

37) The District then appealed and won administrative stay, reimposing the Filing Ban. The stay ignored the unaddressed grounds.

***A Year Into its Uncompensated Moratorium, the District Receives a Partial Bailout (StayDC)***

38) Entering now into 2021... *Thirteen months* into suspending enforcement of all of Plaintiff's leases and forcing Plaintiff to house a squatter in the Foreclosure Unit without compensation or "relief," the District announces that relief would belatedly be made available in some amount to some people.

39) "StayDC" was announced in April of 2021. It purported to offer "both" tenants and housing providers the opportunity to "apply" for assistance, with the possibility of having a tenant's arrearage covered prior to the expiration of the moratorium. But the program was not an entitlement- it was simply a fixed pot with rules. And by "both" apply it really meant *together simultaneously* apply. If a tenant did not apply a landlord could not apply individually.

40) Thus, StayDC was of no use to Plaintiff even belatedly- he could not "apply" to it. The occupant of the Foreclosure Unit refused to communicate with Plaintiff. He would not open the door. He took no action to apply to StayDC and Plaintiff had no mechanism to force him to. Plaintiff could not apply on his behalf to receive any money

41) In granting its stay pending appeal in May 2021, the DC Court of Appeals latched on to StayDC's advertisement of relief as the reason to justify continued imposition of the Filing Ban: "in early April, the Mayor announced a $350 million assistance program..." The Filing Ban was left in place, the Contracts Clause and Takings Clause still ignored, and oral argument scheduled for Fall 2021.

42) Throughout winter and spring of 2021, some of Plaintiffs other tenants began breaching their leases (not paying) while Plaintiff had no remedy. Word had gotten out: why pay if there's nothing the landlord can do about it? And if you had "arrearage" the government *might* reimburse it- so start breaching, rob the landlord and accrue arrearage if you have half a brain. A third of Plaintiff's tenants breached and did so for months on end.

43) In summer 2021, with StayDC available *only to tenants who apply*, Plaintiff considered bilking the program by creating a fake application based on fake self-attested qualifying income (allowed) submitted from a fake email address with the name of the squatter in the Foreclosure Unit. After all, fraud in Covid programs was rampant and everyone knew it, so why not join the printed-money fun train instead of sitting there like an honest chump? However, even this was *mechanically impossible*. The StayDC portal required a business license from the landlord. Plaintiff never had possession of the unit and thus couldn't get a business license (requires an inspection)- so Plaintiff had no path to even submit a fake application to solve his problem.

44) Plaintiff obtained a money judgment against the squatter in the Foreclosure Unit for the rapidly accruing damages ($20,000 by summer 2021). It remains unsatisfied and it is non-collectible.

45) Still losing cash, Plaintiff appeared as appellee in the fall of 2021 in hopes of getting the DC Court of Appeals to resolve the grounds left "unaddressed" by the Superior Court. All 3 judges in the merits hearing essentially agreed that a taking occurred: Judge Deahl, at 2h 02m, stated: "They could probably do that under eminent domain, if they paid you" and there is "a takings claim for a certain amount of money" and Judge Glickman observed at 2h 12m that the remedy seemed to be an "inverse condemnation action against the Government."

46) However, instead of remanding to Judge Epstein, the court of appeals simply "reversed" the trial court's decision and left the unaddressed grounds still unaddressed. This seems to violate precedent: "A lower court decision must be affirmed if the result is correct, despite the fact that the court 'relied on a wrong ground or gave a wrong reason.' *Marinopoliski v. Irish*, 445 A.2d 339, 340 (D.C. 1982) (quoting *Helvering v. Gowan*, 302 U.S. 238, 58 S.Ct. 154, 82 L.Ed. 224 (1937)).

47) In October 2021, StayDC ran out of bailout money and stopped accepting applications. The squatter in the Foreclosure Unit never applied for relief. In total, Plaintiff was deprived of fair use value while sitting without remedy paying the bills on a property occupied by a non-paying squatter Plaintiff had never even met. Plaintiff spent two years being forced to shovel out cash while his right to possess or receive income was abrogated. This situation produced mental anguish. Plaintiff additionally spent significant personal time having to litigate in vindication of his civil rights.

48) This case was filed immediately upon the court of appeals' irresolution of the issues in Fall 2021.

49) After the Filing Ban expired for squatter cases on January 1, 2022, Plaintiff filed a new suit for possession and regained possession of the Foreclosure Unit in May 2022. The place was trashed by the person allowed to live for free in it and who treated it accordingly- requiring tens of thousands in repair cost.

## COUNTS & RELIEF REQUESTED

Plaintiff incorporates herein by reference every allegation contained in the preceding paragraphs.

I.    **Takings Clause[20]: $5 in Nominal Damages and Declaratory Judgment**

The District's Filing Ban takes property without compensation. The government provided no compensation together with the moratorium- therefore it is a violation. Plaintiff requests a declaratory judgment and $1 for each of the following types of takings caused by the Filing Ban's grant of possession. Three property interests are appropriated: reversionary interest (alternatively, the leased fee interest), income, and contract rights; two types of property are taken under a regulatory lens: real property and contract rights. This Section I claim does not hinge on the identity of any one tenant or property. The Filing Ban was an unconstitutional imposition for the ground of nonpayment (not necessarily other grounds). The lack of "relief," rent guarantee or compensation is a facial violation.

*Background Principles- Takings Clause*
"Because the Constitution protects rather than creates property interests, the existence of a property interest is determined by reference to 'existing rules or understandings that stem from an independent source such as state law.'" *Phillips v. Wash. Legal Found.*, 524 U.S. 156, 164 (1998). While it is sometimes said there are two "types" of takings, third "type" known as confiscation of income straddles the takings clause and due process clause.

Physical takings are takings of interests, while regulatory takings are based on mere restrictions on use. See for example *Cienega Gardens v. U.S*., 331 F.3d 1319 (Fed. Cir. 2003) ("taking of a property interest, albeit temporarily, and not an example of government regulation under common law nuisance or other similar doctrines, which we would treat differently"). "Consideration of whether a regulatory taking occurred would not assist in resolving whether a physical taking occurred as well; neither of the two questions is subsidiary to the other. Both might be subsidiary to a question embracing both — Was there a taking?" *Yee v. Escondido*, 503 U.S. 519 (1992).

Accordingly, regulatory takings cases (such as *Loretto v. Teleprompter Manhattan CATV Corp*., 458 U.S. 419 (1982)) should not be crossed with or used to negate physical taking precedents. [21]

---

[20] In Takings Clause Argument (c) the Due Process Clause is jointly pled under the "confiscation" doctrine.
[21] One of the most obvious red flags in *Elmsford* was its declaration that in the 2nd Circuit, somehow and without explanation, physical takings can only be "permanent." The 2nd Circuit- probably fraudulently induced- crossed the wires in 1992, nullifying there every case cited to on page 16-17. The disgrace being that a holding meant to strengthen regulatory doctrine in 1982 was used to negate physical taking doctrine a decade later.

