## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Alexander Gallo
950 25th St NW #329N
Washington, DC 20037
aogallo@gwmail.gwu.edu
516-770-1624
*Plaintiff*
v.

**Case 1:21-cv-03298-TNM**
**Judge Trevor N. McFadden**

District of Columbia
400 6th St NW
Washington, DC 20001
202-727-3400
oag@dc.gov
*Defendant*

### <u>Second Amended Complaint for Damages and Declaratory Relief (42 USC 1983)</u>

This complaint continues the claims raised in Superior Court in 2020 (still unresolved): can the government convert private homes to homeless shelters without compensation.

a. *Notice of Constitutional Questions. August 2020. 2020-LTB-008032 ("this pleading is a facial challenge…") ("no rights, and no remedies…without providing any compensation")*
b. *Plaintiff's Motion for Declaratory Judgment that a Taking is Occurring. (February 2, 2021). 2020-LTB-008032 ("effectuated a temporary physical taking of Plaintiff's property") (predating StayDC)*
c. *Opposition to Stay Pending Appeal. February 9, 2021. 21-CV-0037 (opposing stay but would consent if District "acknowledges" the facial taking) (predating StayDC)*
d. *Brief of Appellee Gallo. July 2, 2021 (seeking affirmance of Superior Court declaratory judgment on alternate grounds of Takings Clause and Contracts Clause)*
e. *Plaintiff's Motion … Declaratory Judgment that the District of Columbia has Taken Property. 9/16/2021. ("no compensation is provided") (5 months into StayDC)*
f. *Complaint for Declaratory Relief. November 2021. Claims ii,iii,iv,v (removed here)*
g. *Amended Complaint for Declaratory Relief. Sections I and III. March 2023.*

*Parties*

Alexander Gallo is a natural person. The District of Columbia is a municipality subject to suit under 42 USC 1983.

*Related Proceedings*

- Superior Court. *Gallo Holdings LLC – Series 2, et al*, v. Andre Hopkins. 2020-LTB-008032. Declaratory Judgment entered 12/16/2020. Possessory action stayed per statute. Case subsequently dismissed pursuant to Filing Ban.
- DC Court of Appeals. *District of Columbia v. Karen Towers, et al*. 21-CV-0037. Judgment entered 10/7/2021, reversing Superior Court's Access to the Court holding of 12/16/2020.



RECEIVED

7/24/2023                    1

Clerk, U.S. District & Bankruptcy
Court for the District of Columbia

## STATEMENT OF THE CASE

*Statutes*

  *(1) DC Code § 16–1501: Forcible Entry and Detainer (the "Filing Ban")*

"During a period of time for which the Mayor has declared a public health emergency pursuant to [§ 7-2304.01], and for 60 days thereafter, the person aggrieved shall not file a complaint seeking relief"

  *(2) DC Code § 28–3814. Debt collection*

"During a public health emergency and for 60 days after its conclusion, no creditor … shall, with respect to any debt:

(A) Initiate, file, or threaten to file any new collection lawsuit;

(B) Initiate, threaten to initiate, or act upon any statutory remedy for the garnishment, seizure, attachment, or withholding of wages, earnings, property, or funds for the payment of a debt to a creditor"

## FACTS

### *Plaintiff's Ownership and Timeline*

1)  Alexander Gallo owns residential condos in the District (some directly, some beneficially). Plaintiff manages all ten, as well as personally guarantees expenses on all ten. His personal liability for timely expenses (taxes, insurance, debt service, HOA fees, etc.) is approximately $7,000/month.

2)  In most units- the usual setup-tenants occupy under leases. Their right to possession flows from leases of indefinite duration. As of February 2020, none were in breach of lease.

3)  There is not much more to say about each unit. Plaintiff holds title and obligation of leases was suspended citywide for 1.5 years. To analogize: if Plaintiff owned some bakeries, and the city passed a law allowing people to dine without paying while "accruing arrearage," the baker need not say much about each shop, table, patron, or thief to challenge such a statute.[1] The precise amount of accumulated theft would be irrelevant to a facial claim.

---

[1] A restaurant is a place "to which the public is invited" *Pruneyard Shopping Center v. Robins*, 447 U.S. 74 (1980). Despite an owner's belief that his "invitation" is a contract to pay menu prices or be denied service again, the government declares invitees can dine while not paying. On recent federal court logic, there is no physical taking of meals because the guy chowing down was "invited." There is no regulatory taking because free food "promotes the common good" and food is a "necessary of life." Evict a diner for non-payment? Nope*:* the government has prohibited removal before on other grounds (*Bell v. Maryland*, 378 U.S. 226 (1964), *Peterson v. City of Greenville*, 373 U.S. 244 (1963)). Nonpayment is now simply a "ground" added to public accommodation laws previously upheld. So Eggs Chesapeake and a Bloody- on my "arrearage" tab. Oh- and fix the air conditioning- this table's a bit warm.

4)  Plaintiff purchased one condo at a foreclosure auction in February 2020 (hereafter, the "Foreclosure Unit"). At such sales, the purchaser bids on a property being auctioned because the owner (possibly but not necessarily the occupant) is heavily delinquent.[2] Upon closing the sale, the purchaser takes title (thus assuming liabilities) but not possession. If the unit turns out to be vacant, the purchaser takes possession and changes the locks. If a foreclosed owner is still in the property after the sale, they convert to a status of "tenant at will" (see paragraph 14).[3] Such tenancy is *terminated* by the new owner's service of a 30-Day notice to quit. Plaintiff served such a notice in March 2020, *terminating the right of possession* of the prior owner as of May 5, 2020.

### *The District Imposes its Uncompensated Filing Ban*

5)  In March 2020, the Mayor declared without warning: all evictions are banned. No mention was made of compensation. Canceled evictions were those scheduled after the court system had issued judgments and writs. At this point- factually- the Mayor dispensed possession to some people.

6)  Plaintiff's initial reaction was: what's a one-month delay on a process which already takes 4 months? "Two weeks" to slow the spread, right? Nobody would waste time suing the government for a one-month taking of a unit here or there, though precedent supports such a suit. *United States v. Russell*, 80 U.S. 623 (1871) (a ship was commandeered by the government for "twenty-six days").

7)  Two weeks then morphed into two more months. Compensation was still not mentioned. Plaintiff thought: this sucks for people who already got judgments for possession and who now can't evict until summer. But at least the court system is open for filings, so if tenants breach now he could file a suit for possession to at least *begin enforcing* payment obligations for all leases, like normal.

8)  The prior owner of the Foreclosure Unit, Andre Hopkins, did not quit the premises by the deadline of May 5, 2020. Due to his failure to vacate, a complaint for possession was filed. Possession would deliver by late summer under the typical judicial process existing when the Complaint was filed.

9)  On May 5, 2020, Hopkins was no longer in privity with Plaintiff. The parties ceased to be in any "Relationship" as of this date.

---

[2] This is unlike a "normal" sale, in which someone browses Zillow, finds a house they like, and gets a key to a vacant property after touring it, with possession delivered at the closing.
[3] *Crockett v. Deutsche Bank Nat. Trust*, 16 A.3d 949 (D.C. 2011) ("Our law defines a "squatter" who is a mortgagor remaining in possession after a foreclosure sale as a "tenant at will." D.C. Code § 42-522.")

