UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ALEXANDER GALLO,**<br><br>          Plaintiff,<br><br>    v.<br><br>**DISTRICT OF COLUMBIA,**<br><br>          Defendant. | Case No. 1:21-cv-03298 (TNM) |

**MEMORANDUM OPINION**

In the early days of the COVID-19 pandemic, the District of Columbia banned landlords from evicting their tenants. Alexander Gallo, a landlord, now sues the District. He claims that its ban violated his rights under the Contract and Takings Clauses of the United States Constitution. Although the Court dismissed his case once, *see Gallo v. District of Columbia*, 610 F. Supp. 3d 73 (D.D.C. 2022), it granted his motion for reconsideration so he could replead his Complaint with greater specificity. *Gallo v. District of Columbia*, No. 1:21-cv-03298 (TNM), 2023 WL 2301961 (D.D.C. Mar. 1, 2023). Despite that opportunity, Gallo's Complaint remains deficient. So the Court now grants the District's renewed motion to dismiss, Mot. to Dismiss (MTD), ECF No. 54, this time with prejudice.

**I.**

Gallo owns and manages ten condominium units in the District. *See* Second Amend. Compl. (SAC) ¶ 1, ECF No. 50.[1] At issue here, though, is a single unit. Gallo acquired the unit

---

[1] Because the Court is ruling on a motion to dismiss, it assumes the truth of Gallo's well-pleaded factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[A] court must accept as true all of the allegations contained in a complaint.").

in this case—what he calls the "Foreclosure Unit"—at a foreclosure sale in February 2020. *Id.* ¶ 4. When he acquired the unit, it was occupied by its prior owner, Andre Hopkins. *Id.* ¶ 8.

By buying an inhabited unit at the foreclosure sale, Gallo created an estate at will with Hopkins as his tenant. D.C. Code § 42-522.[2] This meant that Gallo could terminate the tenancy "at any time," *id.*, subject to a requirement that he provide Hopkins "30 days['] notice in writing," *id.* § 42-3203. Gallo served such notice in March 2020, which, he contends, meant that Hopkins's tenancy ended "as of May 5, 2020." SAC ¶ 4.[3]

That same March, the District imposed an "eviction prohibition." *COVID-19 Response Emergency Amendment Act of 2020*, 67 D.C. Reg. 3093, 3102–03 (Mar. 17, 2020) (capitalization altered). The prohibition had two effects: First, it prohibited evicting tenants "[d]uring a period of time for which the Mayor has declared a public health emergency." *Id*. And second, if a landlord had filed a complaint against a delinquent tenant but no hearing had yet been held, the

---

[2] The core of Gallo's relevant changes in the SAC go to this point. He had originally alleged that "a squatter has been residing [in his condominium] at the District's invitation for nearly two years." Sup. Ct. Compl. ¶ 2, ECF 1-1. And he doubled down on that claim in his Motion for Reconsideration. Mot. for Reconsideration at 4, ECF No. 20. According to Gallo's current pleadings, he did not "invite" Hopkins to take up residence. *Id*. Nor did the District. SAC ¶ 8. Rather, Gallo bought the Foreclosure Unit while Hopkins was still living there. *Id*.

[3] The Court notes that the timeline of events in this case is far from clear. Gallo represents that he purchased the condominium "in February 2020" and that he served the 30-day notice to quit "in March 2020." SAC ¶ 4. He claims his service of the 30-day notice in March meant that Hopkins's tenancy ended "as of May 5, 2020." *Id*. But all dates in March 2020 are more than 30 days prior to May 5, 2020. What's more, Gallo alleges that his service of the notice came *before* the announcement of the eviction prohibition. *Id*. ¶¶ 4–6. But the prohibition was announced on March 17, *see COVID-19 Response Emergency Amendment Act of 2020*, 67 D.C. Reg. 3093, (Mar. 17, 2020), so the latest the tenancy could have ended was on April 16. None of this makes much sense. Compounding the confusion is the District's representation that Gallo *actually* acquired the unit in June 2021. MTD at 1. Nonetheless, the Court is required to take Gallo's allegations as true and, ultimately, these details make no difference to the failure of Gallo's claims on the merits.