Compensation is due "at the time of the taking." Delinquent compensation does not negate the constitutional violation. *Knick v. Township of Scott*, 588 U. S. \_\_\_\_ (2019). ("A later payment of compensation may remedy the constitutional violation that occurred at the time of the taking, but that does not mean the violation never took place…A bank robber might give the loot back, but he still robbed the bank."). Compensation may come through administrative programs provided they are a "reasonable, certain and adequate provision for obtaining compensation" at the time of the taking. *Cherokee Nation v. Southern Kansas Railway Company*, 135 U.S. 641 (1890). Money judgment is appropriate only if "adequate." See *Knick*, at 2176. Declaratory judgments and injunctive relief are also appropriate.[22] State courts have long held similarly.[23]

Temporary takings of possession or occupations are per se takings: *Duckett Co. v. United States*, 266 U.S. 149 (1924) ("Possession…was requisitioned and taken by the President temporarily"), *U.S. v. New River Collieries*, 262 U.S. 341 (1923) (mere 75% compensation for 18-month requisition violates Takings Clause), *Phelps v. United States*, 274 U.S. 341 (1927) (for 18-month requisition, "entitled to have the full equivalent of the value of such use."), *Campbell v. United States*, 266 U.S. 368 (1924) (for one year, "without obtaining plaintiff's consent or instituting condemnation proceedings or making any compensation therefor, took possession of a part of plaintiff's land" - owner "became entitled to have the just compensation safeguarded."), *Seaboard Air Line Ry. Co. v. United States*, 261 U.S. 299 (1923) (for temporary requisition, "the owner is entitled to judgment for the value of the property."), *International*

---

[22] "If the law requires a party to give up property to a third person without adequate compensation, the remedy is, if necessary, to refuse to obey it, not to sue the lawmaker" for money. *Morrisdale Coal Co. v. United States*, 259 U.S. 188 (1922). See also *Lewis Blue Point Oyster Co. v. Briggs*, 229 U.S. 82 (1913) ("taking of private property which may be enjoined unless provision for compensation has been made"); *Manigault v. Springs*, 199 U.S. 473 (1905) ("enjoin…until compensation is paid"), *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555 (1935) (enjoining uncompensated moratorium on foreclosure), *Albert Hanson Lumber Co v. U.S.*, 261 U.S. 581 (1923) (Government may not seize "a right to the possession until reasonable, certain and adequate provision is made for obtaining just compensation."), *Bauman v. Ross*, 167 U.S. 548 (1897) ("Under the Constitution… the United States are not entitled to possession of the land until…actually paid."), *Harrisonville v. W.S. Dickey Clay Mfg. Co*., 289 U.S. 334 (1933) ("injunction should be denied, conditional however upon prompt payment… to oblige the landowner to bring repeated actions at law for loss of rental would be so onerous as to deny adequate relief").
[23] *Gardner v. Trustees of Village of Newburgh*, 2 Johns. Ch. 161 (1816) ("necessity of a preventive remedy…Injunction granted"), enjoin if "serious in amount and irreparable in character" *Town of Greenville v. State Highway Commission*, 196 N.C. 226 (1928), "enjoined from any acts…having  for their object the taking possession of the same without making compensation" *Ill. Cities Water Co. v. Mt. Vernon*, 11 Ill. 2d 547 (Ill. 1957), enjoin when Government takes "faster than the property owner can litigate" *Wandermere Corp. v. State*, 79 Wn. 2d 688 (Wash. 1971) (en banc). When Government is "about to take possession without condemnation, injunction is a proper remedy" *Wilshire v. Seattle*, 280 P. 65 (Wash. 1929), "where a taking is attempted under the power of eminent domain without any provision being made for compensation an injunction will lie" *Beals v. City of Los Angeles*. 23 Cal.2d 381 (Cal. 1943), "Injunction is the proper remedy to prevent the taking…for a public use without just compensation by one who is invested with the power of eminent domain." *Meagher v. Appalachian Electric Power Co.*, 195 Va. 138 (1953), enjoin for government "trespass" where inverse condemnation is not an "adequate remedy." *Curran v. Department of Highways*, 258 Mont. 105 (Mont. 1993).

*Paper Co. v. United States*, 282 U.S. 399 (1931) (8-month taking of water rights), *United States v. Pewee Coal Co., Inc*., 341 U.S. 114 (1951) ("temporary possession of a business enterprise"), *Kimball Laundry Co. v. United States*, 338 U.S. 1 (1949) ("The proper measure of compensation for the temporary taking was the rental that probably could have been obtained"), *United States v. General Motors Corp*., 323 U.S. 373 (1945) ("temporary occupancy of a portion of a leased building"), *United States v. Dow*, 357 U.S. 17 (1958) ("temporary use and occupation"). See also *Anderson v. Chesapeake Ferry Co*., 186 Va. 481,492 (1947) ("just compensation for temporary taking can only be a fair rental value."), McKay v. U.S., 199 F.3d 1376 (Fed. Cir. 1999) (taking for "several years"), *Eyherabide v. United States*, 345 F.2d 565 (Fed. Cir. 1965) ("just compensation for the temporary taking"), *St. Regis Paper Co. v. United States*, 110 Ct. Cl. 271 (1948) ("requisitioned…during the war period"); *Niagara Falls Bridge Commission v. United States*, 111 Ct. Cl. 338 (1948) (for temporary occupancy, "no one has a right,, of course, to occupy another's premises without paying for them"). Squatting on land without paying after failing to vacate is a physical "taking of the current market rental value of the plaintiffs building without just compensation." *Allenfield Associates v. United States*, 40 Fed. Cl. 471 (1998).

### a.   Takings Clause Claim 1: Direct Appropriation of Reversionary Interests

Plaintiff requests declaratory judgment and $1 that the Filing Ban appropriated his reversionary interest in his condos. The Filing Ban declared: whether a tenancy *was terminated* or *is breached*, possession is nonetheless granted to a squatter. The former tenant is given a statutory right to squat for free. No compensation is provided. This is a facial uncompensated taking of reversionary interest citywide.

There is no ambiguity as to when the owner's reversionary interest resumes in the landlord-tenant context: Such interest is "to be resumed summarily upon the failure…to pay rent." *Davis v. Vidal*, 105 Tex. 444 (1912) (reaffirmed in El Dorado Land Co. v. City of McKinney, 56 Tex. Sup. Ct. J. 415 (Tex. 2013), finding a physical taking thereof).[24] The DC Court of Appeals similarly held: reversion resumes summarily upon termination or breach. *DC v. Design Center Owner (D.C.) LLC*, Nos. 21-TX-0473 & 21-TX-0627. A taking of possession is a physical taking.

---

[24] A judge on New York's highest court put it well: "an owner's genuine reversionary interest is satisfied by the ability to remove a financially or behaviorally irresponsible tenant- rights plaintiffs will continue to enjoy" *Manocherian v. Lenox Hosp*, 84 N.Y.2d 385, 406 (N.Y. 1994) (Levine, J., dissenting from majority's holding to elevate the reversionary interest where money is not implicated). In the context of easements (not breached leases), the interest is protected on physical takings grounds. "Without the statutes, the holders of the reversionary interests would absolutely and automatically obtain possession" upon "abandonment. Under the statutes, they would not." *Lawson v. State*, 107 Wn. 2d 444 (Wash. 1986) (en banc)

The DC Court of Appeals helpfully held that if the District interfered with the landlord's reversionary interest by granting a breached tenant the right to occupancy longer, it would have to "take over the tenant's obligation to pay rent to the landlord." *District of Columbia v. Carr*, 607 A.2d 513 (D.C. 1992). ("The District's actions were directed against the possessory rights of the tenant, not against the reversionary rights of the landlord…there was no entry affecting a reversionary interest, warranting compensation to the landlord" and "without taking an estate in land (even as sublessee) or assuming any obligation to take over the tenant's obligation to pay rent to the landlord.")