10) On May 5, 2020, the former tenant Hopkins *became a trespasser* in the Foreclosure Unit.[4]

11) Later in May 2020, the District revealed: the two-month eviction decree was just a teaser. It passed the Filing Ban, which "suspended" the cause of action of possession entirely. While the statute itself was only one sentence, it in fact "suspended" twelve or more distinct causes of action for possession. These are the ten causes of action in the Rental Housing Act, plus the cause of action for terminated tenant at will (the cause of action on which the suit for possession of the Foreclosure Unit rested), and other catch-all causes of action for everyone else.

12) The Filing Ban would apply for the duration of the "emergency" - including retroactively dismissing all complaints pending such as Plaintiff's. How long would this go on for? Nobody said. Every occupant was now *immune from suit* in the event they decided to stop paying rent going forward. Hopkins- whose right to possession Plaintiff had *terminated* as of May 5, 2020- now received a statutory right to squat for free with Plaintiff required to pay for the premises. A second Filing Ban- one for all suits for debt- was simultaneously imposed which prohibited any suit for money, or any execution of judgment for money. Open season had begun.

13) In the hearing imposing the statutes in question, the Council Chairman stated his plebian opinion that the Contracts Clause would be violated. He moved the bill after the attorney general penned a memo stating he was free to declare an "emergency"- then "step in and, to use the phrase from the Constitution, impair contracts."[5]

14) As of May 2020, all of Plaintiff's leases were thus made legally unenforceable, leaving him in a precarious state of being personally liable for $7,000 per month in expenses while having his ability to enforce leases withdrawn. His scheduled possession of the Foreclosure Unit was also withdrawn. No compensation, guarantee or "relief" was made available by the District for the person now squatting by statute. No offsetting quasi-compensatory protection (such as Government directly covering expenses) was provided. Adding insult to injury, the District continually subjected landlords with foreclosure and civil fines throughout the moratorium.

---

[4] *Metromedia v. WCBM Maryland*, 327 Md. 514 (1992) (occupant still present after notice to quit deadline "became a trespasser"); *Union Trust Co. v. National Coal Co*., 20 A.2d 373 (R.I. 1941) ("After the date stated in the notice to quit, the defendants, who remained in possession of the premises, became trespassers"); *Weeks v. Sly*, 61 N.H. 89 (N.H. 1881) ("after the time fixed in the notice the plaintiff was a trespasser"); "An occupancy rightful because permissive becomes tortious when a proper demand to vacate is ignored and it is then the occupants become trespassers and damages for their wrongful occupancy begin to accrue." 1 Restatement, Torts, Sec. 158(b)
[5] DC Council Chairperson, Twenty-Ninth Legislative Meeting. May 5, 2020. At 1 hour, 27 minutes

*Constitutional Challenge Begins*

15) Given the District's imposition of total theft (instead of what could be a permissible exercise of eminent domain), various landlords in Superior Court challenged their cases' dismissals on constitutional grounds. A hearing was scheduled for Fall 2020. Landlords elsewhere, in the same boat, filed challenges also. One in New York requested a TRO- a strategic error.

*Enter: Elmsford and the "Facts" of Non-Payment Eviction Suits in June 2020*

16) One would think that the first statutory compulsion of uncompensated services since 1865 would warrant more than rapid fire briefing before being declared fully constitutional. But Cuomo had an Emmy to win, so enter *Elmsford v. Cuomo*, 469 F. Supp. 3d 148 (S.D.N.Y. 2020).

17) *Elmsford* is a great example of what the facts are not. Real facts form the basis of expectations. In denying the requested TRO, *Elmsford* stated the case "turns entirely on legal issues" and then began with: "A bit of background is in order." *Elmsford*, at 158. No "background" was briefed by the parties, so Plaintiff will highlight a few things which are not facts, along with what facts are:

   a. "stays issue routinely so that non-defaulting tenants are not evicted before their cases are fully reviewed." **Reality**: never for *defaulted* non-paying occupants. Such stays don't exist in DC.
   b. "a tenant may obtain a stay of the issuance of the warrant for up to one year" if they demonstrate hardship. **Reality**: only if they *pay up front* for such a stay. Such stays don't exist in DC.
   c. That suing a non-paying occupant for money is "a remedy" because- presumably, factually- it will cause money to appear. **Reality**: such people never pay and are judgment-proof.
   d. "any reallocation of resources is purely temporary" as landlords "will" be able to "collect" arrearage once the moratorium expires. **Reality**: Arrearage will not be repaid
   e. The court was "sure" the non-payment moratorium "will" end by August 2020. **Reality**: it was extended for another two years
   f. Declaring it relevant the eviction prohibition only applied to tenants who were "eligible" for unemployment insurance, thereby predicting that such persons *are* eligible, *will* apply, *will* receive it, and *will then forward* it to the landlord months later instead of simply lining their own pockets and disappearing. **Reality**: people pocket "assistance" cash and disappear.
   g. Declaring that plaintiffs "do not allege imminent or actual harm." **Reality:** Plaintiffs were actively being robbed

18) After building a factual/economic background on falsities, it addressed the takings clause. On physical takings, it characterized: plaintiffs "object to some tenants' continued occupancy" - tenants of the hitherto-unknown subspecies "non-paying tenant" (who will "continue to accrue arrearages" under leases now running in reverse on "accrual" mode. *Id*). Such creatures- factually- do not exist in New York law, where for centuries: a default in payment "renders the lease void as to the lessee" *Clark v. Jones*, 1 Denio 516 (1845).

19) *Elmsford* thus blessed extensions of non-payment moratoriums on the basis that "tenants" will "continue to accrue arrearage" which will… don't ask. The phrase continues to be copied and pasted

around the country as constitutional law. Reality in the District as of June 2020 was the same as elsewhere: "you can't evict me so I am not paying shit" stated someone in Massachusetts. *Baptiste v. Kennealy*, 490 F. Supp. 3d 353 (D. Mass. 2020). In New York, a "wave of squatters moved in, refusing to pay rent" while "there is little the owner can do about it." An owner states to the news: "complete nightmare… emotionally and financially. Completely devastating." One squatter exits his $90,000 SUV while his lawyer pulls up behind demanding the news crew "get off of the grounds."[6] No compensation was offered by any state at this time.

20) Reality in the District of Columbia is corroborated by other affidavits. One home became "beset with numerous problems, including…not maintaining the house, loud noise, constant groups of people hanging out smoking marijuana, fireworks being shot off during the night, as well as frequent visits from police" after squatters took over, relaxing $23,000 in arrears with water bills spiking 1,388% (affidavit, 2020-LTB-006315).