2

prohibition effectively continued the hearing for the rest of the public health emergency. *Id*. at 3102.[4]

In May, the District added another wrinkle. It expanded the eviction prohibition with an "eviction clarification." *Coronavirus Omnibus Emergency Amendment Act of 2020*, 67 D.C. Reg. 5235, 5243 (May 13, 2020) (cleaned up). The March rule had allowed landlords to file actions in ejectment, and simply postponed any hearing until after the prohibition expired. 67 D.C. Reg. at 3012. But the May rule banned the filing of actions in ejectment altogether. *Id*. at 5243. Landlords now could not even begin a lawsuit until 60 days after the District's public health emergency ended. *Id*. The practical consequences of this expansion were minimal: Under both the March and May rules, no actions in ejectment could proceed during the public health emergency. The primary contribution of the filing ban was to prevent landlords from filing lawsuits that would spring into effect once the prohibition ended.

But neither the March nor the May rule extinguished any cause of action or immunized any party from suit. Rather, the rules simply delayed the filing and prosecution of actions in ejectment within the District. Nothing in either act prohibited the filing of those actions *after* the public health emergency was over. Nor did either act immunize tenants for conduct during the moratoria. And the statute of limitations for all such actions was tolled during this period, *see District of Columbia v. Towers*, 260 A.3d 690, 695 (D.C. 2021), so no ejectment claim was permanently lost.

---

[4] That is because D.C. law requires that a hearing in an ejectment action not occur until 30 days after the defendant is served with a summons. D.C. Code § 16-1502(a). But the eviction prohibition excluded the entire period of a public health emergency from that 30-day period. *See* 67 D.C. Reg. 3093, 3102. So the prohibition effectively froze the clock on the 30-day period, which would begin again only after the eviction prohibition lifted.

While all this was going on, May 5 came and went. But Hopkins lingered. SAC ¶ 8. Despite knowing that his lease had ended, *id*. ¶ 4, he remained in the Foreclosure Unit, *id*. ¶¶ 8–10. And he cut off all contact with Gallo, refusing to respond to even mutually beneficial communications. *Id*. ¶ 30. By Spring 2021, two tenants in Gallo's other properties had followed suit. *Id*. ¶ 33.

Gallo filed this lawsuit in D.C. Superior Court in November 2021. Sup. Ct. Compl., ECF No. 1-1. The District quickly removed the case here, ECF No. 1, where it has remained since. In January 2022, the District moved to dismiss Gallo's Complaint, ECF No. 6, and the Court granted that motion. *See Gallo*, 610 F. Supp. 3d at 91. Yet the Court later granted a motion for reconsideration when Gallo identified new facts that might have cured the defects the Court noted about his Complaint. *See Gallo*, 2023 WL 2301961, at *5. Gallo has therefore filed a new amended Complaint, *see* SAC, and the District has again moved to dismiss, ECF No. 54.

## II.

### A.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. The Court considers "only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint[,] and matters of which [it] may take judicial notice." *Hurd v. District of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017) (citation omitted).

Gallo proceeds without counsel.  This triggers special solicitude for him.  "A document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (cleaned up).  More, courts assess a pro se complaint "'in light of' all filings, including filings responsive to a motion to dismiss." *Brown v. Whole Foods Mkt. Grp., Inc.*, 789 F.3d 146, 152 (D.C. Cir. 2015).  But pro se plaintiffs must still adequately plead their complaint consistent with *Iqbal*.  *See Atherton v. D.C. Off. of the Mayor*, 567 F.3d 672, 681–82 (D.C. Cir. 2009).

## B.

The Constitution recognizes two main categories of claims under the Takings Clause.  First, if "the government physically acquires private property for public use." *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2071 (2021).  The Government can "physically acquire[] private property" in various ways.  For instance, "when it uses its power of eminent domain to formally condemn property," when it "physically takes possession of property without acquiring title to it," and "when it occupies property" without possessing the property or the title to it.  *Id*.  A taking also occurs when the Government "requires [a] landowner to submit to the physical occupation of his land" by a third party, without itself occupying the land.  *Yee v. City of Escondido*, 503 U.S. 519, 527 (1992) (cleaned up); *see also Cedar Point Nursery*, 141 S. Ct. at 2072 (recharacterizing this as a physical acquisition).  In each case, the Government has taken the property, and a plaintiff is entitled to "just compensation."  U.S. Const. amend. V.

But the Government may also effect a taking without physically seizing a property.  When the Government "imposes regulations that restrict an owner's ability to use his own property," it may be liable for imposing a so-called regulatory taking.  *Cedar Point Nursery*, 141

S. Ct. at 2071–72.  If a regulation deprives a landowner of "all economically beneficial or productive use of [his] land," it is per se a taking, categorically warranting compensation by the Government.  *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015–16 (1992).