The Federal Circuit held, regarding reversionary interest: "interests under state property law that have traditionally been recognized and protected from governmental expropriation, and if, over their objection, the Government chooses to occupy or otherwise acquire those interests, the Fifth Amendment compels compensation." *Preseault v. U.S.*, 100 F.3d 1525 (Fed. Cir. 1996). It reaffirmed that again in *Caquelin v. United States*, No. 19-1385 (Fed. Cir. 2020) (finding the uncompensated imposition of a 6-month easement a "categorical taking, for the period" of the reversion- even if valued at only $900 and distinguishing regulatory takings). Not maybe compels. Not "as applied" compels only for subjectively large damages. Not compels after considering *Penn Central*. Does the Filing Ban appropriate the reversionary interest- a *vested present interest* under state law- which reverts upon cessation of a tenancy at will or breach of tenancy at sufferance? **Yes**. Did the government appropriate it without compensation? **Yes**.

The DC Circuit has held the same regarding reversionary interest: "these more limited interests, which do implicate the takings clause, take a variety of forms" *National Wildlife Federation v. I.C.C*, 850 F.2d 694 (D.C. Cir. 1988). ("it concedes that a reversionary interest in land is 'property' within the meaning of the fifth amendment")

*Earlier Filing/Eviction Bans Were Not an Uncompensated Taking of the Reversionary Interest*

"the panel decision never addressed why the scheme in Yee that allowed a landlord to evict existing tenants only for limited reasons after up to 12 months' notice did not constitute a per se taking, while a temporary eviction moratorium during a pandemic ostensibly does." *Heights Apartments, LLC v. Walz*, 39 F.4th 479 (8th Cir. 2022) (Colloton, dissenting). Answer: The "scheme" in *Yee* did not implicate the reversionary interest because the interest only resumes upon- not before- termination or breach. The "scheme" in *Yee*- like the District's Category 2 scheme (see Paragraph 16/17) for no-fault terminations- merely lays out what is required to unilaterally terminate. That may be a "gauntlet" such as for demolition. But tenancies continue through the termination date- and the scheme does not require

occupation *after termination* or *after breach*. Simply: California requiring 12 months' notice for a demolition is not a taking despite DC requiring 6 months.

The Supreme Court's "emergency" housing cases rest on this underlying doctrine. *Block v. Hirsch*, 256 U.S. 135 (1921) ("a tenant's right of occupancy should, at his option, continue, notwithstanding the expiration of his term, subject to regulation by the commission, *so long as he paid the rent and performed the conditions fixed by his lease*.") (Emphasis added); *Marcus Brown Holding Co., Inc. v. Feldman*, 256 U.S. 170 (1921) ("declares a public emergency to exist, and provides that summary proceedings shall not be maintainable to recover the possession" in order to snag a windfall rent but a tenant must "pay a reasonable rent" and the landlord "be put in possession if *payment be not promptly made*.") (emphasis added), *Parker v. Fleming*, 329 U.S. 531 (1947) (affirming eviction ban where "no tenant shall be removed from any housing accommodation, by action to evict…*unless*: (3) *The tenant has violated an obligation of tenancy*") (emphasis added). Evictions continued under these "emergency" laws.[25]

Renewing term has a long history- the government is free to adjust "Category 2" grounds for eviction and compensate for breaches to renew those as well. Even if a Notice to Vacate is served terminating a non-breached tenancy, the tenancy can be resuscitated by compelled payment. "the receipt of rent by a landlord, after notice to quit, of rent for a new term or part thereof, amounts to a waiver of his right to demand possession under that notice" *Byrne v. Morrison*, 25 App. D.C. 72 (1905). The reversion would be taken- but with compensation. When "no action or proceeding to recover possession of housing accommodations shall be maintainable" by the owner, "the effect of the section is to create a non-contractual statutory right of possession in the tenant." *Warthen v. Lamas*, 43 A.2d 759 (D.C. 1945). ("continued possession, the *payment and acceptance of rent*, were with intent to create the estate") *Id*.

Where a tenancy expired and payment is tendered, "equity will compel the landlord to renew" *Soper v. Myers*, 45 App. D.C. 286 (1916). "a renewal of a lease by a tenant in possession is considered in equity as a mere continuance of the original lease"- not a new one. *R. Harris & Co. v. Weller*, 280 F. 980 (1922).

**b.  Takings Clause Claim 2 (In The Alternative): Direct Appropriation of Leased Fee Interests**

The previous section concerned the owner's possessory interest upon reversion. Finding no taking of the reversionary interest would require the court to ignore *Alabama Ass'n* and hold that despite a tenant's

---

[25] *Shipley v. American Security & Trust Co*., 296 F. 1011 (D.C. 1924) ("Tenant subletting in violation of lease may be dispossessed, Ball Rent Act not applying… he was entitled to possession so long as he paid his rent and performed the other conditions of his agreement with plaintiff"), *National Metropolitan Bank of Washington v. Judge*, 37 A.2d 446 (1944) (affirming eviction proceeding where tenant "violated an obligation of her tenancy"), *Dunnington v. Thomas E. Jarrell Co*., 96 A.2d 274 (1953) ("The tenant's possession is protected so long as he pays rent and complies with the act. The landlord can terminate the tenancy only under limited conditions...")

breach the tenancy invited by the landlord still exists. Thus, in the alternative, Plaintiff claims that the Filing Ban takes the leased fee interest. The money due under leases was appropriated.

Like Schrodinger's Cat, both non-possessory interests cannot *simultaneously* be taken, as only one is present at any one time. The court's resolution of Claim A is the equivalent of observing the cat: if the reversionary interest was taken then the leased fee interest had ceased to exist and thus could not be taken.

The Filing Ban simply takes whatever amount of rent is not paid. The interest taken is whatever the theft turns out to be. If someone squats while paying 50%, then the government has appropriated 50% of the leased fee interest- the same way the government appropriated 50% of the raisins in *Horne v. Dep't of Agriculture*, 576 U.S. __ (2015) (where government "pays… only for the remainder" after taking "possession and control" it is a per se taking, not a use restriction).

*Yee* is relevant here. *Yee* held rent control appropriates nothing because the landlord has no property interest in the rent which *would hypothetically be obtained* if the landlord were not subject to the rent control (no "discrete interest in land" formed by the gap between restricted and unrestricted rents, *Id* at 527).[26] *Yee* is thus good law.[27] If *Yee* went the other way, every price-gouging statute would require the government to pay every owner's windfall profit. But the flip side of the coin is: the landlord retains an interest in the rent collectible under rent control.

### c.   Takings/Due Process Claim 3: Confiscation of Income (Rent)

Let's say the court finds the Filing Ban is not a taking of a property interest but merely some kind of amendment to rent control or leases which "regulates" the income due under a lease. Plaintiff hereby claims a confiscation of income. The Superior Court essentially held in 2020 that a confiscation occurs here where a defendant is judgment-proof. "The moratorium completely deprives landlords of the interim protection to which they would otherwise be entitled in order to prevent confiscation of their property and associated income." Epstein, *DC v Towers*, at 20, citing *Brown v. Pearson*, 241 A.3d 265 (D.C. 2020) (concerning judgment-proof tenant refusing to make payments).