21) "I am stuck still paying thousands in property taxes and the costs of keeping the Property in good shape while Vivian and her friends occupy the Property rent-free. A neighbor has let me know they are damaging the Property too, probably out of spite... The D.C. government has not waived any property taxes, assisted in maintenance of the Property, or otherwise helped my father's estate or myself at all…They might as well be the same as random strangers walking and occupying the Property." "I am outraged at having no recourse to remove a squatter …for nearly a year and the government has given me no recourse…The District government has not provided me any assistance or compensation whatsoever." In one exchange between a homeowner and a Councilmember's office in October 2020, the owner asks: "Why am I left to hold the bag for a policy that punishes me for conducting commerce in good faith? Where is my protection as a consumer and a constituent?" The DC Council responds with "…costs are tax deductible- maybe this is his only recourse. I am sorry I don't have better news for you." *Reply Brief of Amici Curaie Shirley Proctor*, 2020-LTB-006315.

22) "In Washington, D.C., affordable housing landlord Arthur Nalls tried for months to hang on after the pandemic began, paying off the mortgages on his two rental buildings with savings, then his credit cards and finally his retirement fund. About a third of his 47 tenants stopped paying, the 66-year-old said. 'My gas bills didn't get a deduction, my utilities didn't get a deduction, my property taxes were still due and I still had to make repairs.'"[7]

---

[6] https://www.youtube.com/watch?v=slRaMVkTDUI
[7] "Selling out: America's local landlords. Moving in: Big investors" *Reuters*, July 29 2021.

23) The District responded to landlords' challenges in fall 2020 by stating: no violation of anything. See *Brief of District of Columbia*, 11/06/2020, Case No. 2020 LTB 006315. "there may be no economic impact in any given case" because the money being stolen may magically reappear years in the future. *Brief* at 30. It also suggested no owner had pled they were not "capable of earning a reasonable return." Appropriation doctrine was not briefed.

24) In December 2020, with the District still denying any duty to compensate, the Superior Court held the Filing Ban unconstitutional. It went out of its way to declare: if the Filing Ban "effects a taking of property (an issue that the Court does not decide), the fact that the taking is for a compelling public purpose does not diminish the property owner's right to just compensation from the District under the Takings Clause" (footnote 2). For the subset of cases which concerned non-payment, the Filing Ban would surely be a "confiscation of their property and associated income" (at 20) and "The record does not provide a basis for the Court to assess the probability that landlords will ultimately be made whole" at 23. The Superior Court also highlighted issues with *Elmsford* (footnote 16).

25) By this point, Hopkin's theft of occupancy of Plaintiff's unit under the Filing Ban was ~$9,000.[8]

26) The District then appealed and moved for an administrative stay. It argued the Superior Court's order is the "first and only decision since the COVID-19 pandemic began to strike down any part of an eviction moratorium in the United States" and therefore should be stayed. On the Takings Clause, the District argued "As a threshold matter, the only remedy for a Takings Clause violation is damages... Thus, even if the Court found an unconstitutional taking, that would not invalidate the statute." *Motion for Stay*, at 19. Dated 1/29/2021. Case 21-CV-37. The Contracts Clause was ignored.

27) The District won administrative stay, reimposing the Filing Ban. The stay ignored the unaddressed grounds. Plaintiff's accumulated damages on the Foreclosure Unit were now crossing $10,000.

***A Year Into its Uncompensated Moratorium, the District Receives a Partial Bailout (StayDC)***

28) Entering now into 2021. *Thirteen months* into suspending enforcement leases and forcing Plaintiff to house Hopkins in the Foreclosure Unit without compensation or "relief," the District announces that relief would belatedly be made available in some amount to some people.

---

[8] In earlier times, Attorney Generals weren't in court covering up theft of occupancy but rather indicting it. See *People v. Perry*, 224 Ill. 2d 312 (Ill. 2007) (affirming felony indictment of previously "invited" hotel guest for squatting for 3 months then disappearing, leaving behind $15,000 in "arrearage").

29) "StayDC" was announced in April of 2021. It purported to offer "both" tenants and housing providers the opportunity to "apply" for assistance, with the possibility of having a tenant's arrearage covered prior to the expiration of the moratorium. But the program was not an entitlement- it was simply a fixed pot with rules. And by "both" apply it really meant *together simultaneously* apply. If a tenant did not apply a landlord could not apply individually.

30) Thus, StayDC was of no use to Plaintiff even belatedly. The occupant of the Foreclosure Unit refused to communicate with Plaintiff. He took no action to apply to StayDC and Plaintiff had no mechanism to force him to. Plaintiff could not apply on his behalf.

31) In a published order granting stay pending appeal in May 2021, the DC Court of Appeals latched on to StayDC's advertisement of relief as the reason to continue the Filing Ban. It was left in place, with the Contracts Clause and Takings Clause still ignored.

32) Throughout winter and spring of 2021, some of Plaintiff's lessees began breaching their leases (not paying) while Plaintiff had no remedy. Word had gotten out: why pay if there's nothing the landlord can do about it? And if you had "arrearage" the government *might* reimburse it- so start breaching, rob the landlord and accrue arrearage if you have half a brain.

33) Accordingly, two of Plaintiff's lessees became trespassers[9] in spring 2021, while he was compelled by the Filing Ban to house them for free. The Filing Ban thus compelled the occupancy of trespassers.

34) The defaults continued for six months while he had no remedy. Plaintiff stated to one defaulted lessee in December 2021, six months into her non-payment: "You've had me apply twice with this program and they are still saying you have not completed an application. Are you going to submit the documents they requested? If not the application will be denied, and your current delinquent rent balance of roughly $6,000 needs to be paid by you entirely."

---

[9] *Reston Recreation Center Associates v. Reston Property Investors Ltd. Partnership*, 238 Va. 419 (Va. 1989) ("because of the tenant's uncorrected default… the tenant ceased to be a tenant and became a trespasser"), *Union Central Life Insurance v. Audet*, 94 Mont. 79 (Mont. 1933) ("the contract having been breached by the defendants, and they being in default…they were trespassers."), *Poole v. State*, 244 Ark. 1222 (1968) (tenant delinquent on rent for 10 days "has become a trespasser" -and can even be criminally indicted), *Fragomeno v. Insurance Co.*, 207 Cal. App. 3d 822 (1989) (nonpayment notice results in "lessee becoming a trespasser"), *Western Un. Tel. Co. v. Hansen Rowland Corp.*, 166 F.2d 258 (9th Cir. 1948) (upon default, "the appellant ceased to be a tenant of the appellee and became a trespasser, 'guilty of unlawful detainer'"), *Owens v. Layton*, 233 P. 645 (Wash. 1925) (tenant becomes a "trespasser" when he "continues in possession after default in the payment of rent…"), *Moses v. Lovegrove* (1952) 2 QB 533 ("the defendant was admittedly a tenant of the plaintiff up to the time he ceased to pay rent" but "from the date of the last payment of rent, the defendant is deemed to have had no contractual right to possession, and theretofore to have been a trespasser")

35) Another lessee simultaneously defaulted while Plaintiff had no remedy. As of summer 2021, Plaintiff thus had three units paying zero while he had no remedy.

36) In summer 2021, with StayDC available *only to tenants who apply*, Plaintiff considered bilking the program by creating a fake application for the Foreclosure Unit based on fake self-attested qualifying income (allowed) submitted from a fake email address with the name of the squatter. After all, fraud in Covid programs was rampant and everyone knew it, so why not join the printed-money fun train instead of sitting there like an honest chump? However, even this was *mechanically impossible*. The StayDC portal required a business license from the landlord. Plaintiff never had possession of the unit and thus couldn't get a business license (requires an inspection)- so Plaintiff had no path to even submit a fake application to solve his problem.