More often, though, courts must engage in an "essentially ad hoc, factual inquir[y]" under *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978).  *Id*. at 124.  Under that test, Courts determine whether the Government is seeking to "forc[e] some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005).  That inquiry focuses on the "economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations," along with "the character of the governmental action."  *Penn Central*, 438 U.S. at 124.

Now, the Contract Clause.  The Contract Clause provides that "No State shall . . . pass any . . . Law impairing the Obligation of Contracts."  U.S. Const. art. I, § 10.  Courts apply a two-step test to determine whether a given law violates the Contract Clause.  First, they ask whether the law "operate[s] as a substantial impairment of a contractual relationship."  *Sveen v. Melin*, 138 S. Ct. 1815, 1821–22 (2018).  To do so, courts look to "the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights."  *Id*. at 1822.  If the law substantially impairs the contractual relationship, courts then ask whether it "is drawn in an appropriate and reasonable way to advance a significant and legitimate public purpose."  *Id*. (internal quotation marks omitted).  When a law violates the Contract Clause, it is simply void. *Carter v. Greenhow*, 114 U.S. 317, 322–23 (1885).  Individuals have no right to affirmative

6

relief under the Contract Clause; rather, they can simply sue to enforce the contract itself, disregarding the unconstitutional law. *Id*. at 322.

Finally, Gallo brings a claim under the District's writ of waste statute. That statute, whose language is nearly identical to the 1278 Statute of Gloucester, *Nelbach v. Nelbach*, 291 A.3d 1129, 1134 (D.C. 2023), provides that

> A man from henceforth shall have a writ of waste in the chancery against him that holdeth by law, or otherwise for term of life, or for term of years; and he which shall be attainted of waste, shall lease the thing that he hath wasted, and moreover shall recompense thrice so much as the waste shall be taxed at.

D.C. Code § 42-1601. In other words, a landlord may sue a tenant who wastes, or permanently damages, *Nelbach*, 291 A.3d at 1137, his property. And if he prevails, the tenant shall "lease"—in modern language, "lose," *id*. at 1136—the property and pay treble damages.

Having set the stage, the Court now reviews the merits of Gallo's claims.

### III.

First, the Court can quickly dispense with Gallo's Contract Clause claim. Gallo brings all his claims under 42 U.S.C. § 1983. SAC at 1 ("Second Amended Complaint for Damages and Declaratory Relief (42 U.S.C. § 1983)" (cleaned up)). But the Supreme Court has long held that the Contract Clause is not enforceable through § 1983. *Greenhow*, 114 U.S. at 322. Instead, the only right secured by the Contract Clause is the right, in a suit to enforce a contract that the Government purports to prohibit, to set aside the state law that would invalidate the contract. *Id*. So this claim may be readily dismissed.

Second, the Court can likewise dispense with Gallo's writ of waste claim. The District's writ of waste statute permits suits only "against him that holdeth by law, or otherwise for term of life, or for term of years." D.C. Code § 42-1601. In other words, the cause of action runs only against the landlord's tenant. But Gallo sues the District, not Hopkins. Because the cause of

action cannot run against the District, Gallo lacks a viable claim. *See Nelbach*, 291 A.3d at 1130 (holding that the landlord "may sue *the tenant*" under § 42-1601 (emphasis added)). This claim also must be dismissed.

Gallo's Takings Clause claim demands more searching inquiry. But it, too, fails. The District did not physically acquire Gallo's property, so the filing ban cannot be considered a taking on that ground. Nor did the District's regulation so exceed the bounds of permissible government action to be considered a regulatory taking.

Start with physical appropriation. The District did not take title to or possession of Gallo's property. Instead, it required him to continue allowing delinquent tenants to live there without fear of eviction. So the question is whether the District's temporary suspension of eviction as a landlord remedy counts as a physical occupation for Takings Clause purposes. The Supreme Court has already addressed this question in a decision that is closely on-point.

In *Yee*, the Court considered a California law that "limit[ed] the bases upon which a park owner may terminate a mobile home owner's tenancy." *Yee*, 503 U.S. at 524. Under that law, "the park owner cannot evict a mobile home owner." *Id*. at 526–27. The Yees, who operated a mobile home park, sued the City of Escondido, arguing that this constituted a taking of their property rights. *Id*. at 526. The Supreme Court disagreed.