---

[26] The court in *Yee* did not hold that the rent control statute there was constitutional. It only held that challenges must proceed under doctrines such as regulatory takings or confiscations of income.
[27] It is unclear why this court considered the first complaint as desiring to "jettison Yee." Dismissal, footnote 6. *Yee* concerns tenants- *Cedar Point* concerns trespassers. Plaintiff rarely cites to either.

The doctrine, where formal rate regulation occurs, is generally: the government must permit a *reasonable* rate. The Filing Ban reduces income to zero which is facially unreasonable. By dispensing occupancy below a "reasonable" rent level, and not *guaranteeing* reimbursement of a reasonable rent, the Filing Ban confiscates the rent. The rate of return is driven to negative infinity for years on end. The gross income is driven to zero while the owner is stuck with the expenses.

This is unconstitutional under centuries of controlling "confiscation" doctrine. See *Kennedy Bros. v. Sinclair*, 287 F. 972 (D.D.C. 1923) (holding that government compelling a rate of return below the prevailing interest rate would be confiscatory); *Karrick v. Cantrill*, 51 App.D.C. 176, 277 F. 578 (1922) (same); *Apartment & Office Bldg, Etc. v. Washington*, 381 A.2d 588 (1977) (finding no taking because hardship petitions avoid subjecting owners to operating when "their cash flow is negative."). *Rust v. Heavy*, 286 F. 782, 52 App. D.C. 320 (1923) (return of 4 per cent at 1901 Wyoming Ave NW "confiscatory"), *Moore & Hill, Inc. v. Marshall*, 286 F. 990, 52 App.D.C. 326 (1923) ("if the net income from the rental, above the ordinary expenses, falls below 6 per cent, per annum of the value of the leased property, it should be treated as confiscatory").

The Supreme Court has long articulated the same. A negative rate is not reasonable. "the legislature may itself fix a maximum beyond which any charge would be unreasonable, in respect to services rendered in a public employment, or for the use of property in which the public has an interest, subject to the proviso that such power of limitation or regulation is not without limit, and is not a power to destroy, or a power to compel the doing of the services without reward, or to take private property for public use without just compensation or without due process of law." *Budd v. New York*, 143 U.S. 517 (1892) (collecting cases). A later case reviewed the history and held: "while the power to regulate has been sustained, negatively the court has held that the legislature may not prescribe rates which, if enforced, would amount to a confiscation of property." *Cotting v. Kansas City Stock Yards Co*., 183 U.S. 79 (1901). "The court holds the rates to be confiscatory in three of the nine cases…the rates are confiscatory as not yielding a return on their property" *Missouri Rate Cases*, 230 U.S. 474 (1913). "When the property itself is taken by the exertion of the power of eminent domain, just compensation is its value at the time of the taking. So, where by legislation prescribing rates or charges the use of the property is taken, just compensation assured by these constitutional provisions is a reasonable rate of return… the utility company is not limited to a return on cost" *West v. C. P. Tel. Co*., 295 U.S. 662 (1935).

"not only must a rent control ordinance be facially nonconfiscatory… it must also be nonconfiscatory as applied." *Brunetti v. Borough of New Milford*, 68 N.J. 576 , 595, 350 A.2d 19 (1975). See also *Ex Parte*

*Young*, 209 U.S. 123 (1908). "the provisions of the acts relating to the enforcement of the rates... are unconstitutional on their face, without regard to the question of the insufficiency of those rates. We also hold that the Circuit Court had jurisdiction...to permanently enjoin the railroad company from putting them in force, and that it also had power, while the inquiry was pending, to grant a temporary injunction to the same effect...the passenger rate act and the orders of the Commission, were not sufficient to be compensatory, and were in fact confiscatory, and the act was therefore unconstitutional." *Id*.

The doctrine also applies if confiscatory rates are imposed for merely two years where "revenues ...fell short of meeting its operating expenses"... "[p]roperty may be as effectively taken by long-continued and unreasonable delay in putting an end to confiscatory rates as by an express affirmance of them. . . ." *Smith v. Illinois Bell Tel. Co*., 270 U.S. 587, 591, 46 S.Ct. 408, 410, 70 L.Ed. 747, 749 (1926).

### d.   Takings Claim 4: Direct Appropriation of Contract Rights (Leases)

Leases do not necessarily continue post-breach. The District Court in New York recognized this when reviewing "post breach" provisions. "it can be argued that in Sections 749 and 753, the New York State legislature is not 'adjusting' the terms of a contract between landlord and tenant in a regulated market, but rather drafting a landlord who is no longer subject to *any enforceable contract* at all (because the tenant is in breach) to provide an additional benefit- of up to one year's housing" *Cmty. Hous. Improvement Program v. City of N.Y*., 492 F. Supp. 3d 33 (E.D.N.Y. 2020) (emphasis original).

This court seems keen on holding that leases are kept alive during the Filing Ban. But the only way to hold that is if the government appropriated their benefits. The third appropriation caused by the Filing Ban is Plaintiff's contract rights. See *De Laval Steam Turbine Co. v. United States*, 284 U.S. 61 (1931) ("the government requisitioned the purchasers' rights in the contracts not for the purpose of putting an end to the contracts, but of keeping them alive for the benefit of the government. Its action being in pursuance of law, the government succeeded to all the rights of the purchasers under the contracts...In effect, the old contracts became new contracts between the government and the petitioner")

A lease is a contract for timely payment of money, which in turn provides the right to occupy land. Plaintiff is the obligor on a handful of leases which require timely payment of rent, several of which were breached while remedy was "suspended." The Filing Ban renders the contract non-enforceable and grants the counterparty the right to continue consuming while not paying. It thus appropriates the contract.

"Contract rights are a form of property and may as such be taken for a public purpose provided that just compensation is paid." *United States Trust v New Jersey*, 431 U.S. 1 (1977). "The Fifth Amendment commands that property be not taken without making just compensation. Valid contracts are property." *Lynch v. United States*, 292 U.S. 571 (1934). Had compensation been provided, "An appropriation under eminent domain with compensation of a contract neither challenges its validity nor impairs the obligation. It is a taking, not an impairment, of its obligation." *Cincinnati v. Louisville & Nashville R. Co*., 223 U.S. 390 (1912). The government appropriates contract rights "by taking over the benefits of one of the parties, or by transferring the contract benefits to some third party." *Public Takings of Private Contracts*, John D. Echeverria. Ecology Law Quarterly, Vol. 38, No. 3 (2011), pp. 639-672 (34 pages), at 643.

### e.   Takings/Due Process Claim 5: Regulatory Taking of Real Property

A "de facto" taking is one which does not entail "a total assumption of possession" because property encompasses "the right of any person to possess, use, enjoy…a thing." *Eaton v. Boston, Concord & Montreal Railroad*, 51 N.H. 504 (1872), citing *Wynehamer v. People*, 13 N.Y. 378, 433 (1856). Thus, where regulation sufficiently destroys use and enjoyment, a taking of the land is "effected" without physical action. Where land is used for business and the regulation is of *uses* not *prices*, the general rule is: can the owner stay profitable with permitted uses. De facto takings are sometimes called "regulatory" takings, but they don't necessarily entail a promulgated regulation.