37) Plaintiff obtained a money judgment against Hopkins for the rapidly accruing damages ($20,000 by late 2021). It remains unsatisfied and it is non-collectible.

38) Still losing cash in fall 2021, Plaintiff appeared as appellee in *Towers* in hopes of getting the DC Court of Appeals to resolve the grounds left "unaddressed" by the Superior Court. All 3 judges essentially agreed that a taking occurred: Judge Deahl, at 2h 02m, stated: "They could probably do that under eminent domain, if they paid you" and there is "a takings claim for a certain amount of money" and Judge Glickman observed at 2h 12m that the remedy seemed to be an "inverse condemnation action against the Government."

39) However, instead of remanding, the court of appeals simply "reversed" the trial court's original decision and left the unaddressed grounds still unaddressed. This seems to violate precedent: "A lower court decision must be affirmed if the result is correct, despite the fact that the court 'relied on a wrong ground or gave a wrong reason.' *Marinopoliski v. Irish*, 445 A.2d 339, 340 (D.C. 1982) (quoting *Helvering v. Gowan*, 302 U.S. 238, 58 S.Ct. 154, 82 L.Ed. 224 (1937)).

40) In October 2021, StayDC ran out of federal bailout money and stopped accepting applications. Hopkins never applied for relief. Plaintiff spent two years being forced to shovel out cash while his right to possess or receive the value of the Foreclosure Unit was abrogated. Plaintiff had spent such time imminently threatened with more massive losses and incurred breaches without remedy. This situation produced mental anguish.

*The Instant Case is Filed*

41) The first Complaint stated (1) a squatter was occupying and not paying under the Filing Ban, for which the District offered no compensation and (2) lease obligations with other tenants were "suspended" while remedy was legislatively "withdrawn." It included facial challenges in counts ii,iii,iv, and v. Count iv alleged "trespass" and highlighted that trespass encompasses both wrongful initial entry and wrongful remaining.

42) The District, bringing the case here, moved to dismiss. It recast "squatter" to "tenant," used the word "tenant" 56 times, and deflected on the facial challenge.

43) Plaintiff subsequently gained possession of the Foreclosure Unit in May 2022, after the Filing Ban was lifted. The place was trashed by Hopkins, who treated it like the playpen the District turned it into- requiring tens of thousands in repair cost.

44) In June 2022, this court dismissed, using the word "tenant" 37 times and "trespass" zero times.

45) The court later granted reconsideration, finding the first complaint "terse." It found the sum of 3 arguments "novel:" a tenant ceases to be a tenant upon default in payment, a defaulted lessee is no different than a member of the public, and that the Filing Ban granted possession to such people.

46) I filed an Amended Complaint in March 2023, splitting the Takings claim into 5 distinct types. The Amended Complaint again included facial challenges in Sections I and III, and an "as applied" claim in Section II (a repeat the prior count (vi)).

47) The District filed a new motion to dismiss, limited in merits argument to (1) "initial" entries by *present* occupants under the Filing Ban were legal (2) no "facts" demonstrate a thief will not pay back a robbery. On July 10, 2023, the court reset the case.

## COUNTS & RELIEF REQUESTED

Plaintiff incorporates herein by reference every allegation contained in the preceding paragraphs.

I.   **Takings Clause[10]: $5 in Nominal Damages and Declaratory Judgment**

   *This section is a facial challenge. Standing is derived from: all units.[11]*

---

[10] In Takings Clause Argument (c) the Due Process Clause is jointly pled under the "confiscation" doctrine.
[11] "the constitutional validity of a law is to be tested, not by what has been done under it, but by what may by its authority be done." *Stuart v. Palmer*, 74 N.Y. 183 (N.Y. 1878) (declaring acts "unconstitutional and void")

This section seeks declaratory judgment and $1 for each distinct taking, and forms the foundation for the just compensation claim in Section II. The Filing Ban came with no compensation, so it is an uncompensated taking. All condos were imminently threatened with massive losses. Some people who "accrued arrearage" paid the loot back.[12] The Filing Ban directly appropriated three types of property: reversionary interest (alternatively, the leased fee interest), income, and contract rights. The Filing Ban also effected a "de facto" taking of land and contract rights.

### a.   Takings Clause Claim 1: Uncompensated Appropriation of Reversionary Interests

The reversionary interest is always vested, becoming *present* (eg, reverts) upon termination or breach. *DC v. Design Center Owner (D.C.) LLC*, Nos. 21-TX-0473 & 21-TX-0627. Plaintiff's reversionary interest in the Foreclosure Unit became present in May 2020, and his interest in other units became present upon the defaults by lessees. The Filing Ban postponed possession without compensation- therefore appropriated the interest without compensation. Plaintiff was imminently threatened with appropriations of all estates. See *National Wildlife Federation v. I.C.C*, 850 F.2d 694 (D.C. Cir. 1988). ("a reversionary interest in land is 'property' within the meaning of the fifth amendment" & "the postponement of a reversionary interest that would otherwise vest under state law constitutes a taking of private property.")[13]

*The Block Precedents Establish this Claim*

In *Hirsh v. Block*, 50 App.D.C. 56, 73 267 Fed. Rep. 614, the court of appeals stated: "what are the rights of which plaintiff has been divested, if the present act is held to constitute a valid defense to his action for possession? Plaintiff had a vested estate and reversion in fee in the property in question…the right of reversion is a property right, of which plaintiff cannot be divested, except by due process of law" *Id*, at 619. It then held that precluding reversion- where a tenant *agreed to vacate* but then *tendered payment*- would violate due process as a "private" taking. "the renting of property is a private business… a private business cannot be made public, or impressed with a public interest, merely by legislative fiat." *Id*, at 620.

---

[12] See *Knick v. Township of Scott*, 588 U. S. _ (2019 )("A later payment of compensation may remedy the constitutional violation that occurred at the time of the taking, but that does not mean the violation never took place…A bank robber might give the loot back, but he still robbed the bank.")
[13] Other cases include *District of Columbia v. Carr*, 607 A.2d 513 (D.C. 1992) ("The District's actions were directed against the possessory rights of the tenant, not against the reversionary rights of the landlord…there was no entry affecting a reversionary interest, warranting compensation to the landlord" and "without taking an estate in land (even as sublessee) or assuming any obligation to take over the tenant's obligation to pay rent to the landlord."), *Preseault v. U.S.*, 100 F.3d 1525 (Fed. Cir. 1996) (regarding reversionary interest, "the Fifth Amendment compels compensation."), *Caquelin v. United States*, No. 19-1385 (Fed. Cir. 2020) (finding a 6-month physical taking of the reversionary interest and distinguishing regulatory takings), *Davis v. Vidal*, 105 Tex. 444 (1912) (reaffirmed in *El Dorado Land Co. v. City of McKinney*, 56 Tex. Sup. Ct. J. 415 (Tex. 2013) (reversionary interest is "resumed summarily upon the failure…to pay rent" and finding appropriation).