The Court held that "[t]he government effects a physical taking only where it *requires* the landowner to submit to the physical occupation of his land." *Yee*, 503 U.S. at 527. But the mobile home eviction bar did not constitute a "compelled physical invasion" because the Yees had "voluntarily rented their land to mobile home owners" in the first place. *Id*. In other words, the Yees had consented to the initial physical occupation of their land when they leased the property to the tenants. At most, the government policy prolonged that occupation.

8

But a mere prolonged occupation was not a taking either. Indeed, as the Court noted, the law did not "compel[] petitioners, once they have rented their property to tenants, to continue doing so." *Yee*, 503 U.S. at 527–28. All it did, the Court found, was defer any eviction by "6 to 12 months." *Id*. at 528. Crucially, the government did not compel the Yees to "refrain in perpetuity from terminating a tenancy." *Id*. So long as an eviction might be available down the line—even if months or more away—no physical occupation had occurred. *See id*. In sum, the Court held that the "tenants were invited by petitioners, not forced upon them by the government," so the "right to exclude" had not "been taken from petitioners on the mere face of the Escondido ordinance." *Id*.[5]

The filing moratorium here resembles the law in *Yee*. Just as there, it regulates Gallo's conduct toward tenants that he (or his predecessor-in-interest) voluntarily leased to. And, just as in *Yee*, the District's policy does not require Gallo to keep a tenant forever. Instead, it simply delays the filing of any action in ejectment until a set time—60 days after the public health crisis ends. 67 D.C. Reg. at 5243. The policy here is legally indistinguishable from the one in *Yee*, so *Yee* commands that Gallo's physical-occupation taking claim fails.

---

[5] It for this reason that *Cedar Point Nursery* also does not help Gallo. That case dealt with whether depriving a landowner of the right to exclude constituted a taking. But the Court in *Yee* held that eviction moratoria like the one here do not deprive landowners of the right to exclude at all. *Yee*, 503 U.S. at 528.

Admittedly, there is tension between *Cedar Point Nursery* and *Yee*. Indeed, it is hard to square *Yee*'s holding with *Cedar Point Nursery*'s more recent treatment of government takings. But the Supreme Court in *Cedar Point Nursery* cited *Yee* with approval. *Cedar Point Nursery*, 141 S. Ct. at 2072. And it has been adamant that "[i]f a precedent of [the Supreme Court] has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions," lower courts "should follow the case which directly controls, leaving to [the Supreme Court] the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989); *see also Gallo*, 610 F. Supp. 3d at 88 n.6.

Gallo argues that his case is unlike *Yee* because the tenancy in *Yee* was as-yet unterminated, whereas the tenancy here has ended. *See* Opp'n to MTD at 6, ECF No. 56. But that fact did not play into the Court's reasoning. The Court in *Yee* paid no mind to the *present* status of the tenancy. What mattered was that the tenancy was *initially* voluntary. *See Yee*, 503 U.S. at 528 ("Petitioners' tenants were invited by petitioners, not forced upon them by the government."). And by all accounts, this tenancy was, too. Gallo alleges that he took title to the Foreclosure Unit voluntarily, converting the previous owner to his tenant at will. SAC ¶ 4. Gallo only later terminated that tenancy, making Hopkins a trespasser. *Id*. More, the reason that the tenancy had not been terminated in *Yee* was because the challenged law forbade it. *Yee*, 503 U.S. at 524. So it would be circular to distinguish *Yee* on that ground.

Turning to regulatory takings, Gallo's claim again fails to cut the mustard. First, the law here is not a per se regulatory taking under *Lucas*. A law is only a per se taking under *Lucas* when it denies the owner "all economically beneficial or productive use" of his property. *Lucas*, 505 U.S. at 1015. That standard is not met here. The filing ban only deprived Gallo of economic benefit from those tenants who refused to pay rent *and* failed to quit the premises, such that eviction was necessary. And even among those individuals, the law did not stop them from accruing liability for money damages over the continued occupation of the units. So almost all economic value of the property remains undiminished.

And *Yee* confirms this. It held that "state and local laws" that "regulat[e] the relationship between landlord and tenant" are subject to the "essentially ad hoc, factual inquir[y]" under *Penn Central*. *Yee*, 503 U.S. at 528–29. The Court now turns to that standard.

10

The *Penn Central* analysis focuses on the regulation's economic effect on Plaintiff, the degree of interference with his reasonable investment-backed expectations, and the character of the governmental action. *See Penn Central*, 438 U.S. at 124. The Court takes each in turn.