One persuasive line of cases: *Luber v. Milwaukee County*, 47 Wis. 2d 271 (Wis. 1970) (predating Penn Central). In this case, a city announced a future condemnation which caused a tenant distillery to not renew its lease. The owner, unable to re-lease, lost all rental income for the two-year period prior to the condemnation date while "required to continue incurring expenses, such as heat, repair and taxes." The Wisconsin Supreme Court affirmed a de facto taking and compensation for two years of lost rent, valued at roughly $11,000. Arizona's highest court held similarly: a threatened two year loss of rent is facially a de facto taking: "The statute here under review makes no provision for just compensation and is hereby declared unconstitutional." *State v. Griggs*, 358 P.2d 174 (Ariz. 1960).[28]

---

[28] Facial challenges have long succeeded under de facto doctrine. Rent Control and Zoning are only facially permissible when they include hardship processes. Several cases in this section were successful as facial challenges Florida's highest court similarly held that where a statute "sanctioned situations which would permit the state to take private property without just compensation" it is facially void. *Tampa-Hillsborough Expressway v. A.G.W.S*, 640 So. 2d 54 (Fla. 1994). The 4th Circuit held that facial challenges are appropriate where "mere existence" of a statute threatens the losses. *Beacon Hill v. Loudon County*, 875 F.2d 1081 (4th Cir. 1989)

Similarly, a decree requiring a hotel to cease operating for one year- while the owner was stuck paying the bills- was held a temporary regulatory taking. *Keshbro v. City of Miami*, 801 So. 2d 864 (Fla. 2001). Same in *State ex rel. Pizza v. Rezcallah*, 702 N.E.2d 81, 124 (Ohio 1998). Same in *City of Seattle v. McCoy*, 4 P.3d 159 (Wash.Ct.App. 2000). A sudden order to delay construction while the owner was left holding the bag was held a temporary regulatory taking in *Hamilton Bank v. Williamson Cty. Reg. Planning*, 729 F.2d 402 (6th Cir. 1984) (finding "temporary taking" under Penn Central).

The Federal Circuit found a temporary de facto taking of the Willard Hotel due to a historic preservation moratorium in *Benenson v. United States*, 548 F.2d 939 (Fed. Cir. 1977) (predating Penn Central). "The lessee could not…pay rent to plaintiffs." Id, at 943. The owners were stuck with a dead asset: "plaintiffs cannot use their property for any income-producing purpose… plaintiffs are forced to preserve the structure for the benefit of the Government, which bears no part of the financial responsibility." at 947, and "the owners could not demolish the Willard or change the facade during the moratoria" at 953.

The California Court of Appeals, in the landlord-tenant context, found a regulatory taking where a statute simply commanded landlords to dispense a little extra cash to tenants via "supplemental" interest. *Action Assn. v. Santa Monica Rent Control Bd.*, 94 Cal.App.4th 587 (Cal. Ct. App. 2001) ("During that period, each landlord, on average, will use $718 of its own funds to pay all of its tenants... Although the Board views those figures as de minimis, we do not. A small taking is still a taking." & "contrary to the landlords' reasonable investment-backed expectations"). The character of the action of such a statute was held to be: "treating private landlords like banks." *Id*.

New York's highest court found a regulatory taking from an "indefinite" conversion moratorium in *Seawall Associates v. City of New York*, 74 N.Y.2d 92 (N.Y. 1989)- even where the coerced tenancies were *paying* and allowed hardship petitions. It earlier found a 6-month de facto taking where the city delayed a demolition permit for the Old Met while providing insufficient interim compensation. "this statute must fall." *Matter of Keystone Assoc. v. Moerdler*, 224 N.E.2d 700 (N.Y. 1966)

The Federal Circuit, applying Penn Central, found a regulatory taking in *Yancey v. United States*, 915 F.2d 1534 (Fed. Cir. 1990) ("If the intent of the poultry quarantine was to benefit the public, the public should be responsible for the Yanceys' losses"). A 77% reduction in value coupled with the swift and unexpected nature of the loss combined (the first two prongs) produced a taking.

Maryland's highest court found a de facto taking where a bus company was compelled to provide rides below cost for the public's benefit. *Capital Transit Co. v. Bosley*, 191 Md. 502 (Md. 1948) (no police power to "compel the carrier to transport it at less than cost, or for a merely nominal compensation").

*Penn Central*

"the New York City law does not interfere in any way with the present uses of the Terminal... So the law does not interfere with what must be regarded as Penn Central's primary expectation" *Penn Central*, at 136. Contrast that to the Filing Ban, which changes "rental" housing to "no rental" housing, stealing all the rent. *Penn Central* was also clear in its holding: the law in question was "permitting Penn Central not only to profit from the Terminal but also to obtain a 'reasonable return' on its investment." at 136.

*Penn Central* was only a limited restriction on the right to build up. "it simply cannot be maintained, on this record, that appellants have been prohibited from occupying any portion of the airspace above the Terminal." *Id*, at 137. It held that even if the law in question had lobbed off some quantity of upper floor space, the law in essence provided compensation via air rights which the owner retained for sale. "the rights afforded are valuable." Id, at 137. Lastly, *Penn Central* acknowledged that its holding would not preclude the same owner from re-litigating the same case should permitted uses become economically nonviable. "if appellants can demonstrate at some point in the future that circumstances have so changed that the Terminal ceases to be 'economically viable,' appellants may obtain relief." *Id*, at 138.

*Dist. Intown Properties v. Dist. of Columbia*, 198 F.3d 874 (D.C. Cir. 1999) similarly focused on the ability to maintain a reasonable rate of return: "no evidence that this regulation rendered Lots 106-114 unprofitable to maintain" at 883 and "whether the property as a whole can be operated at a sufficient profit even with the regulation" at 884. Regarding the owner's expectation, there was no expectation in being able to build whatever it wanted given the "approximately 60 years" of historic preservation rules in that zone (at 883). Also relevantly, the owners had bought the site decades earlier as a single lot and only subdivided it to grasp a windfall by putting eight new houses on what was (and is) a grass front lawn. An owner has no inherent right to put eight houses on a picturesque front lawn (Paragraph 2).

*Penn Central Applied Here*

- Economic Impact: a landlord is forced to realize, or is imminently threatened with realizing, massive cash losses which drive rate of return to negative infinity without reimbursement.
- Investment-Based Expectations: The landlord's expectation is to receive rent. The Filing Ban changes the expectation of rental housing to squatter housing overnight. No such law has ever validly existed.

- The Character of the Action: The character of the action is theft and slavery. An alternate view is "whether the character of governmental action is like a physical invasion." *Giovanella*, 447 Mass.at 735. Here, it is like an invasion- because it is an invasion by someone who is in breach of contract who would otherwise not be occupying. The character of the action is: dispossession. See *Blackburn, Jr. v. Dare County*, No. 20-2056 (4th Cir. 2023) (no taking because owner "not dispossessed")

### f.   Takings Claim 6: Regulatory Taking of Plaintiff's Contract Rights

The Washington Supreme Court recently held that that contract rights are protected under *Penn Central* if contracts are rendered, even temporarily, "commercially impracticable." *Wash. Food Indus. Ass'n v. City of Seattle*, No. 99771-3. Plaintiff asserts a regulatory taking of his leases. The leases are rendered commercially impracticable by a Filing Ban which renders them wholly unenforceable for two years, or in the alternative "amends" the rent due to zero. Arguments in subsection (e) are hereby incorporated, but for contract rights instead of use of real property.