The "private" taking question was only issue under the Takings Clause on appeal, as the *existence* of a taking was apparent to all. The Supreme Court in *Block* held: the act "was not…a taking of his property *for a use not public*" *Id* (holding #3- emphasis added). This is a far cry from: "not…a taking." It was rather a *compensated* taking which satisfies the public use clause. Vested reversionary interest remains state law (see *DC v Design Center*). A taking of the reversion is *permissible* where (1) just compensation is provided and (2) the public use clause is satisfied. The Filing Ban here was uncompensated. It is therefore an uncompensated taking of the reversionary interest.[14]

**b. Takings Clause Claim 2 (In The Alternative): Direct Appropriation of Leased Fee Interests**

If leaseholds are somehow found to continue past breach or termination here, Plaintiff claims the Filing Ban took the leased fee interest. The taking is whatever the theft turns out to be. If someone squats while paying 50%, then the government has appropriated 50% of the leased fee interest- the same way the government appropriated 50% of the raisins in *Horne v. Dep't of Agriculture*, 576 U.S. __ (2015) (where government "pays… only for the remainder" after taking "possession and control" it is a per se taking, not a use restriction).

*Yee* held that price restriction (a restriction on upward increase) appropriates nothing because a landlord has no property interest in an increase which would hypothetically be obtained if rent were not controlled (no "discrete interest in land" formed by the gap between restricted and unrestricted rents, *Id* at 527).[15] The flip side of the coin is: the landlord retains a property interest in the contracted rent.[16]

**c. Takings/Due Process Claim 3: Confiscation of Income (Rent)**

If the Filing Ban is construed as "regulating" leaseholds- amending them to require no payments with a balloon due years later which will likely never be paid- Plaintiff hereby claims a confiscation of income. Where formal rate regulation occurs, government must permit a *reasonable* rate. The Filing Ban reduces income to zero- or imminently threatens it- which is facially unreasonable. Return is driven to negative infinity with the owner stuck with expenses- the government doesn't reimburse.

---

[14] *Elmsford* stated that "Plaintiffs do not allege imminent or actual harm to any particular property interest" at 161. *Elmsford* and related cases are thus of no precedential value.
[15] The court in *Yee* did not hold that the rent control statute there was constitutional. It only held that challenges must proceed under doctrines such as regulatory takings or confiscations of income.
[16] See for example *In re Town Ctr. Flats, LLC*, 855 F.3d 721 (6th Cir. 2017) ("property interest in the rents"), *In re Jason Realty, L.P.*, 59 F.3d 423 (3d Cir. 1995) ("title to the rents"), *Helvering v. Horst*, 311 U.S. 112 (1940) ("The unmatured coupons given to the son…Through the gift, they became at once the absolute property of the donee").

This is facially unconstitutional under centuries of precedent.[17] "the legislature may itself fix a maximum beyond which any charge would be unreasonable, in respect to services rendered in a public employment, or for the use of property in which the public has an interest, subject to the proviso that such power of limitation or regulation is not without limit, and is not a power to destroy, or a power to compel the doing of the services without reward, or to take private property for public use without just compensation or without due process of law." *Budd v. New York*, 143 U.S. 517 (1892) (collecting cases). A later case reviewed the history and held: "while the power to regulate has been sustained, negatively the court has held that the legislature may not prescribe rates which, if enforced, would amount to a confiscation of property." *Cotting v. Kansas City Stock Yards Co.*, 183 U.S. 79 (1901). "where by legislation prescribing rates or charges the use of the property is taken, just compensation assured by these constitutional provisions is a reasonable rate of return… the utility company is not limited to a return on cost" *West v. C. P. Tel. Co.*, 295 U.S. 662 (1935). See also *Ex parte Young*, 209 U.S. 123 (1908) (confiscation doctrine).

The doctrine controls temporarily: where "revenues …fell short of meeting its operating expenses"… "[p]roperty may be as effectively taken by long-continued and unreasonable delay in putting an end to confiscatory rates as by an express affirmance of them. . . ." *Smith v. Illinois Bell Tel. Co.*, 270 U.S. 587, 591, 46 S.Ct. 408, 410, 70 L.Ed. 747, 749 (1926).

### d.   Takings Claim 4: Direct Appropriation of Contract Rights (Leases)

By granting persons a right to continue consuming under a contract while in breach thereof, the Filing Ban appropriates contract rights. See *De Laval Steam Turbine Co. v. United States*, 284 F. 61 (1931) ("the government requisitioned the purchasers' rights in the contracts not for the purpose of putting an end to the contracts, but of keeping them alive for the benefit of the government. Its action being in pursuance of law, the government succeeded to all the rights of the purchasers under the contracts…In effect, the old contracts became new contracts between the government and the petitioner")

 "The Fifth Amendment commands that property be not taken without making just compensation. Valid contracts are property." *Lynch v. United States*, 292 U.S. 571 (1934). Had compensation been provided, "An appropriation under eminent domain with compensation of a contract neither challenges its validity

---

[17] This doctrine sets the constitutional floor here. See *Karrick v. Cantrill*, 51 App.D.C. 176, 277 F. 578 (1922) (return must exceed cost of capital), *Rust v. Heavy*, 286 F. 782, 52 App. D.C. 320 (1923) (return of 4 per cent at 1901 Wyoming Ave NW "confiscatory"), *Moore & Hill, Inc. v. Marshall*, 286 F. 990, 52 App.D.C. 326 (1923) ("if the net income from the rental, above the ordinary expenses, falls below 6 per cent, per annum of the value of the leased property, it should be treated as confiscatory").

nor impairs the obligation. It is a taking, not an impairment, of its obligation." *Cincinnati v. Louisville & Nashville R. Co.*, 223 U.S. 390 (1912). Appropriation occurs by "by taking over the benefits of one of the parties, or by transferring the contract benefits to some third party." *Public Takings of Private Contracts*, John D. Echeverria. Ecology Law Quarterly, Vol. 38, No. 3 (2011), pp. 639-672 (34 pages), at 643.

### e.   Takings/Due Process Claim 5: De Facto/Regulatory Taking of Real Property

Where regulation is of *uses* or activities, not *prices*[18], the general rule is: can the owner stay profitable with permitted uses. Where returns go massively negative- even temporarily- de facto takings occur. The Filing Ban for nonpayment causes an implosion in rents and the statute did not compensate.

See *Luber v. Milwaukee County*, 47 Wis. 2d 271 (Wis. 1970) (predating Penn Central) (de facto taking of two years lost rent caused by a decree leaving owner unable to lease while "required to continue incurring expenses, such as heat, repair and taxes."), *State v. Griggs*, 358 P.2d 174 (Ariz. 1960) (threatened temporary loss of rent is a facial violation: "The statute here under review makes no provision for just compensation and is hereby declared unconstitutional."),[19] *Keshbro v. City of Miami*, 801 So. 2d 864 (Fla. 2001) (one-year mandated closure of hotel), *State ex rel. Pizza v. Rezcallah*, 702 N.E.2d 81, 124 (Ohio 1998) (same), *City of Seattle v. McCoy*, 4 P.3d 159 (Wash.Ct.App. 2000) (same- decree closing restaurant for one year), *Hamilton Bank v. Williamson Cty. Reg. Planning*, 729 F.2d 402 (6th Cir. 1984) (finding "temporary taking" under Penn Central), *Benenson v. United States*, 548 F.2d 939 (Fed. Cir. 1977) (for a DC historic preservation moratorium, "The lessee could not…pay rent to plaintiffs" and "plaintiffs cannot use their property for any income-producing purpose" during a moratorium).