Start with the economic effect on Gallo. He pleads that he has lost $36,400 as a result of the filing moratorium. SAC at 16. He also identifies other downstream costs, like legal fees and mental anguish. *Id*. at 18–20. But those are not *economic* impacts of the kind relevant to *Penn Central*. *See Penn Central*, 423 U.S. at 124. Thirty-six thousand dollars is undoubtedly a great hardship for Gallo. But the law requires more. As the Court previously noted, *see Gallo*, 610 F. Supp. 3d at 90, he must put forward "striking evidence of economic effects" to sustain a *Penn Central* claim. *See Dist. Intown Props. Ltd. P'ship v. District of Columbia*, 198 F.3d 874, 883 (D.C. Cir. 1999). And this does not rise to that level. *Gallo*, 610 F. Supp. 3d at 90. But even if the economic impacts were harsh enough, each of the other *Penn Central* factors weighs against Gallo.

Consider the impact on his reasonable investment-backed expectations. Landlord-tenant relations are pervasively regulated. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 440 (1982); *see also Yee*, 503 U.S. at 529. Gallo is a sophisticated individual who owned several rental properties prior to acquiring this one. SAC ¶¶ 1–4. So he was surely on notice of the degree of government involvement in landlord-tenant relations.

More, the specific kind of regulation at issue had occurred before. *See Yee*, 503 U.S. at 524. It had even occurred here in Washington. *See Block v. Hirsh*, 256 U.S. 135, 153–54 (1921). And these regulations had been upheld by the Supreme Court repeatedly. *See Yee*, 503 U.S. at 538–39; *Block*, 256 U.S. at 156. So Gallo had no reasonable expectation that they could not recur. But even had those prior regulations not existed, "[b]usinesses that operate in an

11

industry with a history of regulation," such as rental properties, "have no reasonable expectation that regulation will not be strengthened to achieve established legislative ends." *Dist. Intown*, 198 F.3d at 884.

Last, consider the character of the government action. This factor focuses on "whether the government has legitimized a physical occupation of the property, and whether the regulation has a legitimate public purpose." *Dist. Intown*, 198 F.3d at 879 (cleaned up). The regulation did not "legitimize[] a physical occupation of the property." *Id*. It did not purport to render trespass by erstwhile tenants lawful. Nor did it bar the termination of tenancies. Rather, it simply deferred a specific remedy (eviction) until after the public health emergency. And this had "a legitimate public purpose." *Id*. It sought to combat the spread of the COVID-19 pandemic, which the Supreme Court has held "is unquestionably a compelling interest." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020); *see also Roman Cath. Archbishop of Wash. v. Bowser*, 531 F. Supp. 3d 22, 37 (D.D.C. 2021). So, in sum, Gallo's *Penn Central* argument fails on all three elements. Thus, the District's filing ban was not a regulatory taking.

Gallo's substantive claims therefore all fail. His remaining claims are all derivative of those substantive claims, requesting various forms of damages or costs. *See* SAC at 18–21. But because Gallo has failed to state a claim, his requests for specific remedies are of no moment. So the Court will dismiss them too.[6]

### IV.

To be sure, Gallo was unlucky in the timing of his real-estate investment. He bought what he thought would be a profitable residential unit, and he ended up with a freeloader who

---

[6] Gallo has also moved for leave to file a Sur-reply to the District's motion to dismiss. ECF No. 59. The Court will grant that motion but notes that it has considered the arguments raised in Gallo's proposed Sur-reply and none changes the outcome of this motion.

avoided eviction because of the District's COVID-related eviction prohibition.  But unfortunately for Gallo, binding caselaw simply does not provide a remedy against the city for landlords in his situation.

At this point, Gallo has had his day in court several times over.  He has litigated these issues in the local courts and in this Court repeatedly.  By now, it is clear that "the allegation of other facts" cannot "possibly cure the deficienc[ies]" in his Complaint.  *See Abbas v. Foreign Pol'y Grp., LLC*, 783 F.3d 1328, 1340 (D.C. Cir. 2015).  So the Court must not only dismiss his Complaint, but also must do so with prejudice.  Because the Court will grant the motion to dismiss, it will deny Gallo's motion to expedite, ECF No. 60, as moot.  A separate order will issue today.

Dated: November 14, 2023                                      TREVOR N. McFADDEN, U.S.D.J.