### II.   Takings Clause: Just Compensation of $34,600 for Property Taken by Government

Regardless of whether this court finds it facially acceptable for the government to permit a squatter to occupy your house and not pay you (Section I) without government guarantee, Plaintiff requests just compensation for the cumulative value of property taken here. This section thus presents accumulated damages for the facially invalid uncompensated Filing Ban or an 'as applied' claim under regulatory doctrine. All six arguments in Section I yield the same result here: the government owes the rent stolen.

This claim presents accumulated damages for two years of uncompensated occupancy in the Foreclosure Unit. The compensation due is the "rental which could have been obtained." *Kimball Laundry Co. v. United States*, 338 U.S. 1 (1949). "As just compensation for a permanent taking is fair market value, so just compensation for temporary taking can only be a fair rental value." *Anderson v. Chesapeake Ferry Co*., 186 Va. 481,492 (1947). The fair use value of the property taken by the District for the occupancy of the non-paying squatter is worth $1,400/month according to the DC Housing Authority. Mr. Hopkins squatted in the condo from February 2020 through May 2022- the time he departed after repossession actions resumed. Two years and two months of his occupancy- forced on Plaintiff for the public good=26 x $1,400 or: **$36,400.**

To the extent *Penn Central* needs to be re-plead "as applied:"

- Economic impact: Plaintiff was forced to lose $36,400 individually without recourse housing a hobo.
- Investment-Backed Expectation: Plaintiff had no idea he would be forced by the government to dispense free housing and stuck with one homeless person for two years without compensation, as it had never happened in the history of the country and was unconceivable how it would ever be allowed to happen without injunction.
- Character of the Action: The character of the action is: theft and slavery. The Filing Ban is unlike any zoning or historic law which merely restricts future construction or uses.

Various appellate courts have found regulatory takings in various as-applied contexts such as temporary permit denials (*Seiber v. U.S.*, 364 F.3d 1356 (Fed. Cir. 2004)) or temporary assertions of jurisdiction which cause a halt to productive activities (*Resource Investments, Inc. v. U.S.*, No: 98-419 L (Fed. Cl. Jan. 23, 2009)). To the extent a writ of waste is constitutionally based, Section VII is incorporated here.

## III.   Nominal Damages of $1 and Declaratory Judgment for violation of the Contract Clause

The Filing Ban impaired the obligation of all of Plaintiff's leases. The Contract Clause applies to the District. *DC Code § 1–203.02* The right is actionable under USC 1983. *Southern California Gas Co. v. City of Santa Ana, 336 F.3d 885, 887 (9th Cir. 2003) (per curiam).* "the laws which subsist at the time and place of the making of a contract and where it is to be performed enter into and form a part of it as if they were expressly referred to or incorporated" *Von Hoffman v. City of Quincy*, 71 U.S. 535 (1866). The key determination is whether a challenged law "stacks up well against laws that this Court upheld against Contracts Clause challenges as far back as the early 1800s." *Sveen v. Melin*, 138 S. Ct. 1815 (2018)

The Contracts Clause is meant to prohibits "installment or suspension laws" of the type "changing the time of payment by authorizing distant installments" *Sturges v. Crowninshield*, 17 U.S. 122 (1819). This was a recognition of the understanding by the signatories: that States- in times of "great public calamities and distress" could not impair contracts by "totally or partially stopping the courts of justice, or authorizing the debtor to pay by instalments." New York also unsuccessfully requested amendments to retain State power to pass debtor relief laws. *1 Debates In The Several State Conventions on the Adoption of the Federal Constitution 376 & 330 ("Luther Martin's Letter").* "…a violation of Contracts had become familiar in the form of…Instalment laws, and of the occlusions of the Courts of Justice" *James Madison: Origin of the Constitutional Convention, December 1835*

The clause "applies to implied as well as to express contracts." *Fisk v. Jefferson Police Jury*, 116 U.S. 131 (1885) (holding that where law establishes a rate for a service, and a person provides such service, "a perfect implied obligation arises to pay for the services at the fixed rate" and this obligation is protected by the Clause). A tenant at will whose tenancy was formerly terminated but who continues occupying and not paying is "liable for use and occupation on an implied contract." *McFarland v. Stewart*, 50 A.2d 194 (Me. 1946). Hence the Filing Ban impairs Plaintiff's leases (see Paragraph 21/28/42) as well as his ability to enforce an implied contract for payment with his holdover squatter.

Acts held unconstitutional suspend remedy and/or unilaterally change income streams between debtor and creditor. *Green v. Biddle*, 21 U.S. 1 (1821) ("postponing or accelerating the period of its performance, imposing conditions not expressed in the contract, or dispensing with the performance…impairs its obligation."). *State of Louisiana v. City of New Orleans*, 102 U.S. 203 (1880) ("he who pays too late, pays less. Any authorization of the postponement of payment… is in conflict with the constitutional inhibition."), "the Legislature may not withdraw all remedies" under a contract. *Oshkosh Waterworks Co. v. Oshkosh*, 187 U.S. 437 (1903)

A state cannot "temporarily extend" the redemption period for a debtor in the context of land possession where no compensation is required in the interim. Older cases include: *Barnitz v. Beverly*, 163 U.S. 118 (1896) ("the act carves out for the mortgagor or the owner of the mortgaged property an estate of several months more than was obtainable by him under the former law, with full right of possession, and without paying rent or accounting for profits in the meantime."), *Bronson v. Kinzie*, 42 U.S. 311 (1843) ("no one, we presume, would say that there is any substantial difference between a retrospective law declaring a particular contract or class of contracts to be abrogated and void and one which took away all remedy to enforce them" & "it is the duty of the court to maintain and enforce it without any unreasonable delay"), *Edwards v. Kearzey*, 96 U.S. 595 (1877) ("If a state may stay the remedy for one fixed period, however short, it may for another, however long"- under a suspension of remedy, a contract "ceases to be, and falls into the class of those 'imperfect obligations,' as they are termed, which depend for their fulfillment upon the will and conscience of those upon whom they rest").

State supreme courts long held the same regarding "extension" of default periods or stay laws. See *Jones v. Crittenden*, 4 N.C. 385 (holding uncompensated "stays" of proceedings violate the contracts clause because "The right to suspend the recovery of a debt for one period implies the right of suspending it for another; and as the state of things which called for the first delay, may continue for a series of years"); *Welsh v. Cross*, 146 Cal. 621 (Cal. 1905) "not only hinders and delays him in recovering his money, but

renders him insecure in the hope of it, and might in many instances totally destroy his rights by nullifying them. It is said that a substantial remedy is left, but if the legislature can delay payment by limitation or exemption laws for six months they could do it for six years"); *State v. Carew*, 47 S.C.L. 498, 13 Rich. 498 (1866) (Stay law violates Contracts clause- collecting cases); *Lapsley vs. Brashears,* 14 Ky. 47, 4 Litt. 47 (1823) (one year "stay" of execution of writ of fieri facias violates Contracts Clause- "all pre-existing remedies upon the prior contract are suspended, and the obligation of the contract thereby weakened and impaired"); *McClain v. Easly*, 63 Tenn. 520 (1874) (Act requiring courts to "stay the collection of all judgments" violates Contracts clause because "the judgment creditor had the right, under the law, to have his execution levied on the debtor's land").