Most persuasively of all temporary moratorium cases, New York's highest court found a 6-month de facto taking where a statute permitted delaying demolition permits while providing *partial* compensation. "this statute must fall." *Matter of Keystone Assoc. v. Moerdler*, 224 N.E.2d 700 (N.Y. 1966) (owner must "stand idle and suffer the loss" while "no guarantee or even likelihood that this assetless corporation will be able to pay damages"). *Moerdler* was "an action to declare the statute unconstitutional." *Id*. Same here.[20]

---

[18] Price restrictions are subject to the one-step Confiscation doctrine. See claim I-c.

[19] Facial challenges have long succeeded under de facto doctrine. Where a statute "sanctioned situations which would permit the state to take private property without just compensation" it is facially void. *Tampa-Hillsborough Expressway v. A.G.W.S*, 640 So. 2d 54 (Fla. 1994). The 4th Circuit held that facial challenges are appropriate where "mere existence" of a statute threatens the losses. *Beacon Hill v. Loudon County*, 875 F.2d 1081 (4th Cir. 1989)

[20] *Moerdler* went from a complaint for declaratory relief and damages, then to a court of appeals, then to the state's highest court- all within *six months*. The owner prevailed at every level.

*Penn Central*

The uncompensated Filing Ban fails the *Penn Central* standard. "the New York City law does not interfere in any way with the present uses of the Terminal... So the law does not interfere with what must be regarded as Penn Central's primary expectation" *Penn Central*, at 136. Contrast that to the Filing Ban, which changes "rental" housing to "no rental" housing, stealing all the money. *Penn Central* was also clear: that law was "permitting Penn Central not only to profit from the Terminal but also to obtain a 'reasonable return' on its investment." at 136. It held that even if the law in question had lobbed off some quantity of potential floor space, the law provided compensation via air rights which the owner retained for sale. "the rights afforded are valuable." Id, at 137. *Penn Central* acknowledged that its holding would not preclude the same owner from re-litigating should permitted *uses* become economically nonviable. "if appellants can demonstrate at some point in the future that circumstances have so changed that the Terminal ceases to be 'economically viable,' appellants may obtain relief." *Id*, at 138.[21]

- Economic Impact: a landlord is forced to realize, or is imminently threatened with realizing, massive cash losses which drive rate of return to negative infinity without reimbursement.
- Investment-Based Expectations: The landlord's expectation is to receive rent. The Filing Ban changes the expectation of rental housing to squatter housing overnight. No such law has ever validly existed.
- The Character of the Action: The character of the action is theft and slavery. An alternate view is "whether the character of governmental action is like a physical invasion." *Giovanella*, 447 Mass.at 735. Here, it is like an invasion- because it is an invasion by someone who is in breach of contract who would otherwise not be occupying. The character of the action is: dispossession. See *Blackburn, Jr. v. Dare County*, No. 20-2056 (4th Cir. 2023) (no taking because owner "not dispossessed")

**f.   Takings Claim 6: Regulatory Taking of Plaintiff's Contract Rights**

Contract rights are protected under *Penn Central* if contracts are rendered, even temporarily, "commercially impracticable." *Wash. Food Indus. Ass'n v. City of Seattle*, No. 99771-3. The leases are rendered commercially impracticable by a Filing Ban which renders them wholly unenforceable for two years, or in the alternative "amends" the rent due to zero. Arguments in subsection (e) are hereby incorporated, but for contract rights instead of use of real property.

---

[21] *Dist. Intown Properties v. Dist. of Columbia*, 198 F.3d 874 (D.C. Cir. 1999) similarly focused on the ability to maintain a reasonable rate of return: "no evidence that this regulation rendered Lots 106-114 unprofitable to maintain" at 883 and "whether the property as a whole can be operated at a sufficient profit even with the regulation" at 884.

## II.     Takings Clause: Just Compensation of $34,600 for Property Taken by Government

*This section applies to: the Foreclosure Unit.*

Plaintiff requests just compensation for occupancy stolen. This section presents accumulated damages for the invalid uncompensated Filing Ban or an 'as applied' claim. All six types of takings in Section I overlap here for damages: the government owes the fair use value stolen. The compensation due is the "rental which could have been obtained." *Kimball Laundry Co. v. United States*, 338 U.S. 1 (1949). The fair use value was $1,400/month according to the DC Housing Authority. Two years and two months of the unpaid occupancy of Hopkins forced on Plaintiff for the public good=26 x $1,400 or: **$36,400.**

To the extent *Penn Central* needs to be re-plead "as applied:"

- Economic impact: Plaintiff was forced to lose $36,400 individually without recourse housing someone who would never pay.
- Investment-Backed Expectation: Plaintiff had no idea he would be forced by the government to dispense free housing and be stuck with one homeless person for two years without compensation, as it had never happened in the history of the country and was unconceivable how it would ever be allowed to happen.
- Character of the Action: The character of the action is: theft and slavery. The Filing Ban is unlike any zoning or historic law which merely restricts future construction or uses.[22]

To the extent a writ of waste is constitutionally based, Section VII is incorporated here.

## III.     Nominal Damages of $1 and Declaratory Judgment for violation of the Contract Clause

*This section concerns impairment of Plaintiff's leases predating the Filing Ban.*

The Filing Ban substantially impaired the obligation of all of Plaintiff's leases by "suspending" the obligation thereof, without compensating.[23] It is therefore unconstitutional. Had the government compensated defaults, substantial impairment (threatened or realized) would not have occurred.

---

[22] Various appellate courts have found temporary regulatory takings in as-applied contexts such as permit denials (*Seiber v. U.S.*, 364 F.3d 1356 (Fed. Cir. 2004)) or temporary assertions of jurisdiction which cause a halt to productive activities (*Resource Investments, Inc. v. U.S.*, No: 98-419 L (Fed. Cl. Jan. 23, 2009)).

[23] The clause "applies to implied as well as to express contracts." *Fisk v. Jefferson Police Jury*, 116 U.S. 131 (1885) (holding that where law establishes a rate for a service, and a person provides such service, "a perfect implied obligation arises to pay for the services at the fixed rate" and this obligation is protected by the Clause). A tenant at will whose tenancy was formerly terminated but who continues occupying and not paying is "liable for use and occupation on an implied contract." *McFarland v. Stewart*, 50 A.2d 194 (Me. 1946).

Plaintiff's leases were morphed from legal obligations to the kind of obligations described in *Edwards v. Kearzey*, 96 U.S. 595 (1877) ("If a state may stay the remedy for one fixed period, however short, it may for another, however long"- under a suspension of remedy, a contract "ceases to be, and falls into the class of those 'imperfect obligations,' as they are termed, which depend for their fulfillment upon the will and conscience of those upon whom they rest"). "the laws which subsist at the time and place of the making of a contract and where it is to be performed enter into and form a part of it as if they were expressly referred to or incorporated" *Von Hoffman v. City of Quincy*, 71 U.S. 535 (1866). This includes enforcement mechanisms post termination or breach, with eviction being the only efficacious remedy. An equally efficacious remedy could have been compensation by the government.