The Supreme Court's "emergency" housing cases- essentially rent control and little more- fit into this larger doctrine. See *Levy Leasing Co., Inc. v. Siegel*, 258 U.S. 242 (1922): ("emergency" eviction ban for some grounds not an impairment because "The obligation to pay specified rent cannot be said to be impaired by a limitation on the recovery to what is fair and reasonable"), *Marcus Brown Holding Co., Inc. v. Feldman*, 256 U.S. 170 (1921) (same: no impairment because "in an action for rent or rental value, the landlord secures judgment by default, he shall, in addition to a money judgment, be *put in possession if payment be not promptly made*.")[29] (emphasis added). New York's highest court held the same regarding a two-year "suspension" of summary evictions on no-fault grounds: "The state, therefore, has the power reasonably to regulate for a time the terms upon which a landlord, under emergency conditions may put his tenants out *so long as they promptly pay a reasonable compensation* for the use of the property." *People ex rel. Durham Realty Corp. v. La Fetra*, 230 N.Y. 429 (1921).

*Blaisdell and Beyond*

Propaganda notwithstanding, *Blaisdell* changed little about the contracts clause. It merely acknowledged- and affirmed as not inherently impairing- the doctrine of equitable relief from a forfeiture in an emergency. *Blaisdell* announced 5 factors that, together, define the outer extent of "reasonableness" for a temporary and minimal relief from obligations in an emergency. It reaffirmed the prior holdings that remedy must remain available: "The obligation of a contract is not impaired by a law modifying the remedy for its enforcement, but not so as to impair substantial rights secured by the contract." *Id*. It reaffirmed the 19th century cases cited herein, which concerned extension of redemption periods, on the ground those cases "do not control where the statute in question *safeguards the interests* of the mortgagee

---

[29] Let's also compare what the law required of tenants in *Marcus Brown* ("a willingness to pay a reasonable rent and any reasonable increase as the same may be determined by a court of competent jurisdiction" Id, at 197) with what an eviction ban for nonpayment requires of tenants here ("you can't evict me so I am not paying shit" *Baptiste*)

purchaser by conditions imposed on the extension." *Id*. "the mortgagee-purchaser thus is not left without compensation for the withholding of possession" and "The procedure and relief provided are cognate to the historic exercise of equitable jurisdiction in cases of mortgage foreclosure" *Id*. The mortgagee was safeguarded with the *equivalent,* in cash, of the *value of possession* for the period. Had the bank been allowed to foreclose, the bank would have been no better off. The statute caused no losses.

The *Blaisdell* dissent put its finger on the problem with the majority's opinion: dicta which would be stripped away from the limited holding and used to bastardize the case as creating some "new era." "The effect…though serious enough in itself, is of trivial significance compared with the far more serious and dangerous inroads" bound to occur. It acknowledged that the bank was being mostly compensated: "a conclusion that payment of the rental value during the two years' period of postponement is even the approximate equivalent of immediate ownership and possession is purely gratuitous." *Id*. Gratuitous yes-but still pretty much full compensation.

After *Blaisdell*, the Supreme Court unanimously and in quick succession reaffirmed that *Blaisdell* was not a burial of the clause. A grant of "undisturbed possession for the debtor and without a dollar for the creditor" with "no enforceable obligation in the meantime" and debtors having "every incentive to refuse to pay a dollar"- precisely what the Filing Ban did here- is unconstitutional. *W.B. Worthen v Kavanaugh*, 295 U.S. 56 (1935). Contracts "are impaired within the meaning of the Constitution when the right to enforce them by legal process is taken away or materially lessened." *Lynch v United States*, 292 U.S. 571 (1934). "We were unable then, as we are now, to concur in the view that an emergency can ever justify, or, what is really the same thing, can ever furnish an occasion for justifying, a nullification of the constitutional restriction upon state power in respect of the impairment of contractual obligations." *W. B. Worthen Co. et al. v. Thomas*, 292 U.S. 426 (1934).

*Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234 (1978) reaffirmed this trio of cases provided controlling limits. "The Blaisdell opinion thus clearly implied that, if the Minnesota moratorium legislation had not possessed the characteristics attributed to it by the Court, it would have been invalid under the Contract Clause of the Constitution…These implications were given *concrete force* in three cases that followed closely in Blaisdell's wake." (emphasis added). Id, at 242, referring to *Worthen*.[30]

---

[30] Many state supreme courts post-*Blaisdell* found violations accordingly: *Federal Land Bank of Wichita v. Story*, 1988 OK 52 (1988) ("fails to provide for the protection of the mortgagee"); *Federal Land Bank of Wichita v. Bott*, 240 Kan. 624 (1987) ("the Act does not provide sufficient protection for the mortgage, and lacks the 'reasonable conditions' contained in the debtor relief legislation upheld in Blaisdell"); *Federal Land Bank of Omaha v. Arnold*, 426 N.W.2d 153 (1988) ("cannot withstand scrutiny"); *Flushing Nat. Bank v. MAC*, 40 N.Y.2d 731 (1976) (Contracts Clause not an "ideal to be worshiped when not needed and debased when crucial"), *Shouse v. Quinley*, 3 Cal.2d 357 (Cal. 1935) ("does not consider the interest of the…bondholder").

IV.    Legal Fees (42 USC 1988)

Legal fees in vindication of the civil rights asserted here were assessed by prior Counsel in the amount of **$10,000** in the related case of 2020-LTB-008032. ("plaintiffs may receive fees under §1988 even if they are not victorious on every claim" *Fox v Vice*, 563 U.S. 826 (2011), citing *Hensley v. Eckerhart*, 461 U.S. 424, 435). Plaintiff therefore "should ordinarily recover an attorney's fee" from the defendant—the party whose misconduct created the need for legal action. *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 416 (1978). "Where a lawsuit consists of related claims, a plaintiff who has won substantial relief should not have his attorney's fee reduced simply because the district court did not adopt each contention raised." *Hensley v. Eckerhart*, 461 U.S. 424 (1983)

V.    Compensatory Damages- Mental Anguish

Plaintiff requests **$50,000** in mental anguish owing to the collective violation of the Takings Clause and Clause.[31] This anguish is demonstrated by the statements of persons similarly situated to whom no compensation was made available. Such statements are admissible non-hearsay evidence under *FRE 803(3) Then-Existing Mental, Emotional or Physical Condition* and 803(1) *Present Sense Impression*.