The Filing Ban was an installment and suspension law. The Clause prohibits "installment or suspension laws" of the type "changing the time of payment by authorizing distant installments" *Sturges v. Crowninshield*, 17 U.S. 122 (1819). It prohibits suspended remedy and/or legislatively-changed payment schedules between debtor and creditor. See *Green v. Biddle*, 21 U.S. 1 (1821) ("postponing or accelerating the period of its performance, imposing conditions not expressed in the contract, or dispensing with the performance…impairs its obligation."), *State of Louisiana v. City of New Orleans*, 102 U.S. 203 (1880) ("he who pays too late, pays less. Any authorization of the postponement of payment… is in conflict with the constitutional inhibition."), *Oshkosh Waterworks Co. v. Oshkosh*, 187 U.S. 437 (1903) ("the Legislature may not withdraw all remedies" under a contract), *Barnitz v. Beverly*, 163 U.S. 118 (1896) ("the act carves out for the mortgagor or the owner of the mortgaged property an estate of several months more than was obtainable by him under the former law, with full right of possession, and without paying rent or accounting for profits in the meantime."), *Bronson v. Kinzie*, 42 U.S. 311 (1843) ("no one, we presume, would say that there is any substantial difference between a retrospective law declaring a particular contract or class of contracts to be abrogated and void and one which took away all remedy to enforce them" & "it is the duty of the court to maintain and enforce it without any unreasonable delay").[24]

---

[24] State precedent is equal. *Jones v. Crittenden*, 4 N.C. 385 (holding uncompensated "stays" of proceedings violate the contracts clause because "The right to suspend the recovery of a debt for one period implies the right of suspending it for another; and as the state of things which called for the first delay, may continue for a series of years"), *Welsh v. Cross*, 146 Cal. 621 (Cal. 1905) "not only hinders and delays him in recovering his money, but renders him insecure in the hope of it, and might in many instances totally destroy his rights by nullifying them. It is said that a substantial remedy is left, but if the legislature can delay payment by limitation or exemption laws for six months they could do it for six years"), *State v. Carew*, 47 S.C.L. 498, 13 Rich. 498 (1866) (Stay law violates Contracts clause- collecting cases), *Lapsley vs. Brashears,* 14 Ky. 47, 4 Litt. 47 (1823) (one year "stay" of execution of writ of fieri facias violates Contracts Clause- "all pre-existing remedies upon the prior contract are suspended, and the obligation of the contract thereby weakened and impaired"), *McClain v. Easly*, 63 Tenn. 520 (1874) (Act requiring courts to "stay the collection of all judgments" violates Contracts clause because "the judgment creditor had the right, under the law, to have his execution levied on the debtor's land").

A statute may toggle remedy where such statute "safeguards the interests" of the creditor. The Filing Ban did not safeguard Plaintiff's interests, instead divesting them without compensation in violation of the *Blaisdell* standard: "the mortgagee-purchaser thus is not left without compensation for the withholding of possession" *Blaisdell, holding #5*. A grant of "undisturbed possession for the debtor and without a dollar for the creditor" with "no enforceable obligation in the meantime" and debtors having "every incentive to refuse to pay a dollar"- precisely what the Filing Ban did here- is unconstitutional as reaffirmed unanimously after *Blaisdell* in *W.B. Worthen v Kavanaugh*, 295 U.S. 56 (1935).[25]

IV.   Legal Fees (42 USC 1988)

*This section applies to: Foreclosure Unit.*

Legal fees on issues asserted here were assessed by prior Counsel in the amount of **$10,000** in the related case of 2020-LTB-008032. ("plaintiffs may receive fees under §1988 even if they are not victorious on every claim" *Fox v Vice*, 563 U.S. 826 (2011), citing  *Hensley v. Eckerhart*, 461 U. S. 424, 435). Plaintiff therefore "should ordinarily recover an attorney's fee" from the defendant. *Christiansburg Garment Co. v. EEOC*, 434 U. S. 412, 416 (1978). "Where a lawsuit consists of related claims, a plaintiff who has won substantial relief should not have his attorney's fee reduced simply because the district court did not adopt each contention raised." *Hensley v. Eckerhart*, 461 U.S. 424 (1983)

V.   Compensatory Damages- Mental Anguish

*This section applies to: all units, based on violation of Takings and Contract Clauses*

Plaintiff requests **$50,000** in mental anguish owing to the collective violation of the Takings Clause and Clause.[26] This anguish is demonstrated by persons similarly situated to whom no compensation was made available.[27] The Filing Ban is a malicious uncompensated dispossession of owners. Mental anguish damages are "presumed" under state law in cases of wrongful dispossession. *Robinson v. Sarisky*, 535 A.2d 901, 905 (D.C. 1988), citing *Higgins v. Dail*, 61 A.2d 38, 40 (D.C. 1948).

Connecticut landlord Jeffrey Dunn stating "the emotion it takes on my wife is devastating" after being forced to pay the housing costs of a tenant who refused to pay and stated they would not leave until the

---

[25] "We state the outermost limits only. In stating them, we do not exclude the possibility that the bounds are even narrower" *W. B. Worthen Co. v. Kavanaugh*, 295 U.S. 56 (1935). And this case concerned a mortgage- in which the contract remained partially secure by *eventual* sale- not a breached lease, which yields zero upon delayed eviction.
[26] Claims in an action for uncompensated taking are not limited to just compensation- they may include all claims for "personal injury." *Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687 (1999). Shoveling cash while getting no rent causes mental anguish. *Baker v. Chrissy Condo. Ass'n*, 251 A.3d 301 (D.C. 2021) (footnote 23).
[27] FRE 803(3) Then-Existing Mental, Emotional or Physical Condition and 803(1) Present Sense Impression.

sheriff removed them.[28] Homeowner Brandie LaCasse has been forced to seek a fourth job to pay the bills of her tenants.[29] "I've never woken up having panic attacks before this year" one landlord states to CNN, while another states "this has been the biggest trial of my life… I saw my savings dwindle down, month by month by month."[30] "I have had this internal struggle going back and forth. I have lost sleep at night."[31]

In New York, an immigrant's life savings is sucked dry. "No joke. I have no money" he says, as the city's leading tenant activist blames him for his fate and the news observes he has "absolutely no recourse." "How can this happen in the U.S.?" says another- housing someone $80,000 in arrears.[32] Elderly homeowners are, according to CBS news, "drain[ed] in the last years of their life" as their liquidity is depleted and they seek hospitalization for stress.[33] In California, a couple (one a veteran with PTSD) has "had to couch surf, we've had to live with different families…I'm paying the mortgage, I'm paying all the bills, for someone to live for free…it does mess with you, that you have no right over your home because the city has taken your house hostage and they won't give it back to you."[34]

VI.     Compensatory Damages- Lost Time or Diversion of Resources
        *This section applies to: all units, based on violation of Takings and Contracts Clauses*

Owing to the collective violation of the Contract Clause and Takings clause, Plaintiff suffers lost time damage of **$37,500**. Loss of time is compensable. See *Reliable Mut. Hail Ins. Co. v. Rogers*, 160 P. 914, 917 (1916). See also *In re U.S. Office of Personnel Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42 (D.C. Cir. 2019). Alternatively, time spent by a proprietor *remedying* a violation, otherwise spent on revenue-generating activities, is compensable. See for example *United States v. Balistrieri*, 981 F.2d 916 (7th Cir. 1992). ("time…was deflected to legal efforts"). See also *Fair Hous. of Marin v. Combs*, 285 F.3d 899 (9th Cir. 2002) ("drains on their time and resources. Expenditures to reach out to potential…") ("Fair Housing itemized its claim of $16,317 for diversion of resources").