"In Washington, D.C., affordable housing landlord Arthur Nalls tried for months to hang on after the pandemic began, paying off the mortgages on his two rental buildings with savings, then his credit cards and finally his retirement fund. About a third of his 47 tenants stopped paying, the 66-year-old said. 'My gas bills didn't get a deduction, my utilities didn't get a deduction, my property taxes were still due and I still had to make repairs.' In January and June, Nalls sold his two properties to investors. 'You can probably tell by the tone of voice,' he said, 'I'm extremely bitter about the whole thing.'"[32]

Connecticut landlord Jeffrey Dunn stating "the emotion it takes on my wife is devastating" after being forced to pay the housing costs of a tenant who refused to pay and stated they would not leave until the sheriff removed them.[33] Homeowner Brandie LaCasse has been forced to seek a fourth job to pay the bills

---

[31] Claims in an action for uncompensated taking are not limited to just compensation- they may include all claims for "personal injury." *Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687 (1999). Shoveling cash while getting no rent causes mental anguish. *Baker v. Chrissy Condo. Ass'n*, 251 A.3d 301 (D.C. 2021) (footnote 23).
[32] "Selling out: America's local landlords. Moving in: Big investors" *Reuters*, July 29 2021.
[33] "Landlord reflects after eviction moratorium leaves him out thousands of dollars" WFSB, July 5, 2021. (https://www.youtube.com/watch?v=z5vf5_rnMtQ)

of her tenants.[34] "I've never woken up having panic attacks before this year" one landlord states to CNN, while another states "this has been the biggest trial of my life… I saw my savings dwindle down, month by month by month."[35] "I have had this internal struggle going back and forth. I have lost sleep at night."[36]

In New York, an immigrant's life savings is sucked dry. "No joke. I have no money" he says, as the city's leading tenant activist blames him for his fate and the news observes he has "absolutely no recourse." "How can this happen in the U.S.?" says another- housing a tenant $80,000 in arrears.[37] Elderly homeowners are, according to CBS news, "drain[ed] in the last years of their life" as their liquidity is depleted and they seek hospitalization for stress.[38] When media confronted Cuomo with "what are landlords supposed to do?" he had no answer. In California, a couple (one a veteran with PTSD) two years after purchasing a home has "not slept a night" in it. "We've had to couch surf, we've had to live with different families…I'm paying the mortgage, I'm paying all the bills, for someone to live for free…it does mess with you, that you have no right over your home because the city has taken your house hostage and they won't give it back to you."[39]

Mental anguish is proven already by the pleadings of tenant amici groups in *Towers*. "Anxiety" is a descriptor for mental anguish. The District and tenant amici have boasted of how the anxiety of having to think about making payments was lifted from their constituency. Where was it put? On me.

## VI.    Compensatory Damages- Lost Time or Diversion of Resources

Owing to the collective violation of Access to the Courts, Contract Clause and Takings clause, Plaintiff suffers additional damage of **$37,500** as follows.

Loss of time is a damage and is compensable. See *Reliable Mut. Hail Ins. Co. v. Rogers*, 160 P. 914, 917 (1916). See also *In re U.S. Office of Personnel Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42 (D.C. Cir. 2019). Alternatively, time spent by a proprietor *remedying* a violation, otherwise spent on revenue-generating activities, is compensable. See for example *United States v. Balistrieri*, 981 F.2d 916 (7th Cir. 1992). ("time…was deflected to legal efforts"). See also *Fair Hous. of Marin v. Combs*, 285 F.3d 899

---

[34] "The Vulnerable Pay the Price for Covid Eviction Moratoriums" Jillian Kay Melchoir, *The Wall Street Journal*. August 13, 2021
[35] Bahney, Anna. Moving target on eviction ban is 'whiplash' for landlords. *CNN Business*, August 24, 2021
[36] https://fortune.com/2021/08/22/new-eviction-ban-landlords-struggle-collect-unpaid-rent-tenants/
[37] https://reason.com/video/2021/02/23/the-victims-of-the-eviction-moratorium/
[38] https://www.youtube.com/watch?v=Eem-Fix-63U
[39] https://www.youtube.com/watch?v=TeccDrS91N4

(9th Cir. 2002) ("drains on their time and resources. Expenditures to reach out to potential…") ("Fair Housing itemized its claim of $16,317 for diversion of resources").

In this case, I was forced to individually devote significant time to learning about the District's various whiplashing moratoria, learning the relevant precedents, assisting Counsel unfamiliar with constitutional law in formulating arguments at each step of the litigation, making countless phone calls and other outreach in search of other Counsel to litigate constitutionality, litigating the entire appeal of this case pro se, litigating an appeal to the Supreme Court pro se, eventually now having to litigating the judgment of possession owing to prior Counsel's withdrawal, obtain the writ of restitution pro se, and now restarting an entirely new civil action for damages here.

I estimate the time spent on all this to be approximately 500 hours to date from the implementation of the District's "filing ban" in March 2020 through the present drafting of this case and petition to Supreme Court. Applying a fair labor rate of $75/hr yields **$37,500**. Should this case go in circles for a while more, additional time damages will be claimed.

VII.    Writ of Waste (DC Code § 42–1601)

This claim is both statutory and constitutional. When Plaintiff finally recovered possession of the Foreclosure Unit the place was trashed and required tens of thousands in repair costs. Destruction was approximately **$20,000** and treble damages are available per statute. See also *United States v. 37.15 Acres of Land, Etc*., 77 F. Supp. 798 (N.D. Cal. 1948) ("damage to both real and personal property during government occupancy"), *The Fowler Irrevocable v. City of Boulder*, 17 P.3d 797 (Colo. 2001) (affirming ~$40,000 in restoration costs owing to government destruction during period of temporary occupancy as staging grounds), *Sacramento San Joaquin Drainage Dist. v. Goehring*, 91 Cal. Rptr. 375, 380 (Cal.Ct.App. 1970) (just compensation for temporary taking includes restoration damages), *Paddock v. Durham*, 110 N.H. 106, 108, 261 A.2d 438, 441 (1970) (same).

VIII.   Costs

Plaintiff moves for an award of costs. This includes all costs associated with all related cases.

*Conclusion*

*Elmsford* was filed on May 27, 2020. The State together with "Tenants United" shoveled a bunch of nonsense two weeks later to dodge a TRO. The court put out an order 2 weeks after that, going along with the notion the ban simply "regulates the terms under which the owner may use the property as previously planned." *Tenants United* at 10. And by "regulates," lease "payments" are not legal tender but "accruing arrearage" which the landlord "will" be able to collect "after" the moratorium (*Elmsford* at 164).

After this crock fell flat at the 8th Circuit, the unhinged went into overdrive. Continued theft is a moral "imperative" because without it there will be "food insecurity." *Brief of Amici Curiae Jewish Community Action*, *et al*, No. 21-1278. But where do they get these alleged morals? *Proverbs 6:30-31* ("he must pay sevenfold"), *Exodus 22:2-3* ("he shall make restitution…if he have nothing, then he shall be sold for his theft."), *Leviticus 5:23* ("he must restore what he took by robbery, or what he got by extortion"). The people they rob go on TV to talk about their… food insecurity.[40]

Plaintiff requests declaratory judgment and $5 in nominal damages for the Filing Ban's appropriation of Plaintiff's reversionary interest, income, contract rights and de facto takings of the same, a money judgment for just compensation in the amount stated in Section II, a declaratory judgment and $1 in nominal damage for the Filing Ban's violation of the Contracts Clause in Section III, and additional damages as stated in counts IV-VIII. Plaintiff thus requests a money judgment of **$193,906 plus costs** from the District of Columbia.

Respectfully submitted,

*Alexander Gallo*

Alexander Gallo
950 25th St NW #329N
Washington, DC 20037
516-770-1624
aogallo@gwmail.gwu.edu

---

[40] https://www.cbsnews.com/losangeles/news/many-mom-and-pop-landlords-owed-tens-of-thousands-in-back-rent/

CERTIFICATE OF SERVICE

I certify that on March 16, 2023, I served a copy of this Amended Complaint on:

Andy Saindon
Andy.saindon@dc.gov

*Alexander Gallo*
Alexander Gallo