---

[28] "Landlord reflects after eviction moratorium leaves him out thousands of dollars" WFSB, July 5, 2021. (https://www.youtube.com/watch?v=z5vf5_rnMtQ)
[29] "The Vulnerable Pay the Price for Covid Eviction Moratoriums" Jillian Kay Melchoir, *The Wall Street Journal*. August 13, 2021
[30] Bahney, Anna. Moving target on eviction ban is 'whiplash' for landlords. *CNN Business*, August 24, 2021
[31] https://fortune.com/2021/08/22/new-eviction-ban-landlords-struggle-collect-unpaid-rent-tenants/
[32] https://reason.com/video/2021/02/23/the-victims-of-the-eviction-moratorium/
[33] https://www.youtube.com/watch?v=Eem-Fix-63U
[34] https://www.youtube.com/watch?v=TeccDrS91N4

In this case, I was forced to individually devote significant time to learning about the District's various whiplashing moratoria, learning the relevant precedents, assisting Counsel unfamiliar with constitutional law in formulating arguments, making countless phone calls and other outreach in search of other Counsel to litigate constitutionality, litigating the entire appeal of this case pro se, and handle two more years of civil litigation. I estimate the time spent on all this to be approximately 500 hours to date from the implementation of the District's "filing ban" in March 2020 through the present drafting of this case and petition to Supreme Court. Applying a fair labor rate of $75/hr yields **$37,500**. Should this case go in circles for a while more, additional time damages will be claimed.

VII.    Writ of Waste (DC Code § 42–1601)

        *This section applies to: the Foreclosure Unit*

This claim is both statutory and constitutional. When Plaintiff finally recovered possession of the Foreclosure Unit the place was trashed and required tens of thousands in repair costs. Destruction was approximately **$20,000** and treble damages are available per statute. See also *United States v. 37.15 Acres of Land, Etc*., 77 F. Supp. 798 (N.D. Cal. 1948) ("damage to both real and personal property during government occupancy"), *The Fowler Irrevocable v. City of Boulder*, 17 P.3d 797 (Colo. 2001) (affirming ~$40,000 in restoration costs owing to government destruction during period of temporary occupancy as staging grounds), *Sacramento San Joaquin Drainage Dist. v. Goehring*, 91 Cal. Rptr. 375, 380 (Cal.Ct.App. 1970) (just compensation for temporary taking includes restoration damages), *Paddock v. Durham*, 110 N.H. 106, 108, 261 A.2d 438, 441 (1970) (same).

VIII.   Costs

Plaintiff requests costs. This includes all costs associated with all related cases.

*Conclusion*

Plaintiff requests a money judgment of **$193,906 plus costs** from the District of Columbia plus declaratory judgment as described. Three years have gone by during which district courts have denied injunction while hopping on bandwagons of frauds- going so far as to misstate what landlords even do.

Take *Williams v. Alameda County*, 3:22-cv-01274-LB (N.D. Cal. Nov. 22, 2022). In rejecting the analogy of selling monthly occupancies like raisins, *Williams* stated that a landlord instead "surrenders" a house to someone and therefore whatever happens after that is irrelevant. "In other words, a landlord's decision to rent property is different than selling a commodity." *Id*.

Wrong: "The landlord is a purveyor of a commodity; the vendor of space in which to shelter one's self and family." *People ex rel. Durham Realty Corp. v. La Fetra*, 230 N.Y. 429, 443 (N.Y. 1921) ("…Unquestionably some taking of private property for the benefit of a class of individuals is the result of the housing laws…If property rights are here invaded, in a degree, compensation therefor has been provided").[35]

From unquestionable takings even where tenants offer payment to "no taking" for theft and squatting by now-trespassers. Critical distinctions have been acknowledged by the Supreme Court and appellate courts. "preventing them from evicting tenants who breach their leases intrudes on one of the most fundamental elements of property ownership- the right to exclude." *Alabama Ass'n v. HHS*, 594 U. S. _ (2021). Trespass begins upon default or termination- including under the "scheme" upheld in *Yee*.[36]

<div style="margin-left:40%">

Respectfully submitted,

*Alexander Gallo*

Alexander Gallo
950 25th St NW #329N
Washington, DC 20037
516-770-1624
aogallo@gwmail.gwu.edu

</div>

---

[35] *Durham Realty* is entitled to great weight. See *Edgar A. Levy Leasing Company, Inc. v. Siegel*, 230 N.Y. 634 (N.Y. 1921) ("Order affirmed, with costs, on opinion of POUND, J., in *People ex rel. Durham Realty Corp. v. La Fetra*"). *Levy Leasing* then went to the Supreme Court, which affirmed the New York court's holding that such statutes were compensated takings. See *Levy Leasing Co. v. Siegel*, 258 U.S. 242, 250 (1922) ("The standard of the statute is as definite as the 'just compensation' standard adopted in the Fifth Amendment to the Constitution and therefore ought to be sufficiently definite to satisfy the Constitution"). Similarly in *Marcus Brown*, the New York Attorney General argued for affirmance on the basis such laws were compensated takings. "Equally immaterial is it that the statutes interfere with property rights. That, too, may be lawfully done by the legislature in the reasonable exercise of its police power. It constitutes but a taking by due process of law…Here the State requires only such a concession as it has been repeatedly held by this court government is constitutionally entitled to require, namely, a concession appropriate to 'exceptional times and places in which the very foundations of public welfare could not be laid without requiring concessions from individuals *to each other upon due compensation* '" 256 U.S. 170, 183 (1921) (Argument of William D. Guthrie) (emphasis added) (citing cases affirming statutes authorizing individuals to exercise eminent domain). The argument a century later in *Elmsford* switched to: "no taking"
[36] *Fragomeno v. Insurance Co*., 207 Cal. App. 3d 822 (1989) (nonpayment results in "lessee becoming a trespasser"), *Greenberg v. Koppelow*, 76 Cal.App.2d 631 (1946) ("their former *tenant* was automatically converted into a *wrongdoer* (see 32 Am.Jur. 779, citing Blumenberg v. Myres, 32 Cal. 93 [91 Am.Dec. 560]) or a *trespasser*") (emphasis original)

## **CERTIFICATE OF SERVICE**

I certify that on July 24, 2023, I served a copy of this Second Amended Complaint on:

Andy Saindon
Andy.saindon@dc.gov

Mateya Kelley
Mateya.kelley@dc.gov

*Alexander Gallo*
Alexander Gallo